COSHOCTON GRAIN COMPANY,

      Plaintiff/Counterclaim-Defendant,

v.

CALDWELL-BAKER COMPANY,

      Defendant/Counterclaim-Plaintiff.

Case No. 14-cv-02589-DDC

## MEMORANDUM OF DECISION AND ORDER

In early 2010, one of Caldwell-Baker's employees was making calls to companies who, he hoped, might want to lease some railcars. He directed one of those calls to Coshocton Grain Company—an Ohio-based grain company. This was a cold-call, as Coshocton Grain and Caldwell-Baker had not done business with one another before. As it turned out, the Ohio company was in the market for more railcars. Things moved quickly and by March 10, 2010, Coshocton Grain and Caldwell-Baker had agreed to a 14-page lease for 25 railcars.

Over the next year, the relationship expanded. The parties twice agreed to add more cars to the lease. They also extended it. Then, things started to unravel. In the summer of 2013, Coshocton Grain and Caldwell-Baker discovered they had conflicting views about a key provision in the lease. This disagreement blossomed, and Coshocton Grain sued in Ohio federal court. That court transferred the case to Kansas shortly before Thanksgiving 2014. Since then, the parties' disputes with one another have grown to titanic proportions.

Unable to resolve their many disagreements, the parties tried the case in a bench trial last November. Their presentations consumed five trial days, memorialized in more than 1,400 pages of trial transcript and 3,900 pages of exhibits. But there was more. Post-trial, the parties

submitted 198 pages of proposed factual findings and legal argument. The court has reviewed this record and done its best to understand Caldwell-Baker's many overlapping and interlocking legal theories. Some of these theories are relatively straightforward. Others are not. The court is now ready to rule.

For reasons explained in this Decision, the court finds in Caldwell-Baker's favor on five claims. Those five claims assert that Coshocton breached: (1) Lease § 13(b)(i) by failing to reimburse Caldwell-Baker for cleaning the railcars at lease end; (2) § 13(b)(i) by failing to reimburse Caldwell-Baker for patching leaks in some of the railcars' roofs at lease end; (3) § 4(d) by failing to pay late fees on Caldwell-Baker's cleaning costs; (4) § 4(d) by failing to pay late fees on Caldwell-Baker's roof-leak repair costs; and (5) § 5(c) by failing to pay for RFMX 464595. The court awards Caldwell-Baker a total of $40,881.50 in damages on these five claims. The court also finds that Caldwell-Baker is contractually entitled to recover its attorneys' fees and litigation expenses, but only those incurred on these five claims. In addition, the court awards Caldwell-Baker $3,584 in damages for Coshocton Grain's breach of the lease's forum-selection clause, for a total of $44,465.50. On the rest of Caldwell-Baker's claims, the court finds for Coshocton Grain and against Caldwell-Baker.

After providing a Table of Contents that summarizes this Decision's content, the court rules two evidentiary issues that it took under advisement when the trial concluded. The court then presents its findings of fact, followed by its analysis of Caldwell-Baker's claims.

## Table of Contents

**Evidentiary Rulings**................................................................................................................5

**Findings of Fact**.....................................................................................................................6
I.       **The Terminology**......................................................................................................6
II.      **The Operative Facts**................................................................................................9
          How the Parties' Relationship Began ............................................................9
          The Disagreement..............................................................................................14

      The Litigation Begins.................................................................................15

      The Final Return........................................................................................16

**III.**      **The Parties' Method for Handling Repairs and Costs During the Lease**..................18

**IV.**     **The Alleged Subleases**..........................................................................19

**V.**      **The Bench Trial and Subsequent Events**.................................................21

      The Trial's Mechanics..............................................................................21

      The Witnesses...........................................................................................22

**<u>Analysis and Conclusions of Law</u>**.......................................................................23

**I.**       **Guiding Principles of Kansas Contract Law**...........................................27

**II.**      **Forum-Selection Clause Claim**..............................................................29

     A. CBC's Shifting Theories.....................................................................30

     B. Attorneys' Fees That CBC May Recover.............................................32

**III.**     **Sublease Provision Claims**....................................................................35

     A. Breach of Contract..............................................................................36

     B. Duty of Good Faith and Fair Dealing.................................................40

**IV.**     **Return Condition Claims**.....................................................................41

     A. Section 13(b)......................................................................................42

     B. CBC's Theories of Liability and Damages..........................................43

         *1. What Exactly Does CBC Consider a Breach of § 13(b)?*..................43

         *2. Overview of CBC's Claims Under § 13(b)*......................................45

     C. Return Condition Claim.....................................................................45

         *1. Section 13(b)(i)'s First Sentence: "Specifications Previously Imposed"*........45

             a. <u>Lessee Maintenance Items, Cleaning Costs, and Suitable for</u>

             <u>Grain Product Loading</u>....................................................................46

                i. Lessee Maintenance Items and Cleaning Costs.......................50

                ii. Suitable for Any Grain and Grain Product Loading................59

             b. <u>Corrosion</u>.....................................................................................63

             c. <u>All Damage</u>....................................................................................67

                i. Section 15.................................................................................68

                ii. Section 17...............................................................................71

                iii. Section 3(a)............................................................................73

                iv. Combined Effect of § 15 and § 17.........................................76

             d. <u>Conclusion: "Specifications Previously Imposed"</u>.......................76

         *2. Section 13(b)(i)'s Second Sentence: Liability on Return Only*......77

         *3. Conclusion*......................................................................................81

     D. Prior Damage Claim............................................................................81

         *1. Responsibility for Damage and Repairs During the Lease*..............82

             a. Section 6(b): "Good Working Order and Repair"......................82

             b. Section 13(b)(i)'s Second Sentence, Again................................84

         *2. Payment Deferred Until the Cars Are Returned*............................84

    E.  Extrinsic Evidence Would Not Alter the Court's Conclusions.....................................86

         *1.  One Lease or Two?*............................................................................................87

         *2.  CBC's All-Damage, "Specifications Previously Imposed" Theory*...............89

         *3.  CBC's All-Damage, Return-Condition Theory*..............................................90

         *4.  CBC's Prior-Damage Theory*........................................................................94

         *5.  Conclusion.*......................................................................................................95

    F.  Lost Rent Claim.........................................................................................................95

**V.      Insurance Provision Claims.**..................................................................................97

    A.  Failure to File Claims for Damage............................................................................98

    B.  Failure to Submit a Claim for the Derailment of RFMX 464595...........…............99

    C.  Failure to Carry Insurance Continuously Throughout the Lease…….……...............99

    D.  Failure to Produce an Insurance Certificate Annually..............................................101

    E.  Failure to Name CBC as an Additional Insured.......................................................101

    F.  Conclusion.................................................................................................................103

**VI.    Indemnification Claims.**........................................................................................103

    A.  Theories of Indemnification.....................................................................................104

         *1.  Indemnification Under § 8*...........................................................................104

         *2.  Indemnification Under § 17*.........................................................................105

    B.  Breach of Contract Claims.......................................................................................108

**VII.   Derailed Car Claims**.............................................................................................108

    A.  RFMX 464595's Derailment and Subsequent Events..............................................109

    B.  Stipulated-Value Claim.............................................................................................111

         *1.  What Terms Control?*.....................................................................................111

         *2.  Meeting of the Minds and Mistake.*..............................................................112

         *3.  Did Coshocton Breach § 5(c)?.*......................................................................113

         *4.  Coshocton's Affirmative Defenses*................................................................114

                 <u>a.</u>  <u>Waiver</u>............................................................................................114

                 <u>b.</u>  <u>Equitable Estoppel</u>..........................................................................116

                 <u>c.</u>  <u>Set Off</u>.............................................................................................117

         *5.  Conclusion.*....................................................................................................118

    C.  Pre-Judgment Interest Claim.....................................................................................118

    D.  Lost-Rent Claim.........................................................................................................120

    E.  Conclusion.................................................................................................................121

**VIII. Late Fee Provision Claims**.................................................................................121

**IX.    Attorneys' Fees and Litigation Expenses**............................................................123

    A.  Attorneys' Fees and Expenses Under § 8 and § 17...................................................124

    B.  Attorneys' Fees and Expenses Under § 12(b)...........................................................124

**X.      CBC's Motion to Re-Open the Evidentiary Record**............................................127

**XI.    Conclusion.**............................................................................................................127

**<u>Appendix A</u>**...................................................................................................................129

**<u>Evidentiary Rulings</u>**

Before the court can introduce the facts, it first must rule a few evidentiary objections still pending from the trial. Several times during trial, Coshocton Grain Company ("Coshocton") objected to evidence as extrinsic or parol. *E.g.*, Trial Tr. 225:1–226:12, 237:1–8, 398:20–24. The court delayed ruling on Coshocton's objections until it could determine whether extrinsic or parol evidence was admissible. *E.g.*, Trial Tr. 225:1–226:12, 237:23–238:4. As the court explains below, it finds that the parties' contract is not, by and large, ambiguous. Indeed, the court finds the contract ambiguous in just one place: the meaning of the phrase "suitable for any grain and grain product loading" in § 6(c). The court relies on extrinsic evidence to answer this one question. So, with this one exception, the court effectively sustains Coshocton's objections to the extrinsic and parol evidence offered by Caldwell-Baker Company ("CBC").

But even a contrary ruling would not alter the outcome on any of CBC's claims. With due respect for the substantial effort that CBC and its counsel devoted to this case, the court has reviewed and considered all of CBC's offers of extrinsic evidence. Admitting this evidence would not change anything other than the length of this Decision.

The court also left open one trial objection asserted by CBC. Trial Tr. 1435:22–1436:1. CBC objected to Coshocton's offer of a September 1996 deposition of Carle Baker Jr., arguing that the deposition was not relevant to the questions presented in this trial. Trial Tr. 1435:15–21. After reviewing the deposition, the court agrees with CBC. Mr. Baker's deposition testimony about an earlier railcar lease[1] that is not at issue here offers no facts of consequence to the outcome in this case and makes no fact more or less probable. Mr. Baker's 1996 deposition thus is not relevant. *See* Fed. R. Evid. 401; *see also TMG Life Ins. Co. v. Ashner*, 898 P.2d 1145,

---

[1] The court recognizes that CBC elicited testimony about this lease—over a relevance objection by Coshocton— during trial, but does not see that as a reason to rule against CBC's relevance objection to Carle Baker's 1996 deposition testimony. *See* Trial Tr. 1234:4–1235:11.

1149 (Kan. Ct. App. 1995) ("As with all problems of interpreting or construing contracts, the facts of each case are of extreme importance; therefore, prior decisions are generally not controlling on questions involving different contracts . . . ."). The court thus sustains CBC's motion. With these evidentiary questions resolved, the court turns to the facts.

But first, this case has so many moving parts that some background information is helpful. Indeed, CBC alone submitted more than 3,900 pages of exhibits at trial. And, over the course of the five-day trial, the parties elicited nearly 1,400 pages of testimony. So, even though the contract in dispute spans just 17 pages, the court is awash in evidence. To help make sense of all this evidence, the court begins by discussing a few terms that are awkward to define in a purely chronological narrative. The court then recites the events that led to this trial, beginning with the start of the parties' business relationship. The court concludes this section with a discussion of the bench trial's mechanics.

## Findings of Fact[2]

### I.     The Terminology

This case involves one particular segment of the railroad industry:  railcar maintenance and repair. The participants in this market segment have drafted detailed guidelines outlining when certain repairs must be made to railcars, how those repairs must be made, and who must pay for them—though this last guideline may be altered by contract. These guidelines are memorialized, in part, by the Association of American Railroads' Interchange Rules. Those in

---

[2] As required by Fed. R. Civ. P. 52(a)(1), this Decision includes separate findings of fact and conclusions of law. The Tenth Circuit has explained that "Rule 52(a) does not require the district court to set out its findings and conclusions in excruciating detail." *Sierra Club, Inc. v. Bostick*, 539 F. App'x 885, 902 (10th Cir. 2013) (Martinez, J., dissenting) (citation omitted). But, in *OCI Wyoming, L.P. v. PacifiCorp*, the Tenth Circuit explained that "[a] district court's findings of fact 'should be sufficient to indicate the factual basis for the court's general conclusion as to ultimate facts[,]. . . should indicate the legal standards against which the evidence was measured[,] . . . [and] should be broad enough to cover all material issues.'"  479 F.3d 1199, 1203 (10th Cir. 2007) (quoting *Otero v. Mesa Cty. Valley Sch. Dist.*, 568 F.2d 1312, 1316 (10th Cir. 1977); further citations omitted). The Circuit also cautioned district courts that "too little detail frustrates meaningful appellate review by requiring the parties and this court to guess at why the district court reached its conclusion." *Id.* at 1204 (citation omitted).

the industry refer to this publication and its guidelines as "the AAR Rules," and so does the court. Several iterations of the AAR Rules exist. The court relies on the AAR Field Manual effective January 1, 2016, which the parties stipulated to and admitted as Exhibit 7.

At trial, CBC called James Jennings to testify as an expert on the AAR Rules. Mr. Jennings serves as operations manager for The Andersons, Inc., a railcar repair shop in Kansas City, Missouri. It has operated out of its current location since September 2013, when it bought an existing railcar repair shop called Mile Rail. Trial Tr. 83:17–84:7. Work by both Mile Rail and The Andersons, Inc. plays an important role in this case.

During his lengthy and detailed testimony, Mr. Jennings discussed the AAR Rules and provided the court with a crash course about how to apply the Rules. He explained that, although the Rules apply at all times, railcars often are inspected as they pass through interchange points.[3] Trial Tr. 138:14–139:8, 148:15–149:15. So, a railcar is inspected when it passes from one railroad company's tracks to another's tracks. *See* Trial Tr. 138:14–139:18, 148:15–149:15. And, it seems, an AAR rule exists for most components of a railcar, but not for all of them.[4] Where no component-specific rule exists, one still must examine a few general rules—mostly about safety—before determining that no AAR rule applies. Trial Tr. 173:25–175:25. If a railroad inspects a railcar and finds that it has cause for attention under the AAR Rules—*i.e.*, an AAR rule requires at least a closer inspection of some component—it "bad

---

[3] Although cars often are inspected by railroads, industries that rely on railcars—such as grain elevators—also inspect railcars for AAR Rules defects. Scott Jones Dep. 35:13–36:23, Feb. 24, 2015 [hereinafter Jones Dep.]. For instance, Coshocton often repaired railcars after grain inspectors alerted it to problems with the cars. *Id.* But, railroads and industries don't always inspect the railcars—or, at least, not thoroughly. So railcars often run in service despite having AAR Rules defects. Trial Tr. 304:6–19.

[4] The AAR Rules use several terms to define what repairs are required. The Lease Agreement uses at least two of those terms—"condemnable" and "cause for attention." Ex. 1 at 9, § 13(b)(i). At trial, some controversy developed about the definition and import of these two terms. For instance, Mr. Jennings defined "condemnable" differently than the AAR Rules define that term. *Compare* Trial Tr. 71:12–72:20 (defining "condemnable" as a part that must be removed and cannot be repaired), *with* Ex. 7 at 709 (defining "condemnable" as "[a]ny condition warranting inspection, repair, or testing"). But, neither the court's analysis nor its ultimate decision rests on the definition of "condemnable" or "cause for attention." The court thus declines to provide a precise definition for either term here.

orders" the railcar. To bad order a railcar simply means that the railcar needs mechanical attention or repairs (as defined in the AAR Rules or the rules of a government agency). Ex. 5 at 1065. A bad ordered railcar may not run in service until it receives the required inspection or repairs. *Id.*

Railroad companies, railcar owners, and lessees have several options for dealing with bad ordered railcars. One is sending a bad ordered railcar to a shop of the owner or lessee's choosing, often called a contract shop. Another option is for the owner or lessee to send a mobile crew—a crew of workers who move about repairing railcars—to fix the railcar. And, sometimes, railroad companies repair the railcar themselves. No matter which method is used, the repairing company drafts billing repair cards, called "BRCs" for short.[5] *Id.* at 1070.

A BRC is a line-item report about the work performed on a railcar, with each line-item corresponding to a particular why-made code from the AAR Rules and a description of the repairs made. *Id.* at 1066; *see also* Ex. 203 at 1 (BRC for RFMX 464857 from The Andersons, Inc.). A "why-made code" is a two-digit numerical code that identifies why the repair was made. Ex. 5 at 1120. Why-Made codes usually correspond to a particular AAR rule, but some codes are more general. For instance, a why-made code of "25" discloses a repair made at the owner's request, and not because of an AAR rule. Trial Tr. 70:10–11. Similarly, a why-made code of "09" indicates that the repair was not linked to an AAR rule, but, instead, was necessary to make another repair. Trial Tr. 68:2–69:8, 154:2–13. These "09" repairs are called "associated repairs." Trial Tr. 68:2–7, 154:2–4.

Some of the invoices CBC admitted as evidence include the three-letter label "CSM" in the description accompanying a why-made code. *E.g.*, Ex. 203 at 1 (BRC for RFMX 464857

---

[5] At trial, the parties also referred to BRCs as "backups." *See, e.g.*, Trial Tr. 1031:17–20 (Coshocton's counsel referring to BRCs as "backups").

from The Andersons, Inc.). "CSM" is an acronym for "customer supplied material." Trial Tr. 861:7–11, 868:23–24. So here, the CSM designation discloses that CBC supplied the contract shop with the materials needed to complete the repair. This designation also discloses that the shop did not charge CBC for those materials.

## II.     The Operative Facts

How the Parties' Relationship Began

CBC is a Kansas company engaged in the business of owning and leasing railcars. Coshocton is an Ohio company that buys, sells, and transports grain. In early 2010, Grant Baker of CBC cold-called Coshocton trying to interest the company in leasing some of CBC's railcars. Mr. Baker was passed to Scott Jones, an independent contractor who handled, among other things, Coshocton's railcars (or, "cars"). Eventually, Mr. Jones and Mr. Baker agreed on the number of cars Coshocton would lease, the rent charged per car per month, and how long the lease would last. Jones Dep. at 75:24–76:4. Mr. Baker reduced this agreement to a writing entitled "Railcar Lease Agreement" ("the Lease" or "the Lease Agreement"), which he drafted by adding these three agreed-to terms to CBC's boilerplate lease.[6] Mr. Baker relied on CBC's boilerplate lease for several reasons, but mostly because the Coshocton deal was his first and because CBC's President, Carle Baker—who happens to be Mr. Baker's uncle—gave the boilerplate lease to him.

Carle Baker and Coshocton's Chief Executive Officer—Rhoda Crown—signed the Lease Agreement on March 10, 2010, and CBC officially leased 25 covered-hopper cars to Coshocton that Coshocton used to haul grain. A month later, Coshocton needed more railcars so the parties agreed to expand their contract. They signed Schedule A, which added five cars to the Lease but

---

[6] The court includes the text of the relevant Lease Agreement provisions in its discussion of CBC's claims. When doing so, the court retains the Lease Agreement's formatting. Any grammatical, typographical, or formatting errors thus are original to the Lease Agreement.

changing no other terms. Ex. 2. Coshocton used these 30 cars without incident for several months until October 27, 2010, when the Norfolk Southern Railroad accidentally derailed one of the cars. This car, designated as RFMX 464595, was completely destroyed.

CBC contacted Coshocton after receiving word that a derailment had split RFMX 464595 in two. In an email dated October 28, 2010, Kathy Peck—CBC's office manager at the time—asked Ms. Crown to submit a claim to Coshocton's insurer for RFMX 464595's $25,000 stipulated value because the derailment had caused $30,000 worth of damage. Ex. 217 at 3. The next day, Ms. Crown wrote back, "I am confused about filing the claim. It is my understanding that the [Norfolk Southern Railroad] would submit [the loss] to their insurance company and pay you from their claim. Let me know." *Id.* Ms. Crown was confused because, as it turns out, CBC and Coshocton interpreted sections 5(c) and 15 of the Lease differently. After Ms. Crown responded to Ms. Peck's email, the parties did not discuss the derailment again until December 6, 2010, when CBC sent Coshocton an invoice for the stipulated value of RFMX 464595. *Id.*

When CBC's invoice arrived, Mr. Jones of Coshocton called Grant Baker to find out why CBC had sent it. Jones Dep. at 63:21–65:7; Trial Tr. 1360:12–14. Although Mr. Jones could not recall the exact words used during the phone call, he testified that he recalled telling Mr. Baker that if Coshocton was "subject to [$]25,000 for each car, we can't be in the lease" (Jones Dep. at 66:17–19), and that Coshocton would have to return the cars if it was "subject to that kind of risk on each car" (*id.* at 67:5–6). Mr. Jones also asked Mr. Baker "to find out if there's anything else [Coshocton] could do" so that Coshocton did not have to back out of the Lease Agreement. *Id.* at 68:3–4. On December 31, 2010, sometime after this phone conversation, Mr. Jones sent Mr. Baker an email asking whether CBC had "ever resolve[d] the insurance issue on [RFMX

464595]?" Ex. 219. Mr. Baker responded by email four days later on January 3, 2011. He wrote:

> We are not going to press the issue at this time. I would say we disagree with the language of the lease, but until an attorney would get involved over this I would just keep paying your rent on the 29 cars you have and [we] will deal with this at a later time. I'm not saying we are going to do anything. We just want to get along. We don't have a substitute car available right now but will keep a look out for one.

*Id.* Mr. Jones remembers a conversation with Mr. Baker after this email exchange. In that conversation, Mr. Baker said that CBC was "going to work with [Coshocton] on this and change the lease . . . so it would only apply on [Coshocton's] . . . tracks." Jones Dep. at 70:18–19; *id.* at 69:23–71:3.

About a month after Mr. Jones and Mr. Baker's email exchange, on February 15, 2011, the parties signed Schedule B1.[7] Schedule B1 added 75 more railcars to the Lease and extended it by 13 months. Ex. 4. And, Schedule B1 increased the monthly rent by $100 per car per month, though it is unclear whether rent increased on all 104 cars or just the 75 cars added by Schedule B1. Also, Schedule B1 added new language to the end of § 15 of the Lease. Based on the evidence presented at trial, the parties did not discuss the derailment of RFMX 464595 again after negotiating this new § 15. Trial Tr. 650:20–25. And CBC did not ask Coshocton for payment on this destroyed car again until it filed its Amended Counterclaim on October 30, 2015. Doc. 134-1.

By their terms, the Lease and Schedule A concluded on July 31, 2012. Exs. 1, 2. On August 21, 2012, Mr. Jones and Mr. Baker began discussing how, when, and where Coshocton

---

[7] The parties did not call the schedule signed on February 15, 2011, "Schedule B1." Instead, they titled it "Schedule B." Ex. 4. But, they also called a later schedule "Schedule B." Ex. 3. For clarity, the court thus refers to the two Schedule Bs as "Schedule B1" and "Schedule B2" based on their chronological order.

would return the 29 cars[8] coming off the Lease and Schedule A. Exs. 428, 419. On October 4, 2012, Mr. Baker sent Mr. Jones an email saying,

> The cars will go off lease after the cars are inspected and fixed. And hatch cover or gate repairs will be at your expense. (if needed) if cars go into shop and do not need any gate or hatch cover repairs per our lease agreement we will take the rail cars off rent when they arrive at mile rail.

Ex. 419 at 1. The significant time-gap between the end of the Lease and Coshocton's actual return of the cars is common in the industry. Trial Tr. 660:4–662:12. This practice arises from economic expediency. When a company sends a loaded car down a railroad, the company gets something called a "free empty move," which is what it sounds like. Trial Tr. 660:23; Trial Tr. 660:18–662:12. A free empty move allows lessees like Coshocton to send a leased car on one last run when the car is unloaded at its destination, the lessee then uses its free empty move to return the car to the lessor for free. Section 13(c) of the Lease Agreement contemplated such a methodology. Ex. 1 at 10; Trial Tr. 1258:10–16.

On January 9, 2013, Keaton Baker—Grant Baker's twin brother and the person in charge of railcar maintenance and repair at CBC—emailed Mr. Jones. He informed Mr. Jones that some of Coshocton's cars had made it back to CBC in Kansas City and that CBC would "start working on the[] cars next week." Ex. 220 at 1. The email also informed Coshocton that CBC intended to "keep sending estimates and billing repair cards as [it] inspect[ed] more cars that [came] into Kansas City." *Id.* Keaton Baker attached a document to his email describing Coshocton's estimated costs for the repair work, but neither party offered this attached document as evidence at trial.

If everything had gone as planned, Coshocton would have returned the cars to Mile Rail (now, The Andersons, Inc.), Mile Rail would have performed any required or requested repair

---

[8] Although the Lease and Schedule A had included 30 railcars, the derailed car was never replaced and so Coshocton had just 29 cars to return.

work on the cars, and Mile Rail then would have sent BRCs and invoices for that work to CBC. CBC then would have reviewed the billing documents and separated the costs that the Lease Agreement required CBC to pay from the costs that Coshocton was required to pay. Trial Tr. 1262:20–1263:2. Then, CBC would send Coshocton a new invoice for its share of the tab, as well as the invoice and BRCs provided by Mile Rail.

Things did not go as planned. Coshocton returned the 29 cars to Mile Rail, but Mile Rail did not repair them in a timely manner. Trial Tr. 1117–18, 1257:5–7. Cars sat untouched for months and, sometimes, even years. Trial Tr. 840–42. This happened for many reasons, including the tank-car boom caused by the rise of fracking. The Andersons, Inc.'s acquisition of Mile Rail also slowed things. *Id.* Based on Keaton Baker's testimony, neither Mile Rail nor any other contract shop did any work on the cars. Trial Tr. 1117:16–17. So, CBC's mobile crew made all the repairs that CBC charged for in the invoices submitted to Coshocton. *See* Ex. 220 at 4–21 (invoices and BRCs for 16 of the Lease and Schedule A cars); *see also* Trial Tr. 1117:3–8, 1120:4–13 (Keaton Baker explaining that, for at least 16 of the 29 cars, CBC did all the repair work).

The parties signed their second Schedule B—called Schedule B2 for clarity—on April 5, 2013. Ex. 3. Schedule B2 extended the termination date for the 75 cars first leased under Schedule B1 from August 31, 2013, to September 30, 2015. About four months later, on August 27, 2013, Grant Baker sent an email to Mr. Jones and Ms. Crown at Coshocton. Ex. 220 at 2. In his email, Grant Baker transmitted invoices and BRCs for "final repairs" to 16 of the 29 cars that Coshocton had returned earlier that year. *Id.* His email also informed Coshocton that he believed Coshocton "had 7 additional cars at the shop which w[ould] be repaired soon." *Id.* The parties submitted the invoices and BRCs attached to this email as evidence. They show that

Coshocton's final cost for the 16 cars was $19,076, *Id.* at 4, an average cost per car of $1,192. During closing argument, CBC conceded that the repairs to these 16 cars were limited to gates, hatch covers, and cleaning. Doc. 243 at 38:21–39:4. The evidence established that Coshocton paid these invoices. The parties did not include invoices for the other 13 returned cars.

Another gap in the evidence follows late August 2013, and the parties seem to have coexisted peaceably for the next year. But an August 27, 2014 email from CBC ended the good times.

The Disagreement

On that date, Grant Baker dispatched an email to Ms. Crown announcing that CBC would "be pulling some or all cars from [Coshocton] that are deemed uneconomical for [CBC] to have in service." Ex. 425. In effect, this message told Coshocton that CBC was going to take back at least some of the leased cars. Coshocton refused to return the cars and asked why CBC was trying to pull the cars more than a year before the Lease ended. Jones Aff. Ex. 74, at 6. In response, Mr. Baker explained that CBC was pulling the cars because the Lease entitled it to do so for any reason. Ex. 423. On October 3, 2014, just a few days later, Mr. Baker sent another email to Coshocton, this time asserting that CBC was pulling the cars to perform repair work required by AAR Rule 88. Ex. 422. Rule 88 requires car owners to make certain repairs and updates to cars when they turn 40 years old. Ex. 7 at 643, 658. Once Rule 88 repairs are made and certified, the 40 year-old cars may run in service for 10 more years. Trial Tr. 1144:1–6. Most, if not all, of the cars CBC had leased to Coshocton were nearly 40 years old when the Lease began. Trial Tr. 572:13–17.

Coshocton's attorneys responded to CBC's announcement by sending a letter on October 15, 2014. This letter notified CBC that Coshocton did not interpret the Lease to permit CBC to

pull cars for Rule 88 work and then "re-lease them to other parties in order to maximize its profits, which appears to be [CBC's] ultimate objective." Ex. 84 at 2. Coshocton's suspicions about CBC's motives were confirmed. At some point, Coshocton learned that CBC had been given the chance to lease the Coshocton cars to two other companies for $275 more per car per month. The new potential lessees were Bella Logistics, LLC and Lansing Trade Group, LLC. Ex. 213 at 3; Ex. 214 at 3. After Coshocton's attorneys sent the October 15 letter, nothing happened for a brief period. Then, on November 3, 2014, CBC tried to divert 33 of the leased cars back to its control by changing their bills of lading from Roachdale, Indiana, to Kansas City. Jones Aff. Ex. 74, at 10. This attempt failed, and the cars headed for Roachdale, Indiana, as scheduled. *Id.*

The Litigation Begins

Seven days after CBC had tried to redirect the 33 cars to Kansas City, Coshocton went to court. It filed this lawsuit in the United States District Court for the Southern District of Ohio, seeking, among other things, a temporary restraining order and preliminary injunction forbidding CBC from pulling any cars out of the Lease. Docs. 1, 2. Because the Lease Agreement included a forum-selection clause, the Ohio court transferred the case to our court on November 20, 2014. Docs. 8, 9.

Sometime in January 2015, three cars derailed on track that Coshocton controlled. One of the cars was destroyed and Coshocton paid to repair the other two. Coshocton filed a claim with its insurer and paid CBC $25,000 for the destroyed car. But CBC never replaced the destroyed car so, after January 2015, only 74 cars remained in the Lease.[9]

---

[9] Also in January 2015, Coshocton added CBC as an additional insured on its umbrella insurance policy. Coshocton also added a schedule to that policy explicitly listing each leased car and covering it for as much as $25,000. Scott Jones Dep. 14:5–16:9, Feb. 25, 2015 [hereinafter 30(b)(6) Dep.]. Although this policy change did not occur until January 2015, it took effect starting in March 2014. *Id.*

On January 6, 2015, this court ruled on Coshocton's request for a temporary restraining order and preliminary injunction. Docs. 41, 46. In his ruling, Judge Lungstrum held that the Lease Agreement entitled CBC to remove cars from the Lease, temporarily, to perform Rule 88 work. Doc. 46 at 251. After this ruling, Coshocton sent a number of emails to CBC asking where it should return the cars so that CBC could perform the Rule 88 work. *E.g.*, Exs. 73, 184, 185, 188. But CBC never pulled any cars to perform Rule 88 work, or for any other reason.

By this time, CBC had asserted a Counterclaim against Coshocton. Doc. 58. On February 9, 2015, Coshocton and CBC filed separate motions for summary judgment. Docs. 63, 65. After a hearing, Judge Lungstrum ruled both motions on March 17, 2015. Doc. 106; *see also* Doc. 110 (Judge Lungstrum's oral summary judgment rulings). The court will not recite all of the parties' summary judgment arguments or all of Judge Lungstrum's rulings. Instead, it mentions only those that are relevant to the issues here. Judge Lungstrum granted summary judgment in CBC's favor on its claim that Coshocton had breached the Lease Agreement's forum-selection clause by suing in Ohio. Doc. 110 at 16, 21–22. He also ruled that this breach constituted an Event of Default under § 12(a)(ii) of the Lease Agreement. *Id.* Judge Lungstrum did not decide whether this breach entitled CBC to recover damages. He also did not address "ultimate consequences" of this Event of Default because CBC had only asked for "summary judgment that [the forum-selection clause breach was] an event of default." *Id.* at 22.

The Final Return

Although the litigation was ongoing—and volatile—the parties continued to honor the Lease Agreement until Schedule B2 expired by its terms on September 30, 2015. But Coshocton had started to return the remaining 74 cars as early as May 2015, apparently under a mutual agreement between the parties. Exs. 38, 39, 185. Then, at 1:17 p.m. on the day that Schedule B2

ended, CBC sent Coshocton an email. It asserted that CBC was "immediately repossessing and demanding immediate possession of the remaining railcars . . . per the default provisions" in § 12 of the Lease Agreement. Ex. 190. The evidence establishes that CBC did not take immediate possession of the cars or otherwise act to reclaim the cars after sending this email. So, Coshocton sent the cars on one last run and used its free empty move to return all the cars to CBC. Trial Tr. 706:24–707:8.

CBC began sending Coshocton invoices for repairs to these cars in January 2016. Ex. 211. Those invoices billed Coshocton significantly greater amounts than the invoices CBC had sent back in 2013 when Coshocton returned the 29 cars leased under Schedule A. In January 2016 alone, CBC billed Coshocton for $483,036 in repairs to 38 railcars. Ex. 211 (invoice numbers CG001, CG002, CG003, and CG004). So, for these 38 cars, the average repair cost to Coshocton was $12,711—$11,519 per car more than the average for the first 16 cars returned in 2013. And, of these January 2016 invoices, only one invoice asserts that it is billing Coshocton for repairs to cars.

This increase in the amount billed manifests the parties' significant disagreement about how to interpret the Lease. Coshocton reads the Lease to make it financially responsible only for repairs to items that § 6(a) of the Lease defines as "Lessee Maintenance Items." Ex. 1 at 4. Those items include "hatch covers (no patching), including batten arms, outlet gate and components thereof." *Id.* On February 19, 2016, Coshocton's counsel contacted CBC's counsel, asking CBC to send revised invoices showing which charges in its invoices billed for Lessee Maintenance Items. Ex. 141. CBC's counsel refused to pass this request on to CBC. *Id.* Eventually, Grant Baker learned that Coshocton had requested revised invoices, Trial Tr. 1393:1–1394:2, but CBC never submitted any. *See* Trial Tr. 1141:10–1142:25 (Keaton Baker

testifying that he has no record of when repairs to just Lessee Maintenance Items concluded); Trial Tr. 1392:18–1395:7 (Grant Baker testifying that he did not know the cost for just Lessee Maintenance Item repairs). Many, if not most, of the controversies ruled by this Decision arise from the amounts charged by CBC's unrevised invoices.

### III. The Parties' Method for Handling Repairs and Costs During the Lease

During the life of the Lease, the parties handled repairs much like they handled repairs when Coshocton returned the first 29 cars back in January 2013. *See* Scott Jones Dep. 499:19–500:16, 503:21–504:13, June 25, 2016 [hereinafter 2016 30(b)(6) Dep.] (discussing the parties' method of invoicing and reviewing invoicing for repairs made during the life of the Lease). When a car was bad ordered, either CBC or a contract shop made the necessary repairs and created the required BRCs. Then, if someone other than CBC had performed the repairs, the repairing party submitted an invoice and the BRCs to corroborate the amount invoiced to CBC. CBC then would sort out which charges were Coshocton's responsibility and create a new invoice listing only those charges. *See, e.g.*, Ex. 430 (email from Grant Baker explaining CBC's view on its maintenance and repair responsibilities). CBC then would send Coshocton the new invoice and the BRCs to back it up.

If Coshocton disagreed with how CBC had divided repair costs, the parties would confer and determine whether the invoice was correct. 2016 30(b)(6) Dep. at 497:24–498:4; Ex. 430. Indeed, Coshocton contested CBC's invoices for repairs several times during the Lease. 2016 30(b)(6) Dep. at 484:23–486:1, 497:18; *see also* Ex. 410 at 2–6 (green highlighting shown in original exhibit, identifying where CBC billed Coshocton, Coshocton protested, and CBC reduced invoice amounts); Ex. 430 (emails between Mr. Jones and Grant Baker where Mr. Jones contested repair costs under § 6(b) of the Lease Agreement and Mr. Baker responded that CBC

agreed with his evaluation and thus reduced the invoice amount). For instance, CBC sent

Coshocton an invoice for repairs to car number RFMX 464634 on March 21, 2012. Coshocton

objected to some of the charges in this invoice. As Mr. Jones explained, he "objected to some of

the items on [the invoice] because [he] didn't feel like they were items that pertained to top

hatches and bottom slides," and that, because CBC "agreed with that," CBC sent Coshocton "a

revised invoice on August 6th of 2012," for $1,405 less than CBC's original invoice. 2016

30(b)(6) Dep. at 497:13–17; Ex. 410 at 2.

## IV.    The Alleged Subleases

Throughout the life of the Lease, Coshocton let other companies use some of the cars it

had leased from CBC. The parties disagree whether all of Coshocton's arrangements with other

companies constituted subleases. CBC contends that they do, and so Coshocton improperly

subleased the cars to four companies: Lansing, Gavilon, Cargill, and Archer Daniels Midland

("ADM"). Coshocton concedes that its arrangement with three of those companies—Gavilon,

Cargill, and Lansing—amounted to subleases. Jones Dep. at 258:5–11, 302:23–303:4. But it

disputes that its arrangement with ADM was a sublease. *Id.* at 259:5–17, 306:18–23; Jones Aff.

Ex. 74, at 9.[10]

The record contains little information about the purported subleases. Indeed, the court

has no evidence about how many cars went to Gavilon or when that sublease occurred. *See*

Jones Dep. at 258:5–11, 259:5–260:2. Likewise, the court has little or no information about the

dates or terms of the other alleged subleases. Based on Exhibits 83 and 430, it appears that

Lansing used Coshocton's leased cars at least three times: June 2010 through July 2010; June

---

[10] At trial, CBC's counsel asked Coshocton's Rhoda Crown a broader question about CBC's attempt to divert the cars that ADM was using. In his question, counsel referred to this arrangement as a sublease. Trial Tr. 778:15–779:14. The court is not persuaded that Ms. Crown's affirmative answer to this question conceded that the ADM arrangement was a sublease. Trial Tr. 652:7–9.

2011 through July 2011; and several times during 2013. And an email from Grant Baker shows that CBC knew about Coshocton's arrangement with Lansing in February 2013. Ex. 430. Exhibit 83 also shows that Cargill used Coshocton's leased cars between January 2013 and February 2013. As for ADM, the record is far less definite. Coshocton concedes that it allowed ADM to use some of the leased cars starting in August 2014. Ex. 85 at 6–7. And the record shows that ADM used the cars through November 2014. Jones Aff. Ex. 74, at 9–11. But the record altogether is silent about whether ADM used the cars past November 2014.

One thing is certain about these arrangements, however. CBC knew about some of the subleases before Judge Lungstrum issued his Preliminary Injunction Order. Trial Tr. 1325:23–1326:2; *see also* Doc. 46 at 249–50 (discussing some of the alleged subleases on January 13, 2015). So, CBC knew of these subleases no later than January 6, 2015—eight months before the end of the Lease. Docs. 41, 46. Indeed, CBC knew about the ADM arrangement by November 3, 2014, because both Ms. Peck and Carle Baker called ADM about CBC's cars on that date. Jones Aff. Ex. 74, at 10. But, CBC never called an Event of Default under the Lease Agreement, and never tried to repossess the cars or terminate the Lease Agreement because of the subleases.

During the periods covered by the alleged subleases, Coshocton paid CBC the required rent for the cars and reimbursed CBC for any repairs made to the cars. *See* Trial Tr. 669:13–19 (Ms. Crown testifying that Coshocton "would have paid" every bill received from CBC during the alleged subleases). No evidence suggests that Coshocton failed to pay CBC for any losses incurred during the alleged subleases or that any of the putative sublessees breached the Lease Agreement. *See* Trial Tr. 1401:1–16 (Grant Baker testifying that CBC has no knowledge of a breach by any sublessee).[11]

---

[11] Grant Baker testified that Mr. Jones had said that Coshocton would not use the cars as part of a unit train, but that Coshocton allowed ADM to use the cars as part of a unit train. If CBC contends that such use breached an oral

## V.     The Bench Trial and Subsequent Events

<u>The Trial's Mechanics</u>

When the Lease Agreement expired on September 30, 2015, the claims in Coshocton's Complaint became moot.  But CBC's Counterclaim remained.  On November 1, 2016, the court began a bench trial to resolve CBC's counterclaims.  The parties presented their cases over five days.  CBC called five witnesses.  Coshocton called none.

After the evidence concluded, the court hoped to receive a coherent explanation of the real issues and the parties' positions on them.  So, the court postponed closing arguments until it could have the benefit of the parties' proposed findings of fact and conclusions of law.  To help clarify the issues, the court issued an Order explaining how CBC and Coshocton should structure their proposed findings.  Doc. 224.  This Order required CBC to "present individually targeted Proposed Findings of Fact and Conclusions of Law for each category of damage it seeks to recover" and explained that "[e]ach such category of damage must have its own separate heading."  *Id.* at 2 (footnote omitted).  The Order also required Coshocton to use the same format in its response.  *Id.* at 3–4.  This Decision often refers to various sections of the parties' proposed findings.

In the same post-trial Order, the court allowed CBC 14 days to supplement the trial evidence "with evidence of attorneys' fees purportedly recoverable under the parties' agreement."  *Id.* at 1.  But it "strictly limited" CBC's submissions to "fees purportedly incurred during the period June 1, 2016 to October 31, 2016."  *Id.*  CBC filed supplemental evidence of attorneys' fees on November 18, 2016 (Doc. 226), and on November 19, 2016 (Doc. 227).  CBC filed its Proposed Findings of Fact and Conclusions of Law ("CBC's Proposed Findings") on

---

agreement, the Lease provides that the parties cannot modify it except in writing.  Exhibit 1 at 13 (§ 18(k)).  CBC presented no writing making this purported oral agreement a modified term of the Lease.  The court thus disregards any CBC claim based on it.

December 16, 2016. Doc. 233. Coshocton filed its Proposed Findings of Fact and Conclusions of Law ("Coshocton's Proposed Findings") on January 17, 2017. Doc. 234. The parties presented closing arguments two months later.

But, about a month before closing arguments, CBC filed a Motion to Re-Open the Evidentiary Record. Doc. 237. In this motion, CBC asked the court to re-open the evidence so that it may submit attorneys' fees records for time spent on the case after October 31, 2016. *Id.* at 1. The issues in CBC's motion are tied to the court's conclusions here. The court thus resolves CBC's Motion to Re-Open the Evidentiary Record at the end of this Decision.

<u>The Witnesses</u>

In this final section of the facts, the court briefly discusses a few of the witnesses who testified at trial—and one who didn't. It does so because the court has had to make some credibility determinations that this Decision should report. But the court also engages in this discussion to explain whose testimony properly is before the court.

Most of the people introduced in the factual narrative testified at trial, but three key players did not: Scott Jones, Kathy Peck, and Carle Baker. The court admitted no testimony from Ms. Peck or Mr. Baker, but it did admit testimony from Mr. Jones through his affidavit and several depositions. The court relies on testimony from all of these sources, and need not resolve any objections to do so.

Few of the witnesses lacked a clear bias, but to the extent that Keaton Baker's testimony is not consistent with Grant Baker's testimony, the court finds Keaton Baker's testimony more credible. Although CBC's counsel led his witnesses most of the time, Keaton Baker resisted the leading questions from his company's counsel more readily than did his brother.[12] Moreover, the

---

[12] For one example of counsel leading Grant Baker so that it wasn't clear who was testifying, see Trial Tr. 1248:2–8. There, counsel asked Mr. Baker how railroads handle derailments under AAR Rule 107. Mr. Baker responded that

court found Grant Baker's testimony evasive when he was cross-examined by adverse counsel and this too harmed his credibility. In contrast, Keaton Baker's behavior on cross-examination did not impair his credibility.[13]

The discussion to date leaves one witness from the trial unintroduced—Larry Koelzer. Mr. Koelzer has worked in the railroad business for many years and currently serves as a consultant for railcar owners and lessees. Coshocton hired Mr. Koelzer to help with its return of the final 74 cars. At trial, though, CBC, not Coshocton, called Mr. Koelzer to testify as an expert witness. Mr. Koelzer testified about the railroad industry and his interpretation of the Lease Agreement. The court does not recite his interpretation here nor rely on it in its discussion below. The interpretation of an unambiguous contract is a legal question reserved for the court. *Waste Connections of Kan., Inc. v. Ritchie Corp.*, 298 P.3d 250, 265 (Kan. 2013). So, testimony like Mr. Koelzer's is relevant only when the court finds that a contract is ambiguous, which it does not find here. *See Westar Energy, Inc. v. Wittig*, 235 P.3d 515, 530–31 (Kan. Ct. App. 2010). However, Mr. Koelzer's testimony explaining certain terms used in the railroad industry assisted the court's understanding of some Lease provisions.

### Analysis and Conclusions of Law

CBC contends that Coshocton breached seven sections of the Lease Agreement, entitling CBC to recover nine categories of damages. The seven sections Coshocton allegedly breached are: (a) § 18(i), the forum-selection clause; (b) § 18(b), the subleasing provision; (c) § 13, the return provisions; (d) § 15, the insurance provision; (e) (§ 8 and § 17, the indemnification

---

the railroads contact the derailed car's owner. Counsel interrupted the witness and interjected "Well, wait a minute. No they don't."

[13] For an example of testimony that limited Grant Baker's credibility, see Trial Tr. 1393:1–9 where he testified in short succession that: no one ever asked him to prepare invoices for just Lessee Maintenance Item repairs and cleaning; then conceded that he was asked to do so during a deposition; and then asserted, "I'm not here to do work for Coshocton." This view of a commercial relationship is not what the court would expect from a party to a contract, which, under Kansas law, carries a duty of good faith and fair dealing.

provisions; (f) § 5(c), the derailment provision; and (g) § 4(d), the late fee provision.  The nine damage categories include direct and consequential damages claimed under the seven breaches alleged, as well as pre-judgment interest and attorneys' fees and litigation expenses.  In total, CBC seeks $2,470,076 in damages and pre-judgment interest, and $643,403 in attorneys' fees and litigation expenses.  Altogether, then, CBC asks the court to award it $3,113,480.

For each alleged breach and category of damage, CBC advances a labyrinth of claims and arguments.  Some complicate the case, making it difficult to discern which claims turn on the outcome of others and which claims function independently.  Other claims twist the ordinary meaning of the English language and, when they do, impair the credibility of CBC's other arguments.  The written word was conceived as a means to make our intentions clear—not to hide it from others.[14]  Before the court begins its analysis of the parties' claims, it addresses three over-arching issues.

*First*, the court explains how CBC may recover under the Lease Agreement.  The Lease does not include a liquidated damages clause, so any recovery under the Lease must be based on general principles of contract damages.  Section 18(i) of the Lease selects Kansas law to govern any dispute, and neither party ever asserts that any provision of Kansas's Uniform Commercial Code applies to their dispute.  So the court bases its findings and conclusions on Kansas's common-law contract rules.[15]

---

[14] To put it more eloquently, "language [has] been given us to make our meaning clear, and not to wrap it in dishonest doubt[.]"  Charlotte Brontë, *Biographical Notice of Ellis and Acton Bell*, *Wuthering Heights* xxxii (1850 ed. 2005).

[15] "A federal court sitting in diversity must apply state law as propounded by the forum's highest court."  *Royal Maccabees Life Ins. Co. v. Choren*, 393 F.3d 1175, 1180 (10th Cir. 2005) (citing *Rancho Lobo, Ltd. v. Devargas*, 303 F.3d 1195, 1202 n.2 (10th Cir. 2002)).  "Absent controlling precedent, the federal court must attempt to predict how the state's highest court would resolve the issue."  *Id.* (citing *F.D.I.C. v. Schuchmann*, 235 F.3d 1217, 1225 (10th Cir. 2000)) (footnote omitted).  To do so, the court "consider[s] a number of authorities, including analogous decisions by the [state] Supreme Court, the decisions of the lower courts in [the state], the decisions of the federal courts and of other state courts, and 'the general weight and trend of authority.'"  *Progressive Cas. Ins. Co. v.*

*Second*, CBC tries to recover on six claims and categories of damage that it did not raise or preserve in the Pretrial Order. Those six claims and categories are:

1. Attorneys' fees in the amount of $194,661 for costs incurred between November 10, 2014, and when the date judgment is entered, based on Coshocton's alleged breach of the forum-selection clause, *compare* Doc. 233 at 2, *with* Doc. 165 at 8;

2. Lost-rent damages in the amount of $203,000 for Coshocton's alleged breach of § 15, *compare* Doc. 233 at 33, *with* Doc. 165 at 4, 10–11;

3. Lost-rent damages in the amount of $203,000 for Coshocton's alleged breach of § 8 and § 17, *compare* Doc. 233 at 76, *with* Doc. 165 at 6, 23;

4. Lost-rent damages in the amount of $17,800 for Coshocton's alleged breach of the Lease's indemnification provisions based on Coshocton's failure to pay for derailed car, RFMX 464595, *compare* Doc. 233 at 76, *with* Doc. 165 at 6, 23;

5. Attorneys' fees and damages based on a new claim that, by "subleasing the railcars and failing to obtain the required subleasing terms," Coshocton breached § 8 of the Lease, *compare* Doc. 233 at 27, *with* Doc. 165 at 8; and

6. Attorneys' fees and damages based on a new claim that Coshocton breached the duty of good faith and fair dealing when it failed to carry the insurance required by § 15, *compare* Doc. 233 at 48, *with* Doc. 165 at 10–11.

CBC's efforts to insert these six claims contradict the Federal Rules of Civil Procedure.

Those rules provide that the pretrial order "controls the course of the action unless the court modifies it." Fed. R. Civ. P. 16(d). So, "claims, issues, defenses, or theories of damages not included in the [final] pretrial order are waived even if they appeared in the complaint." *Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002). When considering whether a claim is included in the pretrial order, courts must construe the pretrial order liberally "to cover any of the legal or factual theories that might be embraced by [its] language." *Zenith Petroleum Corp. v. Steerman*, 656 F. App'x 885, 887 (10th Cir. 2016) (quoting *Trujillo v. Uniroyal Corp.*, 608 F.2d 815, 818 (10th Cir. 1979)). The court construes "pretrial orders most liberally when the orders

---

*Engemann*, 268 F.3d 985, 988 (10th Cir. 2001) (citation omitted). But, decisions by the state's lower courts are not binding on the court, though they are entitled to some weight. *Horton v. Bank of Am., N.A.*, 189 F. Supp. 3d 1286, 1293 (N.D. Okla. 2016).

state the parties' claims in general terms." *Leathers v. Leathers*, 856 F.3d 729, 761 (10th Cir. 2017) (citations omitted).

CBC did not preserve any of these six claims or theories of damages. The Pretrial Order here is quite detailed and CBC, alone, drafted the portions of it devoted to stating CBC's claims. *See* Doc. 190 at 4 (incorporating CBC's previous filing, Doc. 165—titled, "Statement of Contentions"—as CBC's portion of the Pretrial Order). Yet nothing in the Pretrial Order could have prepared Coshocton, or the court, for these six new claims. CBC's final Amended Counterclaim never mentions claims one, three, five, and six, and, other than a stray sentence or two, it does not mention claims two and four either. Indeed, CBC raised precisely none of these claims or theories of damages until after trial, when CBC submitted its Proposed Findings.

"'[T]he primary purpose of pretrial orders is to avoid surprise by requiring parties to "fully and fairly disclose their views [about] what the real issues of the trial will be."'" *Leathers*, 856 F.3d at 761 (quoting *Zenith Petroleum Corp.*, 656 F. App'x at 887). Allowing CBC to assert these six claims now would undermine this purpose. The court thus concludes that CBC failed to preserve the six claims or theories of damages in the Pretrial Order. *Cf. Arias v. Pacheco*, 380 F. App'x 771, 775–76 (10th Cir. 2010) (affirming district court's decision not to allow a plaintiff to raise a wrongful-arrest claim where the plaintiff's first mention of the claim after one reference in the complaint was its proposed jury instructions).

Although CBC never concedes that these six claims or theories of damages are new, the court elects to construe their inclusion in CBC's Proposed Findings as an implied request to amend the Pretrial Order. "The court may modify the [final pretrial] order . . . only to prevent manifest injustice." Fed. R. Civ. P. 16(e); *Arias*, 380 F. App'x at 774. CBC thus "bears the burden of proving manifest injustice would occur without permitting the requested

26

amendment[s]." *Arias*, 380 F. App'x at 774 (citing *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1222 (10th Cir. 2000)).  CBC fails to carry this burden.  It offers no reason why leaving the Pretrial Order as it is would produce manifest injustice.  Indeed, CBC has had more than enough opportunities to amend its claims.  The court thus declines to modify the Pretrial Order and so finds against CBC on the six claims listed above.

*Last*, CBC includes a request for all of its attorneys' fees and litigation expenses— $643,403 altogether—based on all of its breach claims except one.  Because CBC seeks fees and expenses as a prevailing party under the Lease and not as compensatory damages for any particular breach, the court considers CBC's fees and expenses request near the end of this Decision—and not as part of its discussion of each claimed breach.

With that, the court turns to the contract law principles that govern this case and then considers CBC's claims in the following sequence:  (a) forum-selection clause; (b) subleasing provision; (c) return provision; (d) insurance provision; (e) indemnification provisions; (f) derailed car provision and pre-judgment interest; (g) late fee provision.  The court then addresses CBC's claim for attorneys' fees and litigation expenses.  This Decision then concludes by ruling CBC's Motion to Re-Open the Evidentiary Record (Doc. 237).

I.      **Guiding Principles of Kansas Contract Law**

Under Kansas law, "[t]he elements of a breach of contract claim are:  (1) the existence of a contract between the parties; (2) sufficient consideration to support the contract; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) the defendant's breach of the contract; and (5) damages to the plaintiff caused by the breach." *Stechschulte v. Jennings*, 298 P.3d 1083, 1098 (Kan. 2013) (citations omitted).

"The primary rule for interpreting written contracts is to ascertain the parties' intent. If the terms of the contract are clear, the intent of the parties is to be determined from the language of the contract without applying rules of construction." *Waste Connections*, 298 P.3d at 264 (quoting *Osterhaus v. Toth*, 249 P.3d 888, 896 (Kan. 2011)). "If, on the other hand, the court determines that a written contract's language is ambiguous, extrinsic or parol evidence may be considered to construe it." *Id.* (first citing *Barbara Oil Co. v. Kan. Gas Supply Corp.*, 827 P.2d 24, 35 (Kan. 1992); then citing *Mobile Acres, Inc. v. Kurata*, 508 P.2d 889, 894–95 (Kan. 1973)).

That the parties to a contract disagree about what it means does not render the contract an ambiguous one. *Id.* at 265. "To be considered ambiguous, a written contract 'must contain provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language.'" *Infinity Energy Res. v. St. Paul Fire & Marine Ins. Co.*, No. 12-2685-JTM, 2013 WL 3792899, at *6 (D. Kan. July 19, 2013) (quoting *Gore v. Beren*, 867 P.2d 330, 337 (Kan. 1994)). So, a contract is ambiguous if "the language of the contract's provisions is capable of 'one of two or more meanings.'" *Graphic Tech., Inc. v. Pitney Bowes Inc.*, 968 F. Supp. 602, 607 (D. Kan. 1997) (quoting *Simon v. Nat'l Farmers Org., Inc.*, 829 P.2d 884, 885, 888 (Kan. 1992)). But, a contract is not ambiguous "until the application of pertinent rules of interpretation to the face of the instrument leaves it genuinely uncertain which one of two or more meanings is the proper meaning." *Liggatt v. Emp'rs Mut. Cas. Co.*, 46 P.3d 1120, 1125 (Kan. 2002) (quoting *Catholic Diocese of Dodge City v. Raymer*, 840 P.2d 456, 459 (Kan. 1992)). If the court finds a contract ambiguous after giving it "a fair, reasonable, and practical construction,"[16] then "the facts and circumstances surrounding the

---

[16] *Liggatt*, 46 P.3d at 1126 (citing *Marquis v. State Farm Fire & Cas. Co.*, 961 P.2d 1213, 1219 (Kan. 1998)).

execution of the agreement become necessary to the interpretation of its meaning."[17]

If, after applying the ordinary rules of interpretation the contract is still ambiguous, the court can resort to the rule that ambiguities are construed against the drafter.  *First Nat'l Bank of Olathe v. Clark*, 602 P.2d 1299, 1303 (Kan. 1979).  The same rule applies to arguments based on the parties' course of performance or dealing.  The court may resort to these indicators of the parties' intent only after it has determined that the contract is ambiguous.  *See id.* at 1304 ("In construing an ambiguous or indefinite contract, the court 'may also take into consideration the interpretation placed upon the contract by the parties themselves.'"  (citation omitted)).  Moreover, "[i]f a written contract is actually ambiguous concerning a specific matter in the agreement, facts and circumstances existing prior to and contemporaneously with its execution are competent to clarify the intent and purpose of the contract in that regard, but not for the purpose of varying and nullifying its clear and positive provisions."  *Id.* (quoting *Weiner v. Wilshire Oil Co. of Tex.*, 389 P.2d 803, 808 (Kan. 1964)); *accord Williams v. Alumni Ass'n of Univ. of Kan.*, 189 P.3d 580, 2008 WL 3367599, at *5 (Kan. Ct. App. Aug. 8, 2008) (per curiam).

## II.     Forum-Selection Clause Claim

In its first claim, CBC seeks attorneys' fees for Coshocton's breach of the Lease Agreement's forum-selection clause.  In the Pretrial Order, CBC calls this claim "forum attorney fees."  Doc. 165.  The court also adopts this naming convention.

Coshocton filed this case in the Southern District of Ohio on November 10, 2014.  Doc. 1.  On November 12, 2014, CBC filed a motion to dismiss or transfer the case to the District of

---

[17] *Audiotext Commc'ns Network, Inc. v. US Telecom, Inc.*, No. 94-2395-GTV, 1995 WL 36543, at *4 (D. Kan. Jan. 9, 1995) (citing *Mobile Acres, Inc.*, 508 P.2d at 894).

Kansas. Doc. 5. CBC based its transfer motion on the Lease Agreement's forum-selection clause in § 18(i), titled "Applicable Law." Ex. 1 at 13. It reads as follows:

> The terms of this Lease and all rights and obligations hereunder shall be governed by the laws and venue of the State of Kansas without regard to Kansas' choice of law doctrine. There are words and phrases herein that are railroad terminology defined by the *Car and Locomotive Cyclopedia* (1997) dictionary published by Simmons-Boardman.

*Id.* Six days after CBC filed its motion, the Ohio court denied the motion to dismiss but granted the motion to transfer. Doc. 8. The transfer was completed on November 20, 2014, when the Clerk of our court docketed the case here. Doc. 9.

On February 9, 2015, CBC filed a motion for summary judgment. It argued, among other things, that Coshocton was liable for breaching the Lease's forum-selection clause. Doc. 63. On March 17, 2015, Judge Lungstrum granted CBC summary judgment on the forum-selection liability issue, but he did not decide damages. Doc. 110 at 16, 19, 21–22. CBC thus had to prove any recoverable damages caused by this breach at trial.

Throughout this case, CBC has invoked a variety of theories to support its damages efforts. These shifting theories have complicated CBC's endeavor to prove its damages. The court thus begins by sorting out CBC's theories, then addresses whether CBC should recover the damages it seeks.

## A.    CBC's Shifting Theories

In its Proposed Findings, CBC seeks forum attorney fees under sections 8, 12(b), and 17 of the Lease. Doc. 233 at 2–3. But CBC relied on just § 12(b) in the Pretrial Order. Doc. 165 at 7. Though one could argue that Fed. R. Civ. P. 16(d) prohibits CBC from now asserting claims

under § 8 and § 17, the court does not consider the rule so restrictive. The court thus considers CBC's forum attorney fees claim under all three provisions invoked by CBC.[18]

Sections 8 and 17 do not entitle CBC to the damages it seeks. Neither provision's plain language can support a claim for attorneys' fees based on a breach of the forum-selection clause. Section 8 explicitly provides that it is only concerned with liability "arising out of . . . the loading and/or shipping in the Cars of commodities which cause oxidative corrosion." Ex. 1 at 5. Where Coshocton filed suit has nothing to do with corrosion. Section 17 is equally disconnected to CBC's forum attorney fees claim. This provision explicitly states that it only is concerned with "any Car" subject to the Lease. *Id.* at 11. Coshocton's decision to sue in Ohio does not affect "any Car." Sections 8 and 17 thus cannot support CBC's request for forum attorney fees, which leaves CBC with its theory premised on § 12(b). The court considers this theory in the next section.

CBC's second shift in theories increases the damage award it seeks here. In its Proposed Findings, CBC asked for $213,029 in forum attorney fees. This figure consists of $18,368 worth of work CBC's attorney did while the case was pending in Ohio—so, from November 10, 2014 to November 20, 2014—and $194,661 for work CBC's attorney did while the case was pending before our court. Doc. 233 at 2. But CBC did not preserve a claim for forum attorney fees after November 20, 2014. In the Pretrial Order, CBC only asked for forum attorney fees for the ten days that the case was pending in Ohio—November 10 to November 20, 2014. *See* Doc. 165 at 3–4 (claiming "Forum Attorney fees" for the period "10/10/2014 through 11/20/2014"). So again, the Pretrial Order controls and the court declines to amend it. *See Muckala*, 303 F.3d at

---

[18] At one point, CBC also sought forum attorney fees as compensatory damages for Coshocton's breach of the forum-selection clause. CBC appears to have abandoned this theory of recovery. But even if CBC has not abandoned its early theory, it still is entitled to the same damage award. As with fees claimed under the Lease Agreement, CBC's recovery under a compensatory-damages theory is limited to the fees incurred as a result of Coshocton's breach of the forum-selection clause. *Hess v. Jarboe*, 443 P.2d 294, 297 (Kan. 1968).

1215 ("[C]laims, issues, defenses, or theories of damages not included in the [final] pretrial order are waived even if they appeared in the complaint . . . ."); *see also supra* pp. 25–27. The court thus finds for Coshocton on CBC's claim for forum attorney fees allegedly incurred after November 20, 2014.[19]

B.    **Attorneys' Fees That CBC May Recover**

As mentioned, CBC seeks $18,368 in forum attorney fees based on the work CBC's attorney performed while the case was pending in the Southern District of Ohio. Coshocton challenges CBC's forum attorney fees request as unreasonable and as one arising, in part, from work unrelated to Coshocton's breach of the forum-selection clause.

CBC responds, arguing that the court need not review its attorneys' fees evidence to determine whether its fee request is reasonable, as required by § 12(b) of the Lease. For support, CBC relies on the court's decision in *Ross v. Rothstein*, No. 13-cv-2101-DDC-TJJ, 2016 WL 274878 (D. Kan. Jan. 22, 2016). CBC's reliance is in vain. In *Ross*, the court recognized that "[c]ourts apply a different standard when analyzing a request for an award of attorney's fees under a contract compared to a fee request authorized by statute," and that the standard applied to fees under a contract is less searching. 2016 WL 274878, at *4 (citing *Enter. Bank & Tr. v. Barney Ashner Homes, Inc.*, 300 P.3d 115, 2013 WL 1876293, at *21 (Kan. Ct. App. May 3, 2013)). This statement is faithful to Kansas law. *See, e.g.*, *Enter. Bank & Tr.*, 2013 WL 1876293, at *21 ("In a case where attorneys' fees are awarded based on the contractual agreement of the parties, [the court has] no independent duty to peruse the itemized statements for reasonableness in the absence of particularized objections, as [it] might under a statute granting fees to a prevailing party to support litigation serving the public good in addition to

---

[19] Even if the court amended the Pretrial Order to include CBC's new claim of $194,661 in forum attorney fees, the evidence at trial fails to support such an award. CBC submitted no evidence linking the $194,661 it claims to any work performed on the forum-selection liability issue.

purely private interests." (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433–34 (1983))). But, the Kansas Court of Appeals also has recognized that the court may review a fee request if a defendant "quarrel[s] with certain components of the attorney fee request." *Id.* Nothing in *Ross* contradicts this principle and so it does not prohibit the court from reviewing a fee request when asked to do so.

The following principles guide the court's analysis of CBC's forum attorney fees request. "In a lawsuit involving multiple claims or multiple theories, an award of attorney fees must be based on the time spent by the prevailing party's attorney on the claim or theory under which attorney fees are allowable." *DeSpiegelaere v. Killion*, 947 P.2d 1039, 1040 (Kan. Ct. App. 1997); *Dodge v. Davis Remodeling, Repair & Custom Constr., Inc.*, 309 P.3d 974, 2013 WL 5422377, at *3 (Kan. Ct. App. Sept. 27, 2013); *see also Unruh v. Purina Mills, LLC*, 221 P.3d 1130, 1143–44 (Kan. 2009) (discussing *DeSpiegelaere* favorably and affirming a district court's ruling based on *DeSpiegelaere*); *York v. InTrust Bank, N.A.*, 962 P.2d 405, 434 (Kan. 1998) (discussing *DeSpiegelaere* favorably). An exception to this rule exists. "'[W]hen the causes of action involved in the suit are dependent upon the same set of facts or circumstances and thus are "intertwined to the point of being inseparable," the party suing for attorney's fees may recover the entire amount covering all claims.'" *DeSpiegelaere*, 947 P.2d at 1043 (quoting *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 11 (Tex. 1991)); *see id.* at 1044 (adopting rule and exception as stated in *Stewart*); *see also York*, 962 P.2d at 430 (holding that a district court did not abuse its discretion when approving non-segregated fee request because "[i]t was clearly necessary for all of the underlying facts of the transaction to be fully developed in order to prosecute the KCPA claim" and even though "[t]hose services may have also resulted in findings of other tortious conduct sufficient to justify a judgment, . . . the KCPA claim [was] inextricably

intertwined with the single transaction which [was] the subject of th[e] litigation"). But, attorneys' fees that are not supported by "'meticulous, contemporaneous time records' that show the specific tasks being billed should not be allowed." *Davis v. Miller*, 7 P.3d 1223, 1235 (Kan. 2000) (quoting *Case v. Unified Sch. Dist. No. 233 Johnson Cty., Kan.*, 157 F.3d 1243, 1250 (10th Cir. 1998)).

Coshocton contends that CBC is entitled to just $3,488 in forum attorney fees because the billing records admitted at trial show that CBC's attorney only spent 10.9 hours working on Coshocton's forum-selection breach—and not the 57.4 hours that CBC claims. The court agrees with Coshocton's premise. CBC is not entitled to recover all of the attorneys' fees it seeks as damages for Coshocton's breach of the forum-selection clause. But the court disagrees with Coshocton's math. CBC claims 57.4 hours as the basis of its forum attorney fees claim. But Exhibit 210—CBC's attorneys' fees exhibit—reports just 11.2 hours that the court fairly can identify as hours billed for work on the forum-selection issue or transfer motion. By the very terms of the attorney's narrative written to explain the reason the time was incurred, the remaining 46.2 hours were not devoted to the forum-selection issue. Those hours were incurred for attorney work resisting Coshocton's preliminary injunction motion. For instance, CBC's attorney billed two hours of time on November 10, 2014, on an "email for Grant [Baker] regarding holdover rent on Rule 88 cars[;] research lease language default[;] incorporate the 33 cars research tonight 11pm." Ex. 210 at 6. No connection exists between this work and Coshocton's breach of the forum-selection clause. The court declines to give CBC a recovery for it.[20] The evidence at trial thus supports an award of no more than $3,584 (11.2 hours x $320 per hour) in attorneys' fees incurred while the case was pending in the Southern District of Ohio.

---

[20] For other examples of attorney effort unconnected to Coshocton's forum breach claim, see Ex. 210 at 8, reporting six hours reviewing AAR Rule 88 "letters of approval" on November 14, 2014; *id.*, reporting 4.2 hours reviewing

Nevertheless, CBC contends that it is entitled to the full fee award it seeks because CBC has shown that "some work" on the forum-selection issue "was essential to and intertwined with both claims that allow a fee and those that don't" (Doc. 233 at 13, ¶ 18), and because the court "need not review the entire case history to determine if each recoverable breach of contract action completed by defendant's counsel was meritorious" (*id.* at 14, ¶ 19). The court disagrees. Whether Coshocton breached the forum-selection clause is not intertwined with whether CBC prevails on any other breach it claims. And, CBC consistently has maintained throughout this case that its claim for forum attorney fees is based specifically on Coshocton's breach of the forum-selection clause and nothing else. Doc. 110 at 14; Doc. 165 at 7. So, CBC is entitled to recover just those fees it incurred as a result of Coshocton's breach of the forum-selection clause.

In sum, the court awards CBC $3,584 in attorneys' fees for Coshocton's breach of the Lease's forum-selection clause. In so holding, the court also finds that the hourly rate sought by CBC—$320 per hour—is reasonable under the eight-factor test established by Rule 1.5 of the Kansas Rules of Professional Conduct. *See Davis*, 7 P.3d at 1236; *see also Wittig v. Westar Energy, Inc.*, 235 P.3d 535, 546 (Kan. Ct. App. 2010) ("Simply put, the rules are a reference the court may consider to aid in its analysis of attorney fee requests. Their use is a methodology approved by [the Kansas] Supreme Court when assessing fees, even those arising from a contract." (citation omitted)).

## III.   Sublease Provision Claims

CBC's second claim alleges that Coshocton breached § 18(b) of the Lease by subleasing some of CBC's cars without complying with that provision. Section 18(b) provides:

[Coshocton] may sublease the Cars if first (I) [Coshocton] notifies [CBC] within thirty (30) days of the sublease and the terms thereof; (ii) [Coshocton] and

---

The Andersons, Inc. shop records for cars on November 16, 2014; *id.*, reporting three hours to "build trial notebook with exhibits [for] TRO" on November 18, 2014.

sublessee shall be and continue to remain liable to [CBC] under this Lease and sublease; (iii) any sublease shall contain language which expressly makes such sublease subject and subordinate to this Lease and to the rights of [CBC] and the financing parties described in Subsection 10(a); (iv) such sublease must require that the Cars will be used only within the boundaries of permitted use set forth in Subsection 7(a) and in accordance with all of the terms and conditions set forth herein upon [Coshocton].

Ex. 1 at 11 (formatting in original). CBC also claims that Coshocton's subleasing constitutes a breach of the duty of good faith and fair dealing. For these breaches, CBC seeks $185,625 in lost rent as damages. Doc. 233 at 18. The court considers CBC's breach of contract and good faith and fair dealing claims separately, below.

### A.      Breach of Contract

CBC contends that Coshocton breached § 18(b) in every way possible, and in at least two ways that are not possible. Section 18(b) allowed Coshocton to sublease CBC's cars, but required Coshocton to notify CBC of any sublease and to include certain terms in any sublease agreement. Ex. 1 at 11. CBC contends that Coshocton failed to provide CBC notice of its subleases with four companies—Lansing, Gavilon, Cargill, and ADM—and that Coshocton failed to include the required terms in its subleasing agreements with those companies. Doc. 165 at 8. If proven, these actions would breach § 18(b)(I)–(iv).

CBC also contends that Coshocton breached § 18(b) by failing to secure CBC's permission before entering into the subleases and by profiting from them. Doc. 233 at 28, ¶ 13. Failing to secure CBC's consent to a sublease cannot constitute a breach of § 18(b) for the simple reason that this provision does not give CBC the right to consent or withhold consent to any sublease: "[Coshocton] *may sublease the Cars* if first (I) [Coshocton] notifies [CBC] within thirty (30) days of the sublease and the terms thereof . . . ." Ex. 1 at 11 (emphasis added). And though § 18(b) establishes several prerequisites for a permissible sublease, it never obligates

Coshocton to secure CBC's permission. Also, nothing in § 18(b) or the Lease Agreement prevents Coshocton from profiting from a sublease of the cars. CBC's claims based on these theories thus fail.

The only question remaining is whether CBC's other theories of breach under § 18(b)(I)–(iv) produce a claim that warrants recovery. They do not. Although Coshocton concedes that it subleased some of the leased cars without giving CBC notice—plainly a breach of § 18(b)(I)—it contends CBC has failed to prove that these admitted breaches caused any damage. The court agrees. CBC never proved that it suffered any damage as a result of the breaches that       § 18(b) will support. Instead, CBC advances damage theories that are fanciful. For instance, CBC seeks a year's worth of lost rent based on the alleged ADM sublease. Doc. 165 at 4, 7–8; Doc. 233 at 29–33. But CBC never proved that Coshocton failed to pay any of its rent obligations.

The court finds it difficult to understand how CBC arrived at lost rent as a measure of damages when Coshocton never failed to pay any rent owed under the Lease. CBC explains its theory this way: If CBC had received notice of the subleases and discovered that the sublease agreements failed to contain the terms required by § 18(b), then it could have called an Event of Default under § 12(a)(ii), which would have allowed it to terminate the Lease under § 12(b)(iii) and repossess all the cars in the Lease. Once properly repossessed, CBC contends, it would have re-leased the cars to Bella or Lansing and have made $275 more per car per month. Doc. 233 at 29–32. In other words, CBC's lost-rent claim is really a lost-profits claim.

"The basic principle of contract damages is to make a party whole by putting it in as good a position as the party would have [occupied] had the contract been performed." *Kansas ex rel. Stovall v. Reliance Ins. Co.*, 107 P.3d 1219, 1228 (Kan. 2005) (first citing *Kan. Power & Light Co. v. Thatcher*, 797 P.2d 162, 165 (Kan. Ct. App. 1990); then citing Restatement (Second) of

Contracts § 344(a) (Am. Law Inst. 1979)).  Such damages are called "[e]xpectation damages" and "usually consist of lost profits plus any incidental or consequential losses caused by the breach."  *Source Direct, Inc. v. Mantell*, 870 P.2d 686, 693 (Kan. Ct. App. 1994) (citation omitted).  "In Kansas, 'loss of profits resulting from a breach of contract may be recovered as damages when such profits are proved with reasonable certainty, and when they may reasonably be considered to have been within the contemplation of the parties.'"  *Id.* (quoting *Vickers v. Wichita State Univ.*, 518 P.2d 512, 515 (Kan. 1974); then citing *Levi Strauss & Co. v. Sheaffer*, 650 P.2d 738, 746 (Kan. Ct. App. 1982)).  Also, a party may not recover damages if those damages are "not the proximate result of the breach of contract . . . [or] are remote, contingent, and speculative in character."  *Reliance Ins. Co.*, 107 P.3d at 1228 (quoting *Apperson v. Sec. State Bank*, 528 P.2d 1211, Syl. ¶ 7, 1212 (Kan. 1974)).  Naturally, CBC, as the party seeking to recover lost-profits damages, bears the burden "to produce appropriate evidence of [its] damages" so that "a reasonable basis for computation of damages" exists.  *Smith v. Stephens*, 940 P.2d 68, 69 (Kan. Ct. App. 1997) (citations omitted); *accord Reliance Ins. Co.*, 107 P.3d at 1228.  CBC has failed to prove damages under these governing rules for two independent reasons.

CBC's theory of recovery is speculative.  CBC asks the court to award it damages based on what CBC might have done.  Courts applying Kansas law do not award contract damages based on what a party may or may not have done.  *See Reliance Ins. Co.*, 107 P.3d at 1228 ("A party is not entitled to recover damages 'which are . . . speculative in character.'"  (citation omitted)).  Here, the proof is even worse than speculative.  CBC concedes that it knew about some of the complained-of subleases before Judge Lungstrum issued his Preliminary Injunction Order.  Trial Tr. 1325:23–1326:2.  This means CBC knew about these subleases no later than January 6, 2015—eight months before the Lease ended.  Docs. 41, 46.  Likewise, CBC knew of

Coshocton's arrangement with ADM by November 3, 2014, because both Ms. Peck and Carle Baker called ADM about the allegedly subleased cars on that date. Jones Aff. Ex. 74, at 10. And the reason for that phone call? CBC wanted to pull the 33 cars Coshocton had loaned ADM from the Lease so that CBC could put those cars into a more lucrative lease with Bella. *See id.* at 5–10. Yet, CBC never called an Event of Default and never sought to repossess the cars on this basis.[21] CBC's own actions thus belie its theory of recovery. It had actual knowledge of some subleases but never called an Event of Default and never took the other steps necessary to place the cars into the more lucrative Bella lease. CBC thus has failed to prove that it is entitled to the lost-rent damages that it seeks.

Also, CBC's request for lost-rent damages defies the basic rules of contract recovery. CBC argues that "[t]he benefit of the bargain of the subleasing and default provisions, had Coshocton disclosed the subleases, would have resulted in CBC obtaining the right to repossess or otherwise terminate the Coshocton lease and place the 74 railcars into [the Bella] lease." Doc. 233 at 30, ¶ 16. "Benefit of the bargain" is just another way courts say "expectation damages" or "putting a party in as good a position as if the contract had been performed." *Source Direct*, 870 P.2d at 693. Here, had Coshocton performed as required, Coshocton would have paid CBC the agreed rent for each of the subleased cars and covered any loss that CBC incurred due to the sublessees' use of the cars. *See* Ex. 1 at 11, § 18(b). As noted above, CBC does not contend that Coshocton ever failed to pay rent. And, CBC has provided no evidence that Coshocton failed to pay CBC for any losses CBC incurred due to any alleged sublessee's use of the cars or breach of the Lease's terms. Indeed, CBC elicited testimony to the contrary at trial. *See* Trial Tr. 669:13–

---

[21] Throughout trial and in some of its filings, CBC used the word "repossess" to describe how the Lease came to an end. Trial Tr. 1353:14–1355:25; Ex. 190. CBC presented no evidence showing that it repossessed any of the cars. Instead, the evidence shows that CBC simply resumed possession of the cars. *See* Ex. 185 (an email from Mr. Jones to Grant Baker, which suggests that the parties discussed returning some cars early).

19 (Ms. Crown testifying that Coshocton paid all bills it received from CBC during the alleged subleases); *see also* Trial Tr. 1401:1–14 (Grant Baker testifying that CBC has no knowledge of a breach by any sublessee).  CBC received the benefit of its bargain despite Coshocton's admitted breaches of § 18(b).[22]

In sum, CBC has failed to carry its burden on its sublease claim.  The court finds for Coshocton.

## B.      Duty of Good Faith and Fair Dealing

CBC next asserts that Coshocton breached the duty of good faith and fair dealing inherent in the Lease by failing to give CBC notice of the subleases.  Doc. 165 at 8.  Kansas courts describe this duty as follows:

> [T]here is an implied undertaking in every contract on the part of each party that he will not intentionally and purposely do anything to prevent the other party from carrying out his part of the agreement, or do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.  Ordinarily if one exacts a promise from another to perform an act, the law implies a counter[-]promise against arbitrary or unreasonable conduct on the part of the promisee.

*Waste Connections*, 298 P.3d at 266 (quoting *Bonanza, Inc. v. McLean*, 747 P.2d 792, 801 (Kan. 1987)).

CBC has not proven that Coshocton intentionally prevented CBC from carrying out CBC's part of the Lease.  Indeed, CBC merely proved that any failure to comply with § 18(b) on Coshocton's part was inadvertent.  *See* Trial Tr. 664:9–18 (As CBC's counsel put it, "you [Ms. Crown] actually forgot or didn't know there was some subleasing provision" in the Lease

---

[22] Making one final bid to save its sublease damages, CBC argues that it need not prove damages because Coshocton willfully breached § 18(b).  *See* Doc. 233 at 31–32, ¶¶ 18–19.  CBC's argument misapprehends this legal principle. The principle applies where a defendant's willful conduct makes the plaintiff's damages uncertain.  Restatement (Second) of Contracts § 352 cmt. a, Westlaw (updated June 2017).  Here, CBC's problem is not the certainty of the proof used by the damages calculation.  Instead, CBC's problem is that it simply has failed to prove that it was damaged at all.

Agreement "and that's why [Coshocton] felt free to go out and start subleasing" CBC's cars). CBC also has not proven that Coshocton acted in an arbitrary or unreasonable manner. The court finds for Coshocton on the good faith and fair dealing claim as well.

## IV.    Return Condition Claims

The court now turns to the heart of CBC's case—its claims ostensibly under § 13(b), titled "Condition Upon Return." Ex. 1 at 9. CBC asserts that Coshocton breached § 13(b) in several ways and seeks $1,672,526 in damages.

Section 13(b) required Coshocton to return the cars in a certain condition or, at least, to pay for the repairs necessary to return the cars to that condition. What that condition was, however, is up for debate. Both parties ardently contend that § 13(b) is not ambiguous, but they disagree just as sharply about what this unambiguous provision means. Nonetheless, both parties contend that the court can simply apply the provision's terms and easily determine liability.

Section 13(b) is not so clear cut. Indeed, § 13(b)—like much of the Lease—is far from clear. Even so, the court does not find it ambiguous because "[a]mbiguity in a written contract does not appear until the application of pertinent rules of interpretation to the face of the instrument leaves it generally uncertain which one of two or more meanings is the proper meaning." *Simon*, 829 P.2d at 888 (citing *Farm Bureau Mut. Ins. Co. v. Old Hickory Cas. Ins. Co.*, 810 P.2d 283, Syl. ¶¶ 1–2, 284 (Kan. 1991)). After applying these rules, the court finds that § 13(b) is unambiguous. Thus, the court's decision here does not turn on most of the trial evidence, or even reference many of the arguments advanced by the parties. *See Liggatt*, 46 P.3d at 1126 (explaining that the court may resort to extrinsic evidence only when a contract is ambiguous).[23]

---

[23] For instance, the parties dispute: (1) whether rust is corrosion; (2) what the word "maintain" requires CBC to do, as it is used in the Lease Agreement; and (3) what the word "damage" means, as it is used in the Lease Agreement.

The court's analysis of CBC's § 13(b) claims follows. It is lengthy. The provision itself is to blame for some of this length, for it is not a model for future contract drafters to emulate. But CBC also contributes much to the extent of the discussion. It has many theories and its explication of them uses many, many words. Nonetheless, the court has tried to understand all of CBC's theories and provide an analysis of most of them. This analysis proceeds in this fashion:

- first, reproduce the entire text of § 13(b);

- second, briefly describe CBC's theories of liability; and

- last, determine whether CBC has proven its various claims under these theories.

**A.    Section 13(b)**

Section 13 has three subsections: 13(a), (b), and (c). Section 13(a) requires Coshocton to return the cars to the location specified by CBC at the end of the Lease. Ex. 1 at 9.[24] Section 13(b) explains the required condition of the cars when returned. *Id.* at 9. And § 13(c) permits CBC to receive holdover rent if Coshocton returns the cars late. *Id.* at 10.[25] CBC's arguments rely, primarily, on § 13(b). It provides:

**(b)    Condition Upon Return.**

---

The court finds none of these arguments relevant to its decision, even though the parties have devoted much effort to them.

[24] Section 13(a), titled "Return of Cars," provides: "Upon the expiration, repossession, or other termination of this Lease with respect to any Car, [Coshocton], at its expense, shall return such car(s) to [CBC] at a point designated by [CBC] (The Return Location)." Ex. 1 at 9.

[25] Section 13(c), titled "Holdover Rent," provides:

> Until any Car is returned to [CBC], [Coshocton] shall continue to pay rent for such Car and . . . make all other payments and perform all other obligations under this Lease as though the expiration or other termination had not occurred. If [CBC] requests the return of any Car and such Car has not been returned, [Coshocton] upon notice from [CBC], shall pay one hundred fifty percent (150%) of the rent in effect immediately prior to expiration or termination. Nothing in this section shall give [Coshocton] the right to retain possession of any Car after expiration or other termination of this Lease with respect to such Car. This clause is not a limitation on [CBC's] default remedies.

Ex. 1 at 10.

42

> (i)     Each Car shall be returned to [CBC] meeting the specifications previously imposed upon [Coshocton], including (but not to the exclusion of others):  (A) free of all accumulations or deposits from commodities; and (B) free of corrosion and any other commodity-related damage.  Any item that is damaged (or worn beyond what the AAR calls cause for attention or condemnable items or repairs in any AAR rule or (what is considered to be normal by the original component manufacturer) shall be deemed to have been damaged by the negligence of [Coshocton] or its employees, agents or licensees and shall be [Coshocton's] responsibility.  In addition, if [CBC] has permitted [Coshocton] to place any logos or special paint on any Car, [Coshocton] shall have such logos or special paint removed.
>
> (ii)    [CBC] may inspect any returned Car after such return.  [Coshocton] shall be entitled to participate in any such inspection if present.  [Coshocton] agrees to pay [CBC], within thirty (30) days after receipt of an invoice, for all repairs, replacements and cleaning for which [Coshocton] is responsible hereunder but which were performed by [CBC].  This remedy is not exclusive.

*Id.* at 9 (formatting in original).

Besides its claims under § 13(b), CBC also appears to rely on § 13(a).  CBC contends that Coshocton breached § 13 by failing to return car number RFMX 464595 (the car that derailed in October 2010).  Though it is conceivable that § 13(a) could support this claim, the court declines to address it here.  The court concludes that any claim for a derailed car is best considered under § 5(c) of the Lease because that provision explicitly addresses the parties' duties and remedies when a car derails.  *See Exch. State Bank v. Kan. Bankers Sur. Co.*, 177 P.3d 1284, 1285 (Kan. Ct. App. 2008) ("Specific provisions in a contract control over general ones." (citation omitted)).  The court thus finds for Coshocton on CBC's § 13 theory based on this derailed car.  And it addresses CBC's other derailment claims later in this Decision.

### B.      CBC's Theories of Liability and Damages

#### 1.      *What Exactly Does CBC Consider a Breach of § 13(b)?*

CBC's Trial Brief, Statement of Contentions, and Proposed Findings, argue two possible forms of liability under § 13(b): (1) Coshocton breached § 13(b) because it did not perform the necessary repairs before returning the cars, and (2) Coshocton breached § 13(b) by failing to reimburse CBC for performing those unmade repairs. *See* Doc. 233 at 68, ¶¶ 6–7. The court's analysis in Parts B.2 through E of this section discuss the second theory, but the Lease Agreement explicitly precludes the first theory. Section 13(b)(ii) provides:

> [CBC] may inspect any returned Car after such return. [Coshocton] shall be entitled to participate in any such inspection if present. [Coshocton] agrees to pay [CBC], within thirty (30) days after receipt of an invoice, for all repairs, replacements and cleaning
> for which [Coshocton] is responsible hereunder but which were performed by [CBC]. This remedy is not exclusive.

Ex. 1 at 9–10 (formatting in original). According to CBC, this provision applies "in the event a car was returned in the improper condition." Doc. 165 at 14 n.1. So, even under CBC's interpretation, § 13(b)(ii) allowed Coshocton to return the cars in need of repairs so long as Coshocton reimburses CBC for any repairs that were Coshocton's responsibility under § 13(b)(i). Coshocton thus had no duty to return the cars repaired.[26]

This interpretation of § 13(b)(ii)'s effect on § 13(b) harmonizes that provision with § 13(b)(i) and the rest of the Lease. Section 13(b)(i) provides that "[e]ach Car shall be returned to [CBC] meeting the specifications previously imposed." Ex. 1 at 9. These previously imposed specifications required Coshocton to pay for repairs or, alternatively, gave Coshocton the option to make repairs or pay CBC to make repairs. *E.g.*, *id.* at 4, § 6(c).

---

[26] CBC points out that § 13(b)(ii) provides that it is not an exclusive remedy. Doc. 165 at 14 n.1. While this is true, it does not change that § 13(b)(ii) offered the parties a second method for handling returns: CBC could perform (or pay for someone else to perform) all the repairs and simply bill Coshocton for them. The court fails to see how § 13(b)(ii)'s "not an exclusive remedy" language alters Coshocton's duties under § 13(b) and, certainly, CBC never explains how it could.

So, as explained above, Coshocton had no duty under § 13(b) to return the cars fully repaired. Section 13(b) only obligated Coshocton to pay CBC for repairs to the items Coshocton was responsible for under § 13(b)(i). Coshocton thus could not breach § 13(b) unless it failed to reimburse CBC for any repairs that were Coshocton's responsibility under § 13(b)(i).

2.      *Overview of CBC's Claims Under § 13(b)*

In essence, CBC advances three damages claims under § 13(b). These damages claims are: (1) $1,115,449 for Coshocton's failure to pay for the repairs necessary to return the cars to "good condition" at the end of the Lease; (2) $296,276 for Coshocton's failure to reimburse CBC at the end of the Lease for those amounts CBC paid to repair Lessor Maintenance Items during the Lease; and (3) $203,000 in lost rent while CBC or The Andersons, Inc. repaired the cars. CBC calls its first claim "return condition," its second claim "prior damage," and its third claim "lost rent." The court uses these labels in its analysis of each claim below.

## C.      Return Condition Claim

Because CBC contends that the first two sentences of § 13(b)(i) create two, distinct categories of damages, the court considers the parties' arguments under each sentence separately.

1.      *Section 13(b)(i)'s First Sentence: "Specifications Previously Imposed"*

CBC contends that § 13(b)(i)'s reference to "specifications previously imposed" obligated Coshocton to:

- pay to repair any Lessee Maintenance Item;

- pay to clean the cars;

- pay for repairs necessary to make the cars suitable for grain product loading;

- pay to repair any corrosion found on the cars at return; and

- pay for all repairs performed when it returns the cars, *i.e.*, pay for all damage.

CBC invokes and interprets several provisions of the Lease Agreement to come up with this list. The court addresses all five of CBC's proposed "specifications previously imposed" but, first, begins with the obvious. None of these requirements can constitute "specifications previously imposed" unless they are duties imposed on Coshocton by other provisions in the Lease Agreement. So, when considering CBC's proposed "specifications previously imposed" under § 13(b)(i), the court first must ascertain whether Coshocton had any duty to pay for these "specifications" under some other provision of the Lease. If so, the court will consider whether CBC has proven its breach of contract for that claim. If not, CBC has failed to prove its claim.

a.     <u>Lessee Maintenance Items, Cleaning Costs, and Suitable for Grain Product Loading</u>

CBC contends that § 6(c)'s requirement that Coshocton pay for repairs to Lessee Maintenance Items, cleaning costs, and repairs needed to make the cars suitable for grain product loading are "specifications previously imposed" under § 13(b)(i). Coshocton concedes that § 6(c)—titled "Maintenance By Lessee"—requires it to pay CBC for all repairs made to Lessee Maintenance Items and to clean the cars as "specifications previously imposed" under § 13(b)(i). Doc. 234 at 78; Ex. 141.[27] Section 6(c) also provides that the "[c]ars must be returned suitable for any grain and grain product loading." Ex. 1 at 4. Under the plain language of the Lease, then, § 6(c)'s requirement that Coshocton return the cars "suitable for any grain and grain product loading" is a "specification previously imposed." But, some question exists about what this "specification" required Coshocton to do.

As a starting point, the court must determine what the phrase "suitable for any grain and grain product loading" means. Neither the Lease nor the sources it selected to define terms—the Car & Locomotive Cyclopedia and the AAR Rules—define this phrase. Therefore, the phrase

---

[27] Section 13(b)(i)(A) also requires Coshocton to clean the cars on return.

46

"must be interpreted in its usual, ordinary, and popular sense." *U.S. Fid. & Guar. Co. v. Dealers Leasing, Inc.*, 137 F. Supp. 2d 1257, 1262 (D. Kan. 2001) (quoting *Brumley v. Lee*, 963 P.2d 1224, Syl. ¶ 6 (Kan. 1998)). The problem is that the phrase has no ordinary or popular meaning, or at least none identified in the evidence. Therefore, the court finds that this phrase is ambiguous.

"When a contract term is determined to be ambiguous, extrinsic evidence can be admitted to establish the parties' intent as to the meaning of the term at the time they signed the contract." *Cafer v. Ash*, 353 P.3d 469, 2015 WL 4366541, at *11 (Kan. Ct. App. June 26, 2015), *review granted* (Kan. Feb. 19, 2016). At trial, CBC elicited copious testimony about what the phrase "suitable for grain service" means—a phrase that's used in § 2(c) but not in § 6(c)—and whether that phrase is interchangeable with "suitable for any grain and grain product loading." Larry Koelzer and Grant Baker agreed that the two phrases are synonymous, and the court finds no persuasive reason to reject their testimony. Trial Tr. 348:22–349:2, 1336:6–17. The court thus considers the two phrases interchangeable.

In its Trial Brief, CBC argued that "suitable for grain service means a car can load and unload grain, keep it dry, and go from Point A to Point B," and that "th[e] phrase has nothing to do with the condition of any railcar and in fact cars could be damaged or contain any number of AAR defects and still be suitable for grain service." Doc. 208 at 8. But CBC's Proposed Findings attribute a far broader meaning to this phrase. CBC contends that the phrase "suitable for grain service" means that the cars have no AAR defects or "'cause for attention' under any AAR Rule." Doc. 233 at 71, ¶ 20. CBC thus shifted its position. Before trial, it asserted that a car is suitable for grain service even with any number of defects. By the time it filed is post-trial submissions, CBC asserted that a car is not suitable for grain service unless it is in pristine

condition. *See id.* (CBC arguing that a car is not suitable for grain service unless it "can be loaded and unloaded from point A to point B without being bad ordered by a railroad or industry"). This change in position followed the court's inquiry about the condition of the cars at the beginning of the Lease. *See, e.g.*, Trial Tr. 942. It is fair to infer that CBC decided to change its definition of "suitable for grain service" hoping to convince the court that the cars must have been "suitable for grain service" when Coshocton first accepted them under § 2(c).[28] This, under CBC's new definition, would mean that the cars must have had no damage or cause for attention going into the Lease. Doc. 233 at 59, ¶ 4; *id.* at 68, ¶ 3. CBC's shift in definition influences the court's evaluation of its argument's credibility.

The argument's credibility also is undermined by CBC's factual misrepresentation post-trial. In its Proposed Findings, CBC asserts that Mr. Koelzer, Keaton Baker, and Grant Baker all agreed that the phrase "suitable for grain service" prohibits a car from having any damage or cause for attention. *Id.* at 71, ¶¶ 20–21. But this is not correct. Although Grant and Keaton Baker agreed with this definition on direct-examination (Trial Tr. 996:7–12, 1242:16–19), Keaton Baker testified on cross-examination that the phrase "grain service [is] a typical way of saying [the cars] haul grain" (Trial Tr. 1047:3–8). And, Mr. Koelzer testified that CBC's counsel was "splitting hairs" when counsel tried to get him to say that a car is not suitable for grain service if the car has any cause for attention. Trial Tr. 352:12–16. Indeed, Mr. Koelzer testified that "suitable for grain service" means that the cars are "watertight" because "you're hauling a product that is susceptible to moisture." Trial Tr. 349:10–15. And, after CBC's counsel pressed him to testify that "suitable for grain service" means "no cause for attention," Mr. Koelzer responded that CBC's counsel was "trying to get me to say something that I really

---

[28] Section 2(c) provides, in relevant part: "**Acceptance.** Each Car shall be delivered suitable for grain and grain product service. A car shall be deemed accepted if [Coshocton] loads such Car." Ex. 1 at 2.

disagree with. I mean, they can be loaded, they can be suitable for grain service even though they may have a defect." Trial Tr. 357:8–11; *see also* Trial Tr. 356:13–17 (Mr. Koelzer disagreeing with CBC's definition); Trial Tr. 352:24–353:3 (CBC's counsel listing examples of broken parts and asking if that would make a car not suitable for grain service, to which Mr. Koelzer responds, "It's not suitable for any service"). Given Mr. Koelzer's explicit and repeated rejection of CBC's position, the court does not understand how CBC can argue that the witness had agreed. He hadn't.

The persuasive evidence and resulting inferences lead the court to reject the definition proposed by CBC's Proposed Findings. Instead, the court concludes that Coshocton, to satisfy § 6(c)—and thereby satisfy § 13(b)(i)—need only return the cars in a condition capable of loading and unloading grain and keeping grain dry during transport. Or, Coshocton must pay to repair the cars to achieve that condition.

A second, independent consideration bolsters the court's decision to adopt this definition. Black's Law Dictionary defines "suitable" as "[f]it and appropriate for the end in view." *Suitable*, *Black's Law Dictionary* (6th ed. 1990). Merriam Webster defines "suitable" as "adapted to a use or purpose." *Suitable*, *Merriam Webster's Collegiate Dictionary* (10th ed. 1997). These definitions suggest that the ordinary meaning of "suitable" used in the phrase "suitable for grain service" is not a broad one. It is limited to those characteristics that a car specifically must possess to carry grain. To read "suitable for grain service" as requiring a car to comply with all AAR rules would expand the definition of the word "suitable" beyond a meaning that focuses on "the end in view" to one that focuses on any end. If this breadth had been the parties' intent, they easily could have said as much. They did not. Instead, the parties chose the limiting phrase "suitable for grain service." The court thus finds CBC's newly

proffered definition of "suitable for grain service" too expansive and therefore untenable for a second reason.[29]

Section 6(c) thus includes three "specifications previously imposed" that Coshocton is responsible for at return: (1) repairs to Lessee Maintenance Items, (2) cleaning costs, and (3) repairs required to make the cars loadable and unloadable while also keeping grain dry during transport. The court next considers whether CBC has proven that Coshocton breached § 13(b)(i) by failing to pay for any of these "specifications previously imposed." Because Coshocton's Proposed Findings address just the first two "specifications," the court considers them together. It then considers the third "specification" separately.

i. Lessee Maintenance Items & Cleaning Costs

Coshocton concedes that it did not repair some Lessee Maintenance Items or clean the cars before returning them to CBC and so, it is liable for such costs under § 6(c). Coshocton asserts that it always was willing to pay CBC for cleaning the cars and repairing Lessee Maintenance Items. Doc. 234 at 78; Ex. 141. Coshocton was surprised when it began receiving invoices from CBC for repairs to the cars. These invoices charged Coshocton, on average, $11,519 more per car than the invoices Coshocton had received when it returned the first 16 cars under the Lease and Schedule A. And, the BRCs CBC sent to back up these invoices showed that the invoices charged Coshocton for nearly every repair performed on the cars. Exs. 203, 211.

After it received these invoices and BRCs, Coshocton's attorney contacted CBC's attorney. He advised CBC that Coshocton would pay to clean the cars and make Lessee Maintenance Item repairs under § 6(c), but that Coshocton could not discern what those charges

---

[29] This definition not only aligns with Mr. Koelzer's testimony and the definition of "suitable" but also with the Lease's definition of Lessee Maintenance Items, which includes those portions of a hopper car that are most closely connected to loading and unloading grain. *See* Doc. 234 at 63.

were from CBC's invoices. Ex. 141 at 1. Coshocton's attorney asked CBC to provide this information, or to submit invoices billing only for Lessee Maintenance Item repairs and cleaning costs. *Id.* at 1–2. CBC's attorney refused to tender Coshocton's request to his client. *Id.* at 2. Eventually, CBC learned of Coshocton's request, but also refused it. Trial Tr. 1393:1–1394:2, 1392:18–1395:7. Coshocton contends that these refusals prevented it from performing its obligations under § 13(b)(i) and thus excused Coshocton from its obligation. *See* Trial Tr. 698:5–7 ("[CBC] pummeled me with that big long invoice. We couldn't decipher all that, so we did not pay.").

The court's independent review of CBC's invoices confirms that Coshocton's bewilderment was legitimate. For example, CBC submitted some invoices that announce they "modify and replace" other referenced invoices. *E.g.*, Ex. 211 (invoice number 1508RR1511). But the purportedly modified and replaced invoices referenced by CBC do not exist. *See, e.g.*, Ex. 211 (invoice number 1508RR1511 referencing three invoices that do not exist in the evidence: CG201602, CG201602B, and CG201602C). So, the court agrees with Coshocton, at least to some extent.

In Kansas, as in many jurisdictions, "[a] party to a contract may not, in absence of justifiable cause, interfere, hinder or prevent performance by the other party and claim benefits or escape liability on the ground of nonperformance." *Briney v. Toews*, 95 P.2d 355, 355 (Kan. 1939); Kan. Judicial Council, *Pattern Instructions for Kansas—Civil* § 124.21, Westlaw (updated Nov. 2016); *accord Dill v. Pope*, 29 Kan. 289, 290–91 (1883); *United States v. Peck*, 102 U.S. 64, 65 (1880). "This general principle has been referred to as the doctrine of prevention." Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 39.3 (4th ed.), Westlaw (updated May 2017); *M W., Inc. v. Oak Park Mall, LLC*, 234 P.3d 833, 847

(Kan. Ct. App. 2010) (explaining that, in Kansas, the doctrine of prevention is "an implied condition to not prevent performance or make it impossible for the other party to perform" under a contract). The prevention doctrine typically applies to performance of conditions in a contract but the doctrine derives from "a principle of fundamental justice." This principle provides "that if a promisor is personally the cause of the failure of performance, either of an obligation due him or of a condition upon which his own liability depends, the promisor cannot take advantage of the failure." *Davis v. Key Gas Corp.*, 124 P.3d 96, 105 (Kan. Ct. App. 2005) (quoting Williston & Lord, *supra*, p. 51, § 39.6).

The court now considers whether this doctrine precludes CBC from recovering for Lessee Maintenance Item repairs and cleaning costs.

Lessee Maintenance Items

Coshocton argues that the prevention doctrine applies here because CBC refused to send invoices that identified Lessee Maintenance Item repairs or otherwise identify such costs. Coshocton contends that this refusal prevented it from paying for those repairs because Coshocton never could identify, with any certainty, which line items on the BRCs billed for repairs to Lessee Maintenance Items. Ms. Crown testified to this point when she explained that neither she nor Mr. Jones could discern, with any comfortable accuracy, which line items on the BRCs identified Lessee Maintenance Item repairs. *See* Trial Tr. 698:5–7 ("[CBC] pummeled me with that big long invoice. We couldn't decipher all that, so we did not pay."); 2016 30(b)(6) Dep. at 492:10–15 (Mr. Jones testifying about a BRC submitted by CBC and explaining that he didn't know what a "capstan" is even though it is a line-item on the BRC). During a June 2016 deposition, Mr. Jones echoed Ms. Crown's sentiments. He testified that he didn't know what a why-made code was, and that the invoices and BRCs CBC sent after the final return "meant

nothing to [him]" and might as well be "Pig Latin." 2016 30(b)(6) Dep. at 244:8–16. CBC's rejoinder asserts that it is Coshocton's job to sort out Lessee Maintenance Item repairs from the BRCs and that "[n]early anybody would be able to do it just by following the AAR Manual." Trial Tr. 1395:1–2 (Grant Baker testimony).

Coshocton has the better of this dispute. Based on the trial evidence, the prevention doctrine applies to CBC's claim that Coshocton breached § 13(b)(i) by failing to pay for Lessee Maintenance Item repairs on return. The court finds that one must repair railcars and work with the AAR Rules on a regular basis to understand why-made codes and know how to associate a particular code with a particular part of the railcar. For instance, the why-made code "09" indicates that a given repair is associated with some other repair. If one does not know railcars inside and out, it is extremely difficult, and perhaps impossible, to ascertain which repair to associate the "09" repair with. The court thus accredits Ms. Crown's testimony that Coshocton could not discern, with appropriate certainty, which repairs it should pay for from the BRCs accompanying the invoices CBC sent.[30]

The court recognizes that Coshocton objected to certain repair costs in the past as ones not associated with Lessee Maintenance Items. But Ms. Crown credibly explained why. When cars were bad ordered during the Lease, Mr. Jones usually could discern which amounts from the BRCs went into the CBC invoice Coshocton had received. And, he could tell, generally, whether those amounts were for gates and hatches—*i.e.*, Lessee Maintenance Items. Trial Tr. 697:8–698:7. CBC's invoices and BRCs during the Lease were much shorter than its invoices and BRCs after the Lease, and the parties regularly communicated with one another about questions over charges. But later, the evidence demonstrates, CBC's behavior changed. It

---

[30] CBC's attorney seemed to agree. During closing argument, he suggested that Coshocton should have paid Larry Koelzer—as an expert—to determine which charges on the BRCs were for Lessee Maintenance Item repairs. Doc. 243 at 11.

refused to communicate with Coshocton about the BRCs and invoices in question—even though those documents span hundreds of pages. So, Coshocton's previous capacity to inquire about the early invoices does not nullify the court's conclusion that Coshocton could not decipher CBC's invoices for the final 74 cars.

Also, even if Coshocton had the capacity to discern which charges in the invoices and BRCs were for Lessee Maintenance Items, CBC substantially interfered with Coshocton's ability to perform under the Lease. As soon as Coshocton's attorney contacted CBC's attorney, CBC should have known that Coshocton's ability to perform was hampered by the volume of invoices and BRCs. At trial, it emerged that CBC eventually acquired direct knowledge that Coshocton had requested an invoice billing just for Lessee Maintenance Item repairs and cleaning costs. Trial Tr. 1393:1–1394:2. It also emerged that CBC refused Coshocton's request for this kind of invoice. Trial Tr. 1392:18–1395:7. Indeed, when Coshocton's counsel asked Grant Baker during a deposition to separate out "the amounts for gates, hatch covers and cleaning," he responded, "I'm not here to do work for Coshocton," and "I'm not going to jump just because you tell me to jump." Trial Tr. 1393:2–3, 1393:7–8, 1394:1–2; *but see* Trial Tr. 1089:25–1090:11 (Keaton Baker testifying that no one had ever asked him to separate Lessee Maintenance Items from the rest of the repairs done to the 74 cars on return). And yet, at trial, both Grant and Keaton Baker testified that CBC still had not tabulated the costs for just Lessee Maintenance Item repairs and cleaning. Trial Tr. 1392:18–1395:7, 1141:10–1142:25. CBC offers no justification for its refusal to provide this information to Coshocton. The prevention doctrine thus applies and CBC may not now claim damages for a breach of § 13(b)—a breach that CBC caused. The court finds for Coshocton on CBC's claim for Lessee Maintenance Item repair costs under § 13(b)(i).

But even if the prevention doctrine did not apply, the court would reject CBC's claim for the costs it incurred repairing Lessee Maintenance Items upon return of the final 74 cars for another reason: CBC has not proven its damages. CBC provided the court with the 760-plus page AAR Rules Manual and more than 500 pages of invoices, BRCs, and modified invoices and BRCs for the 74 cars. Exs. 7, 203, 204, 211. But it never provided any evidence showing it had calculated the cost of repairs to just Lessee Maintenance Items. *See* Trial Tr. 1141:10–1142:25 (Keaton Baker testifying that he has no record of when repairs to just Lessee Maintenance Items concluded); Trial Tr. 1392:18–1395:7 (Grant Baker testifying that he did not know the amount for just Lessee Maintenance Item repairs). And CBC provided little helpful guidance about how to decipher the information from the invoices and BRCs. *See* Trial Tr. 867:10–887:21 (during voir dire by Coshocton, Keaton Baker explains how to read the revised BRCs admitted as Exhibit 204). To determine CBC's damages, then, the court would have to review every invoice and BRC for all 74 cars and attempt to discern when charges within them bill for Lessee Maintenance Items repairs.

Coshocton asks the court not to rectify CBC's omission. Doc. 234 at 59. Coshocton argues that "CBC bears the burden of proof for its claims, and merely providing a lengthy 'record without any indication of where [the Court] might look to identify' actual damages does not carry its burden." *Id.* (quoting *N.M. Off-Highway Vehicle All. v. U.S. Forest Serv.*, 645 F. App'x 795, 803 (10th Cir. 2016)). Coshocton cites several Tenth Circuit cases where it held that it need not scour the record for evidence supporting an appellant's claims. *Id.* These cases do not translate directly to the trial enterprise, where the court acts as the fact finder. Still, the court agrees with the gravamen of Coshocton's point. The court has no duty to solve an evidentiary puzzle that CBC has not bothered to solve.

"The burden of proving the damages incurred rests on the plaintiff," CBC. *Short v. Wise*, 718 P.2d 604, 609 (Kan. 1986). So, CBC "must not only show the injury [it] sustained, but must also show with reasonable certainty the amount of damage [it] suffered as a result of the injury or breach." *Venable v. Imp. Volkswagen, Inc.*, 519 P.2d 667, 674 (Kan. 1974) (citation omitted). Because the fact finder "should not be allowed to merely speculate in arriving at damage[s],"[31] CBC cannot carry its burden to prove damages unless it provides the court with a "reasonable basis for computation [of its damages] and the best evidence obtainable under the circumstances" so that the court, as the trier of fact, may "make an estimate which provides an adequate recovery of damages."[32]

CBC provides no such evidence. While James Jennings and Keaton Baker's testimony provided some explanation about BRCs and why-made codes, neither their testimony nor any other evidence allows the court to determine—with reasonable certainty—which why-made codes correspond with repairs to Lessee Maintenance Items. This is especially true for the highly technical BRCs prepared by The Andersons, Inc. Unlike Coshocton's return of the first 29 cars, no testimony exists that CBC performed all Lessee Maintenance Item repairs on the final 74 cars. So, The Andersons, Inc.'s BRCs may include repairs that Coshocton is responsible for, making those BRCs a crucial part of CBC's damages evidence. But with few exceptions, the court cannot discern which charges in The Andersons, Inc. BRCs are for Lessee Maintenance Item repairs or associated repairs. *See* Ex. 203 (first tab, The Andersons, Inc. BRCs that Coshocton received); Ex. 204 (first tab, revised and highlighted The Andersons, Inc. BRCs that Coshocton never received). Even the easier-to-read CBC-generated BRCs, which include descriptions like "REPLACE HATCH COVER", still present insurmountable problems. Ex. 203

---

[31] *Venerable*, 519 P.2d at 674.

[32] *Short*, 718 P.2d at 609.

(second tab, CBC BRC for RFMX 464115). For instance, some Lessee Maintenance Item repair entries may not be accompanied by descriptions as easily understood as the examples just noted. And, the court cannot discern if any of the 09 repairs are associated with those Lessee Maintenance Item repairs that CBC's BRCs clearly identify.

Judge Lungstrum warned CBC that it could not "just try to try this case . . . by dumping the records in." Doc. 236 at 14. CBC did not heed this guidance. The evidence CBC provides does not allow the court to arrive at an estimate that provides CBC an adequate recovery for Lessee Maintenance Item repairs. Any amount the court awarded CBC would amount to nothing more than a guess, and Kansas law does not permit damages based on guessing. The court thus awards CBC zero damages for Lessee Maintenance Item repairs for this reason as well.[33]

Cleaning Costs

The prevention doctrine does not apply, however, to CBC's claim for cleaning costs. Although CBC included this information in a sizeable volume of BRCs and invoices, Coshocton easily could have discerned which amounts charged for cleaning the cars on return. Each CBC-generated BRC contains a line item plainly marked "PRESSURE WASH CAR DEBRIS." Ex. 203 (second tab, CBC BRC for RFMX 10480). There is nothing technical about this description, and the evidence reveals no other reason to question whether cleaning a car requires any associated repairs. The court thus is not persuaded that the length and quantity of CBC's invoices or BRCs—though likely more cumbersome than necessary—prevented or hindered Coshocton from reimbursing CBC for cleaning costs. The court finds that Coshocton breached § 13(b)(i) by failing to reimburse CBC for cleaning all 74 cars on return.

---

[33] Having heard Keaton and Grant Baker's testimony, the court still invested significant time trying to understand CBC's invoicing system without ever fully succeeding. CBC chose to separate the invoicing and BRCs into three exhibits and though CBC provides a summary of all invoices, the summary does little to advance one's understanding of why those invoices were created. Exs. 211, 204, 203. Moreover, some of those invoices assert that they modify an earlier invoice that CBC does not appear to have admitted at trial.

But, the court does not award CBC the amount it invoiced Coshocton as damages for this failure. In the invoices CBC sent Coshocton, CBC charged $260 for cleaning per car. *E.g.*, Ex. 203 (second tab, CBC BRC for RFMX 10480). This figure, CBC's evidence explained, represents four hours of labor charged at $65 per hour. Trial Tr. 924:8–11. According to CBC, $65 per hour is the market rate for labor in the industry. Trial Tr. 924:8–16, 1041:13–19. This may be so, but that does not make it an appropriate measure of contract damages. Coshocton's breach entitles CBC to be placed in as good a position as it would have enjoyed had Coshocton reimbursed CBC for the costs CBC actually incurred cleaning the cars. *See Paola Gas Co. v. Paola Glass Co.*, 44 P. 621, 623 (Kan. 1896) (explaining that the proper measure of damages for a breach of contract, such as the one here, "should be confined to actual expenses, properly and necessarily incurred" due to the breach). Keaton Baker testified that CBC pays its repair crew no more than $25 per hour. Trial Tr. 1041:5–12. So, basing CBC's damages on a market rate for labor would award CBC more than its actual costs. It would award CBC a profit of $11,840 and thereby violate the principles governing contract damages. *Cf. Paola Gas Co.*, 44 P. at 623 (decreasing damage award to costs actually incurred due to the defendant's breach). The court thus awards CBC $7,000 in damages for Coshocton's breach of the cleaning obligation encompassed in § 13(b)(i)'s "specifications previously imposed." *See* Appendix A to this Decision. This figure represents $25 per hour of labor times four hours for each of the 70 cars for which the CBC BRCs in Exhibit 203 show an entry for "PRESSURE WASH CAR DEBRIS."[34]

---

[34] The court relies on Exhibit 203 alone because Coshocton never received the BRCs contained in Exhibit 204. Trial Tr. 873:4–11, 921:1–6, 922:7–19. Even though Keaton Baker testified that the BRCs in Exhibits 203 and 204 were identical but for the highlighting in Exhibit 204 (Trial Tr. 867:14–17, 873:4–11), the court found that Exhibit 204 contains CBC-generated BRCs for three cars not included in the CBC-generated BRCs in Exhibit 203: RFMX 464422, RFMX 464451, and RFMX 464575. The court thus cannot award CBC damages for those three cars; it infers that Coshocton received no BRC's from CBC for those three cars. Also, CBC's BRC in Exhibit 203 for

58

The court decides whether late fees apply to this award under § 4(d) of the Lease Agreement in its analysis in Part VIII of this Decision, below.

ii.      Suitable for Any Grain and Grain Product Loading

The court next considers whether CBC has proved that Coshocton breached § 13(b)(i) by failing to pay for repairs necessary to make the cars suitable for grain service—that is, to make the cars suitable for any grain and grain product loading under § 6(c).  At trial, CBC asked Mr. Koelzer whether a malfunction with or damage to various components of a car would render the car not suitable for grain service.  Only three of those components fall under the court's definition of the phrase "suitable for grain service":  rusty interiors, hatch covers, and roofs.  Trial Tr. 349:23–350:3, 350:23–351:1, 355:22–24.  CBC presented no evidence that it repaired the interior of any car because of rust.  Any claim for such repairs thus fails.  And, hatch covers are a Lessee Maintenance Item.  Ex. 1 at 4, § 6(a).  So, CBC's claim for hatch cover repairs here fails for the same reason that its claim for Lessee Maintenance Items failed.  Its claim for roof repairs, however, is a different story.[35]

The court has found the term "suitable for grain service" to mean loading and unloading grain, and keeping grain dry in transport.  Obviously, roof leaks render a car incapable of keeping grain dry in transport.  When Coshocton returned the final 74 cars, CBC's crew patched roof leaks in 17 of them.  *See* App. A.  Coshocton never reimbursed CBC for these repairs, and Coshocton thus breached § 6(c)'s suitable-for-grain-service requirement.  This failure therefore breached § 13(b)(i).

---

RFMX 464272 contains no entry for pressure washing the car.  So again, the court cannot award cleaning damages for that car.

[35] Though not made explicitly, the court responds to a possible counter-argument by Coshocton.  An email from Grant Baker shows that CBC considered roof repairs its responsibility during the Lease.  Ex. 430.  But, § 6(c)'s suitable-for-grain-service requirement applies only on return.  So, even if the Lease makes CBC responsible for roof repairs during the Lease, Coshocton is still responsible for roof repairs required at the end of the Lease.

But Coshocton argues that, even if it breached § 13(b)(i), CBC is not entitled to recover any damages.  Coshocton contends that had CBC performed as required by § 6(b) of the Lease, the only repairs the cars should have needed on return are Lessee Maintenance Item repairs.  Doc. 234 at 70.  The parties dispute what § 6(b) requires from CBC, but the court need not resolve their dispute to rule on Coshocton's argument.  As the court understands it, Coshocton's argument aims to defend CBC's claim that the Lease Agreement obligates CBC to pay for certain repairs during the Lease but then shifts all repair costs to Coshocton the moment the Lease ends.  *Id.*  The court does not understand Coshocton's argument as one asserting that it is not liable for roof-leak repairs under § 6(c)'s suitable-for-grain-service requirement.

Even if Coshocton intended to argue that it is not liable for roof-leak repairs at Lease end because CBC should have kept the roofs leak-free during the Lease, it would not persuade the court.  No evidence suggests that CBC declined to repair roof leaks during the Lease so that Coshocton would shoulder the cost at the end of the Lease.  Indeed, the evidence supports a contrary conclusion.  *See* Ex. 430 (email from Grant Baker stating that CBC would pay to repair a car roof during the Lease).  Moreover, returning the cars suitable for grain service is a duty created in § 6(c) and a "specification previously imposed" under § 13(b)(i).  A car with a leaking roof cannot keep grain dry and therefore cannot be suitable for grain service.  Coshocton thus must reimburse CBC for any roof-leak repairs.  Coshocton has not done so.  Coshocton therefore has breached § 13(b)(i) and CBC is entitled to recover any damages it proved were caused by that breach.

At trial, Keaton Baker testified that CBC repaired roof leaks on many of the Coshocton cars.  Trial Tr. 948:22–24, 1021:1–18.  CBC repaired these leaks by welding patches on the offending sections of the roof.  Trial Tr. 905:7–17.  The BRCs that CBC generated for the work

it performed on the cars clearly identify these roof repairs. In fact, CBC highlighted the line-item entries for roof patches. *E.g.*, Ex. 203 (second tab, CBC BRC for RFMX 464115). So, unlike with Lessee Maintenance Item repairs, CBC has provided the court with sufficient evidence to determine CBC's damages.[36]

But, the court does not award CBC the amount it invoiced Coshocton as damages. The CBC-generated BRCs include line-item entries such as, "WELD ROOF PATCH FOR LEAK," highlighted in yellow. *Id.* These entries include a labor charge and a materials charge. But, unlike other entries, they include no total charge. In other words, CBC recorded the repair and its cost but never charged CBC for that cost. Trial Tr. 908:11–909:9, 1054:22–1055:8. Instead, CBC included a section titled "SUPPLEMENTALS FOR CORRECT REPAIRS 'NO PATCHING' (TEMPORARY REPAIR)" in every BRC. *E.g.*, Ex. 203 (second tab, CBC BRC for RFMX 464115). In the CBC-generated BRCs that include entries for roof-leak repairs, this section includes entries for replacing the entire sheet of metal where the offending leak is located. As one would suppose, the labor and material for replacing a roof sheet exceeds the cost of patching it. In some instances, it's as much as $11,000 more. Ex. 203 (second tab, CBC BRC for RFMX 464214). It is this second, larger amount that CBC charged Coshocton. But CBC never replaced any roofs, it just patched them. Trial Tr. 1055:13–20.

Keaton Baker explained that CBC chose to bill Coshocton in this fashion for two reasons. First, CBC interprets the Lease to require what Mr. Baker calls the "proper repair" and not just any repair. Trial Tr. 908:11–909:9, 1037:3–8. Mr. Baker testified that, according to Carle Baker, the proper repair for a leaking roof requires replacing the entire roof sheet, and not just patching the leak. Trial Tr. 1021:6–18. And second, CBC interprets AAR Rule 1(2)(a)(6),

---

[36] Also unlike Lessee Maintenance Item repairs, the evidence is silent about whether Coshocton ever offered to reimburse CBC for repairing rook leaks. The court thus sees no reason to consider whether the prevention doctrine applies to CBC's claim to reimbursement for roof-leak repairs.

which provides that repairs must "conform to the original construction of the car" (Ex. 7 at 7), to prohibit patching. Trial Tr. 907:13–20. Because the Lease incorporates the AAR Rules, CBC contends that all roof repairs must conform to its interpretation of AAR Rule 1(2)(a)(6). So, even though CBC just patched the leaks, it charged Coshocton for the purportedly proper repair—replacing the entire roof sheet. The court is not persuaded by CBC's theory.

The Lease does not obligate Coshocton to reimburse CBC based on CBC's definition of the "proper repair" for a leaking roof. To be sure, § 6(a) prohibits Coshocton from patching Lessee Maintenance Items—*i.e.*, "hatch covers . . . including batten arms, outlet gate and components thereof." Ex. 1 at 4. And, § 6(c) provides that "[Coshocton] shall, at its expense, maintain all Lessee Maintenance Items in good condition and repair, and all repairs must be made in kind and *per the original construction and design of the entire car*, unless otherwise permitted in writing by [CBC], including renewal necessitated by repair to other portions of the Cars." *Id.* (emphasis added). But the roofs of the railcars are not a Lessee Maintenance Item. The Lease only obligated Coshocton to pay for roof repairs when Coshocton returned the cars and those repairs were required only to prevent leaks. So, nothing in the Lease required Coshocton to pay CBC for replacing roof sheets that, in fact, CBC never replaced.

The court finds CBC's argument under AAR Rule 1(2)(a)(6) equally unavailing. Rule 1(2)(a)(6) requires repairs to "conform to the original construction of the car." Ex. 7 at 7. But Rule B(6) provides that "[a]ny deviation from correct repairs identified in the Rules herein will be considered a wrong repair unless owner's permission is received." *Id.* at 6. Here, CBC chose to patch the roof leaks. Under the AAR Rules, then, those patches are sufficient.

Indeed, the patches were sufficient to make the cars suitable for grain service. As Grant and Keaton Baker testified, the 74 railcars that Coshocton leased are now leased to other

companies. So, patching roof leaks is acceptable under the Lease, the AAR Rules, and, it appears, to other lessees. CBC thus is limited to recovering the damages it actually incurred due to Coshocton's breach of the Lease's "suitable for any grain and grain product loading" requirement. *See Paola Gas Co.*, 44 P. at 623 (explaining that damages for a breach of contract "should be confined to actual expenses, properly and necessarily incurred" due to the breach).

But CBC's damages problems don't end there. While the CBC-generated BRCs record CBC's roof-patching costs, those costs include labor. As discussed in the previous section, CBC charged Coshocton $65 per hour of labor, but paid its workers no more than $25 per hour. So again, the court awards CBC only $25 per hour of labor. The court thus grants CBC $1,760.50 for Coshocton's failure to reimburse CBC for the roof repairs necessary to "return the cars suitable for any grain and grain product loading." The court shows how it arrived at this figure in Appendix A.

The court decides whether late fees apply to this award under § 4(d) of the Lease Agreement in its analysis in Part VIII of this Decision, below.

b.    Corrosion

CBC next contends that both § 8 and § 13(b)(i)(B) require Coshocton to return the cars free of corrosion—that is, free of any rust—as a "specification previously imposed."[37] Again, the court agrees with this argument's premise. These provisions are "specifications previously imposed." But the parties disagree about what the "specifications" required Coshocton to do. Unlike the preceding section, however, the court need not resort to extrinsic evidence to decide

---

[37] In its Statement of Contentions, CBC asserts that § 2(c) also supports its claim that Coshocton must pay for corrosion repairs on return as a "specification previously imposed." Doc. 165 at 14. Section 2(c) has nothing to do with corrosion; it addresses whether and how Coshocton can reject a car as one not suitable for grain service. Ex. 1 at 2. The court believes that CBC cites this section to support its argument that, if Coshocton accepted the car, the car must have been suitable for grain service. CBC contends this means that there was nothing wrong with the car whatsoever. Doc. 233 at 59–60, ¶¶ 2–5. The court already has dismissed this argument as unpersuasive and nothing in § 2(c) changes that conclusion.

this issue. The plain language of these provisions, along with a few rules of contract interpretation, make their requirements clear.

Section 8 provides, in relevant part:

> If any Car has corrosion or similar deterioration or damage due to any commodity placed or allowed to accumulate in or on the Car, or to which the Car is exposed during any term of this Lease, [Coshocton] shall be liable for the cost of correcting such deterioration or damage at the time the Car is returned to [CBC], regardless of whether or not such condition is due to [Coshocton's] negligence.

Ex. 1 at 5. So, under § 8, Coshocton must pay to repair any corrosion or corrosion-like damage caused by commodities during the Lease. CBC does not argue that § 8 is unclear, or that § 8 requires Coshocton to return the cars corrosion free regardless of the corrosion's cause. Instead, CBC argues that Coshocton owed a duty under § 13(b)(i)(B) to return the cars "'free of corrosion' irrespective of how it was caused" (Doc. 233 at 73, ¶ 25), because § 13(b)(i)(B) "was designed to overcome arguments about causation and responsibility for corrosion" (*id.* at 74, ¶ 27). In other words, CBC interprets § 13(b)(i)(B) to create a second, separate obligation to repair corrosion at the end of the Lease and this obligation is more expansive than the one imposed by § 8. CBC provides no persuasive basis for its interpretation. *See id.* at 75, ¶ 28 (asserting CBC's interpretation of § 13(b)(i)(B) and merely arguing that the interpretation is "reasonable and fair"). The court rejects CBC's interpretation for two reasons.

First, § 13(b)(i) provides that § 13(b)(i)(A) and (B) are examples of "specifications previously imposed"—and not newly imposed specifications. This interpretation is supported not only by the plain language of § 13(b)(i) itself, but also by reference to the Lease as a whole: Section 13(b)(i)(A) refers back to the requirements of § 6(c), and § 13(b)(i)(B) refers back to the requirements of § 8. Although the court should avoid interpreting a contract in a manner that creates superfluity, no rule of interpretation prevents parties from building redundancies into

their contracts.  *See Foltz v. Struxness*, 215 P.2d 133, 139 (Kan. 1950) (holding that parties are free to determine the terms of their contract, so long as those terms do not violate the law, and that "freedom to contract is not to be interfered with lightly" (citation omitted)); *see also U.S. W. Inc. v. Time Warner Inc.*, No. 14555, 1996 WL 307445, at *15 (Del. Ch. June 6, 1996) ("While redundancy is sought to be avoided in interpreting contracts, this principle of construction does not go so far as to counsel the creation of contract meaning for which there is little or no support in order to avoid redundancy.").  Indeed, some redundancies can improve a contract's clarity.

And second, adopting CBC's interpretation of § 13(b)(i)(B) would violate two rules of contract interpretation:  (1) "an interpretation giving reasonable, effective meaning to all terms is preferred to one that leaves some terms with no effect,"[38] often called the rule against superfluity; and (2) "[s]pecific provisions in a contract control over general ones."[39]  Under CBC's interpretation of § 13(b)(i)(B), § 8 is superfluous.  Because, to CBC, § 13(b)(i)(B) is a separate, broader statement of Coshocton's liability for repairing corrosion on return than § 8, § 13(b)(i)(B)'s corrosion obligation nullifies (or replaces entirely) Coshocton's § 8 obligations.  So, CBC's interpretation of § 13(b)(i)(B) renders § 8 entirely useless.  And, § 8 unambiguously imposes return-condition obligations on Coshocton that are specific to corrosion, whereas § 13(b)(i) speaks generally about Coshocton's return-condition obligations.  So, a natural reading of § 13(b)(i)(B) and the rules of contract interpretation counsel against adopting CBC's

---

[38] *Dillard Dept. Stores, Inc. v. Kan. Dep't of Human Res.*, 13 P.3d 358, 364 (Kan. Ct. App. 2000) (first citing Restatement (Second) of Contracts § 203(a); then citing *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995)).

[39] *Exch. State Bank*, 177 P.3d at 1285 (citing *Colburn v. Parker & Parsley Dev. Co.*, 842 P.2d 321, 329 (Kan. Ct. App. 1992)).

interpretation. The court holds that § 8, and not § 13(b)(i)(B), controls Coshocton's obligation to pay to repair corrosion when the cars are returned.[40]

But, even if § 13(b)(i)(B) and § 8 created separate duties, the court still would not adopt CBC's interpretation of § 13(b)(i)(B)'s effects. The plain language of § 13(b)(i)(B) requires the "corrosion" it speaks of to be commodity-related. Section 13(b)(i)(B) provides, "[e]ach Car shall be returned to [CBC] meeting the specifications previously imposed upon [Coshocton], including (but not to the exclusion of others): . . . (B) free of corrosion and any other commodity-related damage." Ex. 1 at 9. The phrase "commodity-related" in § 13(b)(i)(B) applies to the term "corrosion" as well as to "any other . . . damage" because the phrase "and any other commodity-related damage" suggests that the corrosion itself was commodity-related. Otherwise, why would the provision say "any other"? So, whether § 8 and § 13(b)(i)(B) create one duty or two, Coshocton is obligated to pay to repair only commodity-related corrosion.

To recover damages for a corrosion-inspired breach, CBC must prove that Coshocton failed to pay to repair corrosion or corrosion-like damage occurring during the Lease that was caused by commodities such as grain. *See* § 8, Ex. 1 at 5. CBC has not proved these required elements (even if the court assumes—without deciding—that rust is corrosion or corrosion-like damage under the Lease Agreement). At trial, CBC proved that the cars had a lot of rust on them when returned, but CBC did not prove what caused that rust or when the rust appeared. *See* Trial Tr. 492:1–7, 498:22–499:3 (Mr. Koelzer testifying that he saw no corrosion-caused holes in the cars' roofs and that he could not tell when any corrosion he did see formed without knowing "the history on these cars"). Indeed, Keaton Baker testified that the corrosion damages CBC seeks are based off the percentage of the railcar he estimated to have rust on it without any analysis of

---

[40] Although one could view this interpretation as rendering § 13(b)(i)(B) superfluous, the plain language of the Lease proves otherwise. Section 13(b)(i) explicitly states that § 13(b)(i)(A) and (B) are just examples of "specifications previously imposed," and not new duties.

what caused the rust, or when the rust appeared.  Trial Tr. 1023:6–9, 1026:1–5.  And Mr. Baker

also testified that CBC never repaired any corrosion after Coshocton returned the cars.  Trial Tr.

913:1–2, 1031:3–16.  In sum, CBC is not entitled to recover the corrosion damages it seeks

under § 13(b).  CBC has not proven that Coshocton breached § 8.  And, even if it had, CBC has

not proven that it was damaged by that breach.  The court thus awards CBC no damages on this

claim.

c.    <u>All Damage</u>

As noted previously, CBC contends that Coshocton is responsible for all repairs

necessary to return the cars to "good condition"[41] at the end of the Lease.  That is, CBC claims

that Coshocton must reimburse CBC for repairs to all damaged parts.  CBC's Proposed Findings

never explain the basis for this claim, or the legal theory purportedly supporting it.  But, CBC's

Statement of Contentions cites several Lease provisions as the basis for its all-damage,

"specifications previously imposed" argument.  And, various sections of CBC's Proposed

Findings unrelated to its return condition claims, provide a spate of arguments why Coshocton's

breach of those Lease provisions support their own, separate all-damage claims.  So, the court

imports these arguments into CBC's all-damage, "specifications previously imposed" claim.

This means the court often will refer back to this section when, later in this Decision, it addresses

CBC's other all-damage claims.

While CBC's theories frequently are difficult to follow, the court understands CBC to

assert that sections 15 (Insurance), 17 (Indemnity), and 3(a) (Charges)—individually—require

Coshocton to pay for all repairs, and that the combined effect of sections 15 and 17 requires the

same.  Docs. 233, 208.  None of these provisions, or any combination of them, supports CBC's

---

[41] Ex. 5 at 1088 (Cyclopedia definition of *good condition*).

theory that the Lease obligates Coshocton to pay for all repairs at return as a "specification previously imposed." The court explains why below.

i.     Section 15

CBC contends that § 15—the Lease's insurance provision—obligates Coshocton to repair "all 'physical damage'" to the cars, occurring both during and after the Lease, and so Coshocton must pay for all repairs as a "specification previously imposed" under § 13(b)(i). Doc. 165 at 20; *see also* Doc. 233 at 54, ¶ 35 ("Coshocton agreed to be responsible for any damage to the railcars . . . ."). Section 15 provides,

> [Coshocton] represents that it is insured with J H Ward Agency Insurance Company, P.O Box 98, Unionville Center, Ohio 43077. [Coshocton's] insurance has commercial general liability insurance with J H Ward Agency Insurance Company and will cover [CBC's] railcars in the amount of twenty-five thousand dollars ($25,000) against physical damage per Car. [CBC] will provide unique identifying marks for each Car insured by [Coshocton]. [Coshocton's] insurance shall name [CBC] as additional insured's. Upon execution hereof, and annually thereafter, [Coshocton] shall provide [CBC] with [Coshocton's] insurance certificate evidencing [Coshocton's] insurance required hereunder. [Coshocton's] insurance shall be primary without right of contribution from any insurance carried by [CBC]. The $25,000 value is a stipulated loss value for the casualty of a railcar regardless of its AAR Rule 107 depreciated value. Except while cars are on a Short-line or Class 1 railroad tracks, the depreciated value will apply, and [CBC] shall collect depreciated value from the damaging railroad. [All terms of the Lease shall remain unchanged and continue in full force and effect.]

Ex. 1 at 10; Ex. 4.

As the court understands them, CBC's arguments under § 15 rest on the premise that the phrase "physical damage" shows that the parties intended for Coshocton to pay for all repairs and maintenance to the cars during and after the life of the Lease. *See* Doc. 233 at 48–50, ¶¶ 16–19 (discussing damage theory in Insurance Clauses section). In other words, CBC contends that § 15's reference to "physical damage" imports every provision of the Lease that uses the word "damage" into § 15, and thereby makes Coshocton responsible for all damage to the railcars,

68

and, thus, all repairs to the railcars. *Id.*; *see also* Trial Tr. 11:11–13 (CBC's counsel stating, during opening argument, that "this insurance provision recognizes that Coshocton is responsible for all damage to these cars"); Trial Tr. 16:22–24 ("So this insurance is covering more than just the one species of damage called derailment damages.").

CBC's interpretation is untenable. Nothing in the Lease Agreement even suggests that the parties meant for the phrase "physical damage" in § 15 to obligate Coshocton to pay for every repair made to the cars during and after the life of the Lease. Also, CBC's interpretation of § 15—and for that matter all of its all-damage claims—takes a synergistic approach to contract interpretation. CBC contends, in effect, that the interaction or combination of two or more Lease provisions produces a combined effect greater than the sum of their separate effects. But the parties' rights and liabilities are what the contract says they are, and not something greater.

CBC characterizes its synergy-based interpretation of § 15 and the Lease as a whole as "harmonizing" the Lease Agreement's provisions. Doc. 233 at 50, ¶ 19; Doc. 243 at 12:21–23. CBC misapprehends what it means to harmonize a contract's provisions. The principle that a court must "harmonize" a contract's provisions does not permit the court to add two provisions together to impose a new duty not created by either provision. Instead, this principle counsels that courts "should not construe . . . [a contract's] paragraphs or clauses so as to make them conflict with each other," and instead should construe a contract's provisions in a way that "make[s] them harmonize, if such a construction is possible; and should construe them so as to give to each and all their terms full force and operation." *Cobb, Stribling & Co. v. Ins. Co. of N. Am.*, 17 Kan. 492, 497–98 (1877). So, when a court "harmonizes" a contract's provisions, it does not add two and two and get six, or even five. It is, instead, avoiding conflicting meanings and giving effect to all of the contract's terms. *See, e.g.*, *Cent. Nat. Res., Inc. v. Davis Operating*

69

*Co.*, 201 P.3d 680, 687 (Kan. 2009) ("In other words, we strive to determine the document's meaning and the parties' intent from within its four corners; we consider, construe, and harmonize the entire instrument without isolating any one particular sentence or provision." (citation omitted)); *In re Miller's Estate*, 348 P.2d 1033, 1037 (Kan. 1960) ("Where there are definite and unambiguous expressions in a will, other expressions that are capable of more than one meaning must be construed, if possible, so as to harmonize them with the plain provisions.").

CBC's definition of harmonizing goes well beyond that permitted by Kansas law. It asks the court to harmonize provisions that do not conflict and, thereby, creates new duties not imposed by the provisions. So, even though several provisions of the Lease Agreement address Coshocton's liability for "damage," none of them prove that Coshocton has a duty under § 15 to pay for all repairs to the cars. Coshocton is liable only for the repairs the Lease Agreement requires it to make.

A third reason exists to reject CBC's interpretation of § 15. CBC's interpretation is correct only if § 15 requires Coshocton to file a claim with its insurer whenever the cars experience any "physical damage." By its plain language, § 15 just requires four things of Coshocton: (1) Coshocton's insurance "will cover [CBC's] railcars" for $25,000 each; (2) Coshocton must list CBC as an additional insured on its policy; (3) Coshocton must provide CBC a certificate of insurance annually; and (4) Coshocton's insurance can't seek contribution from CBC's insurance. Ex. 1 at 10. These obligations do not require Coshocton to file a claim for or otherwise make Coshocton financially responsible for every dent and ding the cars may incur. If the court gave § 15 the interpretation and construction CBC advances, it would violate one of the first rules of contract interpretation in Kansas—a court cannot add obligations or rights to the ones that the parties saw fit to adopt. *See In re Marriage of Strieby*, 255 P.3d 34, 46

(Kan. Ct. App. 2011) ("The cardinal rule of construction is 'that courts will not rewrite a contract by construction if it is clear and unambiguous.'" (quoting *Thomas v. Thomas*, 824 P.2d 971, 977 (Kan. 1992))).

The court rejects CBC's arguments and holds that § 15 imposes no duty on Coshocton to pay for any repairs to damaged cars. CBC thus cannot rely on § 15 for its theory that one of the "specifications previously imposed" under § 13(b)(i) is that Coshocton must reimburse CBC for all repairs on return.

ii.      Section 17

CBC next contends that § 17—the Lease's general indemnification provision—requires Coshocton to pay for all repairs made to the cars during and after the Lease. This means, CBC says, that Coshocton must pay for all damage as a "specification previously imposed" under § 13(b)(i).

Section 17 provides, in relevant part:

> [Coshocton] shall indemnify, defend and hold [CBC] harmless from and against any loss, liability, claim, cost, damage or expense (including reasonable attorney's fees) arising out of or in connection with the possession, leasing, subleasing, storage, use or return of any Car from the date of acceptance by [Coshocton] to the date of delivery to [CBC] . . . .

Ex. 1 at 11. CBC's argument rests on § 17's reference to "damage." CBC asserts that this reference demonstrates that Coshocton is responsible for all costs that CBC incurred when it repaired the cars. Doc. 165 at 20. But the Lease Agreement does not define "damage" in § 17 to include costs to repair railcars. Indeed, the Lease Agreement does not define any of the terms used in § 17. So, CBC's definition of "damage" and, therefore, its interpretation of § 17 does not come from the four corners of the Lease.

CBC disagrees with this conclusion, arguing that,

[w]hen the indemnification clause [§ 17] is read together with the reimbursement [§ 6(c)], insurance [§ 15] and default provisions [§ 12], together with the exculpatory clauses in paragraph[s] 9 and 18(g), the contract as a whole shows the intent of the parties to obligate Coshocton to indemnify CBC for the cost to repair the corrosion, damage, and cause for attention, attorney's fees, and litigation costs.

Doc. 233 at 81, ¶ 4 (discussing damage theory in Indemnity Clauses section). So, CBC again asks the court to use synergy to broaden the Lease. For the same reasons discussed above, the court declines. The fact that some provisions of the Lease refer to Coshocton's liability for damage to the cars does not mean that § 17 intended the word "damage" to mean "all damage to railcars" or otherwise to expand Coshocton's repair obligations.

Indeed, the Lease Agreement as a whole suggests the opposite. After applying the following three rules of contract interpretation, the court concludes that § 17 does not require Coshocton to pay for all repairs to the cars: (1) "in construing a written instrument, language used anywhere in the instrument should be considered and construed in harmony with all provisions and not in isolation";[42] (2) the rule against superfluity, discussed already;[43] and (3) "[s]pecific provisions in a contract control over general ones."[44]

Several provisions in the Lease divide liability for repairs and other costs between Coshocton and CBC. For instance, § 3(a) requires Coshocton to indemnify and reimburse CBC for any railroad transportation costs. Ex. 1 at 2; *see also infra* pp. 74–76. Section 6(c) requires Coshocton to pay for repairs to Lessee Maintenance Items, which § 6(a) defines as "hatch covers (no patching), including batten arms, outlet gate and components thereof." *Id.* at 4. Section 6(b) requires CBC to pay for all repairs, other than those to Lessee Maintenance Items, that are

---

[42] *Colburn*, 842 P.2d at 328 (quoting *Wood River Pipeline Co. v. Willbros Energy Servs. Co.*, 738 P.2d 866, 871 (Kan. 1987)).

[43] *Dillard Dept. Stores, Inc.*, 13 P.3d at 364 (citations omitted).

[44] *Exch. State Bank*, 177 P.3d at 1285 (citation omitted).

required to "maintain each Car in good working order and repair." *Id.* And, § 8 requires Coshocton to pay to repair any commodity-related corrosion that develops on the cars during the course of the Lease. *Id.* at 5. So, when CBC asserts that § 17's use of the word "damage" requires Coshocton to pay for all repairs—whether made during or after the Lease—CBC ignores these provisions, renders them meaningless, and allows a broad, general provision to control over the specific provisions in sections 3(a), 6, and 8.

CBC's interpretation of § 17 also violates the first of these contract rules in a second way. It ignores the last part of § 17:

> [Coshocton] shall indemnify, defend and hold [CBC] harmless from and against any loss, liability, claim, cost, damage or expense (including reasonable attorney's fees) . . . *excepting, however, any loss, liability, claim, cost, damage or expense which . . . accrues with respect to any of the Cars while such Car is in a repair shop undergoing repairs for only Lessor maintenance items.*

*Id.* at 11 (emphasis added). This reference to Lessor Maintenance Items implies that CBC indeed is responsible for at least some repair costs. *See* Doc. 205 at 20 (Coshocton's Trial Brief, arguing that no matter "how CBC attempts to spin Section 17, its plain language clearly *excepts* Coshocton from *Lessor* maintenance items").

The court concludes that § 17 does not obligate Coshocton to pay for all repairs to the cars and so it cannot support CBC's all-damage, "specifications previously imposed" theory under § 13(b)(i). This conclusion also forecloses CBC's separate all-damage indemnity clause claim. *See* Doc. 233 at 76; *see also infra* pp.105–08.

### iii.      Section 3(a)

In its Trial Brief, CBC relies heavily on § 3(a), claiming that this section required Coshocton to reimburse CBC for repairs performed by the railroads. Doc. 208 at 10, 12, 18. In its Proposed Findings, CBC lists § 3(a) as one of the Lease provisions that supports its return

condition claim, but never references the provision in its proposed findings of fact or conclusions of law. Doc. 233 at 56. Perhaps CBC has abandoned its argument under § 3(a) but, to be careful, the court considers the argument advanced in CBC's Trial Brief.

There is no question that § 3(a) is a "specification previously imposed" under § 13(b)(i). But, there is a question whether § 3(a) obligated Coshocton to pay for the things that CBC says it did. CBC contends that § 3(a) "required Coshocton to repay CBC for railroad charges." Doc. 208 at 18. This much is true, but CBC stretches the phrase "railroad charges" beyond the scope of § 3(a). Section 3(a) provides:

> **(a)      Charges.**  From and after the acceptance of the Cars, [Coshocton] shall pay, and shall defend and indemnify [CBC] against, all switching, transportation, freight, demurrage *and other charges* assessed by any railroad or other entity with respect to such Car (including its movement, use or operation) from the time period beginning after delivery of such cars until the return of such cars to [CBC] in accordance with the terms hereof.  [Coshocton] shall also pay all expenses and charges for the movement of each Car to a return location designated by [CBC] upon the expiration or termination of this Lease pursuant to Subsection 13 (a) of this Lease.

Ex. 1 at 2 (emphasis added).  CBC contends that the italicized phrase includes the cost of repairs. *See* Doc. 208 at 10.  Based on this, CBC asserts that the phrase means that "CBC would be billed by railroads for repairs" and CBC would "pay those bills with a right to be reimbursed for that work under paragraph 3."  *Id.*  Coshocton contends, however, that § 3(a) "only applies to transportation charges on the railroad."  Doc. 234 at 84.

Because either party's interpretation might be correct, the court looks to the rules of contract interpretation for guidance.  One of those rules—*ejusdem generis*—applies here.  As the Kansas Supreme Court has explained, *ejusdmen generis*

> "is a well-known maxim of [interpretation] to aid in ascertaining the meaning of . . . [an] instrument, the doctrine being that where an enumeration of specific things is followed by some more general word or phrase, such general word or phrase is to be held to refer to things of the same kind with respect to a

classification which immediately precedes it—that is to say, where general words
follow particular words in an enumeration describing the subject matter, general
words are construed to embrace only objects similar in nature to those enumerated
by antecedent specific words."

*Wulf v. Shultz*, 508 P.2d 896, 901 (Kan. 1973) (quoting *Keller v. Ely*, 391 P.2d 132, 135 (Kan.

1964)).  Here, § 3(a) requires Coshocton to pay "all switching, transportation, freight, demurrage

and other charges."  Ex. 1 at 2.  The words "switching," "transportation," "freight," and

"demurrage"[45] thus confine the meaning of "other charges" to charges for the leased cars' travel

on a railroad's tracks.  Although a bad ordered car cannot travel on a railroad's tracks—*i.e.*,

cannot run in service—charges for repairs to the body of a car are too far removed from the car's

travel or movement to be considered similar to charges for switching, transportation, freight, and

demurrage.

Also, and as the court already explained, § 6 controls the parties' financial liability for

repairs.  So, if a railroad repaired a Lessee Maintenance Item on one of the leased cars and CBC

paid for that repair, § 6 would require Coshocton to reimburse CBC.  The court thus agrees with

Coshocton and finds that § 3(a) does not require Coshocton to reimburse CBC for repairs,

whether those repairs are performed by a railroad operator or otherwise.  CBC thus cannot rely

on § 3(a) for its all-damage, "specifications previously imposed" theory under § 13(b)(i).  This

conclusion also forecloses any prior-damage claim based on § 3(a).  *See* Doc. 233 at 78, ¶¶ 6–7

(Indemnity Clauses section of CBC's Proposed Findings); *see also* Trial Tr. 1334 (Grant Baker

discussing whether any railroad repaired some of the cars returned to CBC in 2015).

---

[45] The term *demurrage* was once used more widely than it is today.  Because this term is no longer used frequently,
the court briefly explains what its recognized meaning is in the railroad industry.  Demurrage charges are charges
assessed "for undue detention" of railcars and the like, and are used "to secure compensation for the use of the car
and of the track which it occupies . . . [and] to promote car efficiency by providing a deterrent against undue
detention."  *Turner, Dennis & Lowry Co. v. Chicago, Milwaukee & St. Paul Ry. Co.*, 271 U.S. 259, 262 (1926)
(citation omitted).  Neither the Lease nor its selected definition sources ever define this term so the court applies the
recognized industry meaning.  *See McAffee v. City of Garnett, Kan.*, 469 P.2d 295, 299 (Kan. 1970) ("It may be
assumed in the absence of evidence to the contrary, that when members of a trade or business employ trade terms in
their contracts with one another they attach to them their trade significance."  (citation omitted)).

iv.     Combined Effect of § 15 and § 17

CBC next argues that combining § 15 and § 17 requires Coshocton to pay for all damage inflicted on the cars during the life of the Lease as a "specification previously imposed" under § 13(b)(i).  The court understands this theory to contend that § 17 requires Coshocton to reimburse CBC for costs to repair any damage to the cars and that § 15 requires Coshocton to carry insurance on the leased cars that covers all damage done to the cars—no matter where the car was located when damaged and no matter who caused the damage.  Read together, CBC contends, these two provisions require Coshocton to file an insurance claim to reimburse CBC for any costs it incurs to repair any damage to the cars.  *See* Doc. 233 at 81, ¶ 4 ("When the indemnification clause [§ 17] is read together with the . . . insurance [§ 15] . . . provisions, . . . the contract as a whole shows the intent of the parties to obligate Coshocton to indemnify CBC for the cost to repair . . . damage . . . .").

The court already has rejected CBC's interpretations of § 15 and § 17's effects on Coshocton's liability for repairs.  Combining those rejected interpretations cannot produce a different result.  The court thus rejects CBC's argument that the combined effect of § 15 and § 17 renders Coshocton liable for any repairs to damaged cars.  Those provisions will not support CBC's all-damage, "specifications previously imposed" theory under § 13(b)(i).

d.     Conclusion:  "Specifications Previously Imposed"

For all the reasons explained above, the court finds that the following provisions and responsibilities are the "specifications previously imposed" that § 13(b)(i) required Coshocton to abide when returning cars:

- Coshocton must pay to repair all Lessee Maintenance Items, § 6(c);

- Coshocton must pay to clean the cars, § 6(c);

- Coshocton must pay for all repairs necessary to make the cars suitable for loading and unloading grain and keeping grain dry during transport, § 6(c); and

- Coshocton must pay to repair any commodity-caused corrosion or corrosion-like damage that developed during the Lease, § 8.

Given this conclusion, CBC has proved that Coshocton breached just two of these duties—paying to clean the cars and paying to repair roof leaks existing when it returned the cars. For these breaches, the court awards CBC $8,760.50. The court now turns to CBC's argument that § 13(b)(i)'s second sentence expands Coshocton's liability on return to include all damage.

        *2.       Interpreting the Second Sentence of § 13(b)(i):  Liability on Return Only*

CBC contends that § 13(b)(i)'s second sentence expands Coshocton's liability for repairs on return to include all repairs—and not just repairs for "specifications previously imposed" under § 13(b)(i)'s first sentence.

Section 13(b)(i) starts with these words:  "Each Car shall be returned to [CBC] meeting the specifications previously imposed upon [Coshocton], including (but not to the exclusion of others):  (A) free of all accumulations or deposits from commodities; and (B) free of corrosion and any other commodity-related damage." Ex. 1 at 9.  This first sentence is followed by this one:  "Any item that is damaged (or worn beyond what the AAR calls cause for attention or condemnable items or repairs in any AAR rule . . . shall be deemed to have been damaged by the negligence of [Coshocton] . . . and shall be [Coshocton's] responsibility." *Id.*  Coshocton contends that the term "[a]ny item" in this second sentence "merely refers back to the 'specifications previously imposed upon [Coshocton]' which were the subject of the first sentence," and so it creates no new duties.  Doc. 234 at 69.  CBC takes the opposite view, contending that "[a]ny item" means any item, and it does not refer back to the previous sentence.

Thus, CBC reasons, § 13(b)(i)'s second sentence creates a new duty. Doc. 208 at 5; Doc. 233 at 74–75, ¶¶ 27–28. At bottom, CBC asserts that Coshocton must pay to repair any item that is damaged when the car is returned.

Coshocton's interpretation has the better end of the dispute. A plain reading of § 13(b)(i)—start to finish—leaves the court with the conviction that the sentences in this provision flow one into the next, rendering the second sentence's use of the phrase "any item that is damaged" a natural reference to the obligations imposed by the sentence preceding it. CBC's interpretation, on the other hand, requires an awkward and contrived interpretation of § 13(b)(i) because it asks the court to read the second sentence of that provision as an entirely new concept, one completely unrelated to the sentence preceding it. Also, the court is unpersuaded by CBC's argument that Coshocton's interpretation ignores the phrase "in addition to" in § 13(b)(i)'s first sentence. Doc. 208 at 5. CBC's argument is unpersuasive for the simple reason that the first sentence of § 13(b)(i) does not include the phrase "in addition to." Ex. 1 at 9. Equally unpersuasive is CBC's argument during closing argument. There, CBC asserted that Coshocton could not advance a reasonable interpretation of the Lease now because Coshocton was ignorant of the Lease's terms when the parties executed it in 2010. Doc. 243 at 14:7–16. Though Mr. Jones and Ms. Crown conceded that neither had read the Lease start to finish in 2010, CBC provides no legal authority supporting the conclusion that CBC draws from this fact. So, the court agrees with Coshocton that the second sentence of § 13(b)(i) should be read with reference to the sentence preceding it.

Nonetheless, the court considers the rest of the Lease Agreement to determine whether the Lease as a whole can support CBC's view. It cannot. CBC's interpretation of the effect of § 13(b)(i)'s second sentence suffers the same problem that plagued its all-damage, "specifications

previously imposed" theory under § 17. It reads § 13(b)(i)'s second sentence in isolation, thus overlooking the detailed distribution of liability for repairs and costs established elsewhere in the Lease. But this time, CBC's interpretation of § 13(b)(i) more egregiously offends the interpretation rules against reading a provision in isolation, superfluity, and allowing general provisions to control over specific ones.

As with § 17, CBC ignores part of § 13(b). Specifically, it ignores the first sentence of § 13(b)(i). This sentence required Coshocton to return the cars "meeting the specifications previously imposed." Ex. 1 at 9. As the court already has found, these "specifications" are the ones located in sections 6 and 8, among others. Under CBC's interpretation, the second sentence of § 13(b)(i) eradicates any reference to the "specifications previously imposed" in the first sentence and, at the moment the Lease ends, makes Coshocton liable for all repairs to the cars. CBC's interpretation also ignores the careful and detailed distribution of responsibilities found elsewhere in the Lease—such as in sections 6 and 8. Because many of the Lease's other provisions contain no restrictions about when they apply, *i.e.*, no temporal limitations, CBC's interpretation of § 13(b)(i) swallows these other provisions whole, rendering them meaningless and without effect.

Among other problems, CBC's interpretation of § 13(b)(i)'s second sentence also offends an often quoted rule of contract interpretation: the court should avoid an interpretation that "vitiate[s] the purpose [of the contract] or reduce[s] the terms of the contract to an absurdity." *First Nat'l Bank of Olathe v. Clark*, 602 P.2d 1299, 1303 (Kan. 1979) (quoting *Weiner v. Wilshire Oil Co. of Tex.*, 389 P.2d 803, 808 (Kan. 1964)); *see* Doc. 234 at 71. Under CBC's interpretation, when Coshocton agreed to § 13(b)(i), it agreed to pay rent and repair all Lessee Maintenance Items during the Lease, and Coshocton also agreed to pay to overhaul the cars

completely at the end of the Lease. In other words, CBC contends, Coshocton agreed to make these cars like new, even though they were nearing the end of their useful life when the Lease began. Trial Tr. 573:8–577:20. CBC's view of § 13(b)(i) simply is too extreme to adopt. *Cf. In re Kahn*, 133 F.3d 932, 1998 WL 17754, at *3 (10th Cir. Jan. 20, 1998) (applying Kansas law and finding a party's interpretation of a settlement agreement "absurd" because that party's interpretation had "[Mr.] Schigur [giving] up a $169,000 claim for nothing, when the sole purpose of the adversary claim was to receive something"). A circumstance might exist where a lessee would be willing to take on such an extraordinary obligation. But, the parties to such an unusual economic bargain undoubtedly would recite it and in no uncertain terms. To say it more bluntly, any lease requiring a lessee of 40-year old railcars to return those cars in new condition at the end of the lease would memorialize that requirement explicitly. Nothing in the Lease Agreement ever suggests that CBC and Coshocton intended to strike such an extraordinary bargain.

Although CBC's interpretation of § 13(b)(i)'s second sentence violates several rules of contract interpretation, Coshocton's does not. Coshocton's contends that the second sentence of § 13(b)(i) merely makes it clear that the division of responsibility imposed by sections 5, 6, 8, and others extends beyond the last day of the Lease,[46] and clarifies that CBC need not prove that Coshocton caused the damage for those provisions to apply. Coshocton's interpretation of § 13(b)(i) provides a plausible, reasonable meaning for all of the Lease's provisions, harmonizes those provisions with the rest of the Lease, and leaves no provision without effect.

Because principles of contract interpretation confirm the court's inclination to reject CBC's interpretation of § 13(b)(i)'s second sentence and adopt Coshocton's, § 13(b)(i) does not

___

[46] Pragmatic considerations in the railroad industry often create a lag between the end of the lease and the railcars' actual return to the lessor. Doc. 233 at 59, ¶ 1.

admit two reasonable interpretations. The court thus finds that §13(b)(i) is not ambiguous and holds that the second sentence of § 13(b)(i) merely references the one preceding it. Consequently, the court concludes that this sentence does not expand Coshocton's liability for repairs on return. Coshocton merely was obligated to pay CBC for the repairs necessary to comply with its obligations under the Lease's "specifications previously imposed" when it returned the cars.

*3.    Conclusion: Return Condition Claim*

For all the reasons recited above, the court awards CBC $7,000 for Coshocton's breach of the Lease's cleaning requirement and $1,760.50 for Coshocton's breach of the Lease's suitable-for-grain-service requirement. The court finds for Coshocton on the rest of CBC's return condition claims.

**D.      Prior Damage Claim**

CBC's next claim contends that the Lease made Coshocton financially responsible for all repairs made during the life of the Lease but that CBC's bill for those repairs was not due until the end of the Lease. Doc. 208 at 16. CBC contends that Coshocton failed to pay for those repairs upon return, causing $296,276 in damages. Coshocton responds, arguing that "no lessee, regardless of its level of experience, sophistication, or diligence, could have possibly understood the Lease to mean" what CBC says it does. Doc. 234 at 57. The court agrees with Coshocton— the Lease will not support CBC's interpretation of it.

CBC never indicates precisely which Lease provision Coshocton breached to give rise to this prior damage claim. Instead, CBC makes a web of perplexing arguments. Hoping to provide CBC's arguments some structure, the court divides them into two groups: (1) ones

making Coshocton responsible for all damage done to the cars during the Lease; and (2) ones making payment for that damage due at the end of the Lease.

###### 1. *Responsibility for Damage and Repairs During the Lease*

To support its claim that Coshocton is liable for all repairs during the life of the Lease, CBC makes essentially two arguments: (1) the phrase "maintain in good working order and repair" in § 6(b) ultimately makes CBC financially responsible for no repairs; and (2) the second sentence of § 13(b)(i) makes Coshocton financially responsible for all repairs during the Lease. The court considers these two arguments, separately, below.

###### a. Section 6(b): "Good Working Order and Repair"

CBC asserts that the phrase "in good working order and repair" in § 6(b), combined with sections 6(c), 8, and 17, shows that the parties intended for Coshocton to reimburse CBC for all the repairs CBC paid for during the Lease. The court is not persuaded. Nothing in the plain language of sections 6, 8, or 17 supports CBC's theory.

Section 6(b), titled "Maintenance by Lessor," provides: "[CBC] shall, at its expense, maintain each Car *in good working order and repair* and in accordance with the standards set by the Interchange Rules and by the rules of any other applicable regulatory body." Ex. 1 at 4 (emphasis added). CBC contends that the italicized words did not require it to pay for any repairs. Instead, CBC says, these words merely required it to pay for the repairs necessary to secure release of a bad ordered car and that Coshocton then must reimburse CBC for these repair costs at the end of the Lease. Doc. 223 at 70, ¶ 16; Doc. 208 at 9–10. To support this claim, CBC relies on reimbursement language in sections 3(a), 5(c), and 6(c), and on indemnification language in sections 8, 14, 15, and 17. Doc. 223 at 70, ¶ 16; Doc. 208 at 10; Doc. 165 at 20.

Even if one assumes that § 6(b) merely obligated CBC to front the costs to repair a bad ordered car subject to a right of reimbursement, CBC's interpretation still fails. This is so because CBC's interpretation is based on a faulty premise: CBC asserts that sections 3(a), 5(c), 6(c), 8, 14, 15, and 17 required Coshocton to pay for all repair costs during the Lease. This premise ignores the plain language of these seven provisions and adds words to them that they do not contain. *See In re Marriage of Strieby*, 255 P.3d at 46 ("The cardinal rule of construction is 'that courts will not rewrite a contract by construction if it is clear and unambiguous.'" (citation omitted)); *see also Quenzer v. Quenzer*, 587 P.2d 880, 882 (Kan. 1978) ("Words cannot be written into a contract which import an intent wholly unexpressed when it was executed." (citation omitted)).

The words that these seven provisions actually contain never require Coshocton to reimburse CBC for all repair costs. To the contrary, they merely require Coshocton to reimburse (or indemnify) CBC for specific costs. And, in fact, several of them have nothing to do with reimbursing CBC for repairs at all. For instance, § 3(a) requires Coshocton to reimburse CBC for "all switching, transportation, freight, demurrage and other charges assessed by any railroad or other entity with respect to" a leased car. Ex. 1 at 2; *see also supra* pp. 74–76 (discussing CBC's § 3(a) argument). And, sections 14, 15, and 17 have nothing to do with how to divide maintenance and repair costs between Coshocton and CBC. So, § 6(b)'s use of the phrase "good working order and repair," when combined with CBC's right to reimbursement or indemnification under sections 3(a), 5(c), 6(c), 8, 14, 15, and 17, cannot support the notion that the Lease made Coshocton responsible for all prior damage. Instead, all of them provide CBC with specific, narrow rights to reimbursement or indemnification, and even when combined these provisions do not support a contrary conclusion.

### b. Section 13(b)(i)'s Second Sentence, Again

CBC next contends that the second sentence of § 13(b)(i) supports its $296,276 prior damage claim. CBC asserts that this sentence shows that "the Lease made Coshocton responsible for all damage to the railcars" during the life of the Lease. Doc. 208 at 12. As already discussed, the second sentence of § 13(b)(i) provides, in relevant part, "Any item that is damaged [] or worn beyond what the AAR calls cause for attention or condemnable items or repairs in any AAR rule . . . shall be deemed to have been damaged by the negligence of [Coshocton] . . . and shall be [Coshocton's] responsibility." Ex. 1 at 9.

CBC argues that the term "any item" in § 13(b)(i) "eliminated the possibility of arguing about how damage would be defined or who was responsible for it" during the Lease by providing that any damage "shall be [Coshocton's] responsibility." Doc. 208 at 14; *Id.* at 5. This argument is unpersuasive. Section 13(b)(i) only applies at the end of the Lease when Coshocton returns the cars. *See* Ex. 1 at 9 ("Condition Upon Return . . . Each Car shall be returned . . . ."). So, on its face, § 13(b)(i)—including all the sentences in it—is limited to Coshocton's responsibility to pay for certain repairs at Lease-end. *See supra* pp. 78–81. It does not control who pays for particular repairs during the life of the Lease.

### 2. *Payment Deferred Until the Cars Are Returned*

As part of its prior-damage argument, CBC also contends that the parties intended for Coshocton to reimburse CBC for all repairs CBC paid for during the Lease, but that "the timing of payment—and for reckoning of Coshocton's responsibility—was agreed to be delayed and triggered when the cars were returned." Doc. 208 at 16. To support its interpretation, CBC argues that the parties "clearly agreed in . . . [the Lease] that the final accounting for the condition of the cars would be handled at the conclusion of" the Lease. *Id.* But CBC never

identifies which part of the Lease established this protocol. CBC does assert that it believes that some of § 13(b)(i)'s language "[c]learly . . . required Coshocton to be responsible for the complete condition of the railcars at their return." *Id.* at 6; *see id.* at 5–6 (relying on the words in § 13(b)(i) that "any item that is damaged . . . shall be [Coshocton's] responsibility"). And, CBC asserts that § 8's reference to deferred maintenance—"[Coshocton] shall be liable . . . at the time the Car is returned"—shows that the Lease "was designed" to "defer accountability of responsibility for the cars until the end of the [L]ease." *Id.* at 6.[47] Coshocton disagrees, arguing that CBC's interpretation goes "well beyond the four corners of the Lease" and that "no lessee, regardless of its level of experience, sophistication, or diligence, could have possibly understood the Lease to mean" what CBC says it does. Doc. 234 at 57.

The court agrees with Coshocton. CBC's interpretation of the Lease is untenable for three reasons. First, the Lease Agreement did not make Coshocton responsible for all repairs made during the Lease or on return. *See supra* pp. 77, 81. If Coshocton is not responsible for all repairs, then it is illogical to make Coshocton responsible to pay for all repairs at the end of the Lease. Second, nothing in the Lease supports CBC's assertion that the parties intended to defer payment for all repairs until the end of the Lease. And third, that § 8 permits Coshocton to forego paying to repair corrosion until the Lease ends does not establish that the parties intended to defer accountability for *all* repairs until the end of the Lease.

The court concludes that the Lease did not make Coshocton financially responsible for all repairs made during the Lease. The court also concludes that the Lease does not manifest an

---

[47] CBC contends that this "deferred accountability" concept was built into the Lease to increase Coshocton's use of the railcars. Doc. 208 at 6. Because the Lease is not ambiguous on this point, the court finds no need to resort to extrinsic evidence such as the parties' motivations for including certain concepts in the Lease.

agreement to make the bill for those repairs due at the end of the Lease. Accordingly, the court finds for Coshocton on CBC's prior damage claim.[48]

### E.    Extrinsic Evidence Would Not Alter the Court's Conclusions

Both CBC and Coshocton presented extrinsic evidence at trial, each claiming that its evidence supported its interpretation of the Lease's repair provisions. CBC asked the court to consider, among other things, norms—or, purported norms—within the railcar industry and its version of what the parties believed to be their agreement. Coshocton asked the court to consider the parties' course of performance[49] (or course of dealing) and CBC's attempt to pull cars out of the Lease early. Because the court has concluded that the Lease's repair provisions are not ambiguous, it has not relied on either party's extrinsic evidence to reach its decision on claims made under them. But, even if it found any part of the Lease provisions ambiguous, the court's conclusion would be the same: The Lease does not make Coshocton financially liable for all repairs during or after its life.

On the chance that the court of appeals might disagree with the court's conclusion about ambiguity, the court briefly considers three of the parties' course-of-performance/course-of-dealing arguments about: (1) CBC's all-damage, "specifications previously imposed" theory; (2) CBC's all-damage, return-condition theory; and (3) CBC's prior damage theory.

Before the court can address these arguments, however, it must address a threshold question. Namely, do these arguments rely on course-of-performance or course-of-dealing

---

[48] Given this conclusion, the court finds it unnecessary to consider the parties' arguments whether CBC maintained the cars in "good working order and repair" during the Lease. *See* Doc. 233 at 65, ¶ 38; *id.* at 66, ¶ 47; Doc. 234 at 61.

[49] In its Proposed Findings, CBC characterizes Coshocton's course-of-performance arguments as ones asking the court to find that the parties' course of performance modified the terms of their Lease. Doc. 208 at 12. Though this is one way to use course-of-performance evidence, that's not how Coshocton uses it here. Doc. 234 at 54, ¶ 111; *id.* at 58, 71–75. The court thus does not consider CBC's modification arguments.

evidence?  To answer that question, the court must ask whether the parties committed to one lease or two.

### 1. One Lease or Two?

Course of dealing analysis is germane only "where the contract at issue is one of a series of similar contracts" between the same parties.  *McRae v. Publ'ns Int'l, Ltd.*, 985 F. Supp. 1036, 1041 (D. Kan. 1997) (applying Kansas law); *see also* Restatement (Second) of Contracts § 223(1) (Am. Law Inst. 4th ed. 2008) (defining "course of dealing" as "a sequence of previous conduct between the parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct").  Course of dealing thus speaks to the parties' conduct before they entered into the disputed contract.  Course of performance, on the other hand, speaks to the parties' actions under the disputed contract. Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 53:28 (4th ed.), Westlaw updated May 2017.  So, course-of-performance evidence arises "[w]here an agreement involves repeated occasions for performance."  Restatement (Second) of Contracts § 202(4). When interpreting an ambiguous contract, courts prefer course-of-performance evidence to course-of-dealing evidence.  *Id.* § 203(b).

Though CBC first argued that only one lease existed, it now contends that there were two leases.  CBC asserts that the first lease "began March 10, 2010, and ended July 31, 2012," and the second lease began February 15, 2011, and ended on September 30, 2015.  Doc. 208 at 3.  In the larger context of the evidence, CBC's position would make the original Lease Agreement and Schedule A the "first lease" (Exs. 1, 2), and Schedule B1 and B2 the "second lease" (Exs. 4, 3).  In contrast, Coshocton contends that there was only one lease and that the various Schedules merely amended that single lease agreement.  Doc. 234 at 72–73.

Judge Lungstrum addressed a similar question earlier in the case. At summary judgment, Coshocton argued that Schedule B2 constituted a new contract. Doc. 66 at 16. Judge Lungstrum disagreed, concluding that the parties did not substitute one agreement for another in Schedule B2. Doc. 110 at 25. As he explained, "the operative document clearly provides that it is an amendment to the [L]ease by which the term of the [L]ease was extended, the rent amount was changed, and all other terms remained unchanged and continued in full force." *Id.* Turning the table on the issue, Coshocton now invokes the law-of-the-case doctrine and asks the court to apply Judge Lungstrum's ruling. *See* Doc. 234 at 72.

"Under the 'law of the case' doctrine, when a court rules on an issue of law, the ruling 'should continue to govern the same issues in subsequent stages in the same case.'" *Bishop v. Smith*, 760 F.3d 1070, 1082 (10th Cir. 2014) (quoting *United States v. Graham*, 704 F.3d 1275, 1278 (10th Cir. 2013)). Whether and when to apply this doctrine is a discretionary decision and not a rigid rule. Nonetheless, Tenth Circuit authority recognizes just three exceptions to the doctrine: "(1) when new evidence emerges; (2) when intervening law undermines the original decision; and (3) when the prior ruling was clearly erroneous and would, if followed, create a manifest injustice." *Id.* at 1086 (citations omitted). CBC never shows that any of these exceptions apply here, and the court finds no reason why they would. The court thus applies the law-of-the-case doctrine and adopts Judge Lungstrum's summary-judgment ruling: Schedule B2 is not a second contract.

But whether any of the other Schedules created a new contract is an open question. Applying the same reasoning that Judge Lungstrum applied at summary judgment, the court finds that none of the other Schedules constituted a new contract. Each Schedule provides: "THIS AMENDMENT TO THE AGREEMENT is made . . . pursuant to the 'Railcar Lease

Agreement.'" Ex. 2; *accord* Exs. 3, 4. The court finds three of these words dispositive of the issue. Each schedule referred to itself as an "AMENDMENT." And when the parties described their understanding of their commercial arrangement with one another, they called it "THE AGREEMENT"—singular. Based on the ordinary meaning of the words the parties used in their contract, the court finds that Schedules constitute serial amendments to the Lease Agreement. They did not adopt new contracts.

2. *CBC's All-Damage, "Specifications Previously Imposed" Theory*

Because only one contract exists, the court considers whether the parties' course of performance illustrates their understanding of who was responsible for what repairs during the life of the Lease. CBC argues that the Lease makes Coshocton responsible for all repairs during the Lease. The course of the parties' performance of their bargain shows otherwise.

At trial, Coshocton presented ample evidence—invoices, testimony, and emails—that during the life of the Lease, CBC only asked Coshocton to pay for Lessee Maintenance Items. *See* Ex. 401 at 2, 5 (green highlighting shown in original exhibit, identifying where CBC billed Coshocton, then Coshocton protested, and CBC reduced invoice amounts); Ex. 430 (email from Grant Baker to Coshocton explaining CBC's view of its maintenance and repair responsibilities); 2016 30(b)(6) Dep. at 492:10–15, 497:5–21 (discussing the parties' course of performance). CBC never refutes this evidence with contradictory evidence.[50]

CBC responds to this evidence by arguing that "CBC could not have sent invoicing [charging] for the return condition of the cars prior to [Coshocton] returning" them, and that Coshocton's course-of-performance evidence is a figment of "Jones and Crown['s] . . . world of

---

[50] At one point during trial, CBC elicited testimony from Keaton Baker that Carle Baker's illness had caused CBC to bill Coshocton differently than it otherwise would have. The court does not address this argument now because CBC did not raise it in its Proposed Findings (or other trial filings) and because the argument is not dispositive of any of CBC's claims.

misconception or ignorance of lease terms."  Doc. 208 at 16; *see also id.* (arguing that the invoices CBC sent Coshocton during the Lease—which charged only for Lessee Maintenance Items—were just "CBC exercising [its] right to be reimbursed during the lease for gates and hatch covers while delaying invoicing for other items").  But the court is concerned with the parties' course of performance about repairs made *during* the Lease.  So the cars' condition at return is not at issue here.  If the Lease made Coshocton responsible for all damage to the cars during the Lease, as CBC contends, the parties' course of performance should show as much.  It does not.

Neither the Lease nor the parties' correspondence nor their conduct with one another will support CBC's argument.  As the emails presented by Coshocton show, CBC told Coshocton "[s]ection 6(b) talks about how we will keep the cars in good working order . . . [so] [w]e are going to pay for the cost of the repair on the roof."  Ex. 419.  This email comports with a mutual understanding that each party was required to bear certain costs.  The court finds that the parties' course of performance, if considered, illustrates a mutual understanding that Coshocton was responsible only for paying to repair Lessee Maintenance Items during the life of the Lease.

3.      *CBC's All-Damage, Return-Condition Theory*

The court next considers whether extrinsic evidence supports CBC's theory that § 13(b)(i)'s second sentence made Coshocton liable for all repairs performed after Coshocton returned the cars.  Coshocton's course-of-performance evidence about this theory presents more complicated questions than it did in the previous section.

Although there was no question whether the court could consider the parties' course of performance during the Lease, a question exists whether the court can rely on Coshocton's course-of-performance evidence about the parties' understanding of § 13's return conditions.

For course of performance to carry weight as an interpretive tool, Coshocton must present evidence of a "repeated course of performance." *Iron Mound, LLC v. Nueterra Healthcare Mgmt., LLC*, 234 P.3d 39, 48 (Kan. Ct. App. 2010), *rev'd on other grounds*, 313 P.3d 808 (Kan. 2013) (citation omitted); *see also* Restatement (Second) of Contracts § 202 cmt. g ("The [course of performance] rule . . . does not apply to action on a single occasion . . . ; [but] in such cases the conduct of a party may be evidence against him that he had knowledge or reason to know of the other party's meaning . . . ."). Coshocton has presented no evidence of a repeated course of performance. The parties agree. Coshocton had returned cars to CBC only once before—at the end of Schedule A. With only a single occurrence to consider, the court cannot employ course of performance as an interpretive tool.

Even so, the court still may be able to consider evidence of the parties' conduct when Coshocton returned those first cars and use that conduct to help interpret § 13(b)(i). Under Kansas law, "[s]ubsequent conduct of parties to a contract may aid interpretation of controversial provisions." *Cline v. Angle*, 532 P.2d 1093, 1097 (Kan. 1975); *Clark*, 602 P.2d at 1304. "If parties to a contract, subsequent to its execution, have shown by their conduct that they have placed a common interpretation on the contract, this interpretation will be given great weight in determining the meaning to be attributed to the provisions in question." *Cline*, 532 P.2d at 1097 (citing *Fred Mosher Grain v. Kan. Co-Op Wheat Mktg. Ass'n*, 15 P.2d 421, 423–24 (Kan. 1932)). While this principle sounds like a course-of-performance analysis, Kansas law doesn't seem to consider the two interchangeable.

For instance, Kansas courts have invoked this subsequent-conduct principle when using a single occurrence of conduct to help interpret a contract. *E.g.*, *Ark. La. Gas Co. v. Kansas*, 675 P.2d 369, 372 (Kan. 1984) (invoking the subsequent-conduct principle and holding that a single

event—"[t]he conduct of the gas company in moving the pipe and paying the expenses in 1965"—was "persuasive as to the intent of the parties concerning the contract"); *Mangels v. Cornell*, 189 P.3d 573, 578 (Kan. Ct. App. 2008) (invoking the subsequent-conduct principle and holding that a single event—both grantors signing a trust amendment—persuasively identified the parties' intent); *see also Leger v. Williams Nat. Gas Co.*, 898 F. Supp. 805, 807 (D. Kan. 1995) (applying Kansas's subsequent-conduct principle and finding one instance of conduct—an agreement extending an easement—instructive about the parties' intent); *In re QuVIS, Inc.*, No. 09-10706, 2010 WL 2228246, at *8 & n.60 (D. Kan. Bankr. June 1, 2010) (applying Kansas's subsequent-conduct principle and finding one episode of conduct—filing a new UCC-1— instructive about the parties' intent). Consistent with this Kansas law, the court considers both Coshocton and CBC's subsequent conduct here—*i.e.*, the parties' conduct when Coshocton returned the first 29 cars.

Coshocton began returning the first 29 railcars—railcars coming off the Lease at the end of Schedule A—around September 2012. Trial Tr. 1257:5–7. In a January 9, 2013 email to Mr. Jones, Keaton Baker wrote:

> Please find attached estimates for repairs to lessee maintenance Items that Coshocton Grain Co. is responsible for according to our lease agreement. If you refer back to our lease agreement, lessee maintenance items are defined in Section 6 (a). . . . It goes on to include . . . section 6(c) . . . . Everything that [CBC] charge[s] for mainly fall[s] under these categories, however, there is one car with an excess amount of mold and residue on the interior of the car that is not suitable for loading. This is clarified in section 13(b(i)); "each car shall be returned to lessor . . . free of all accumulations or deposits from commodities."
> . . . See also Section 5(a), Section 6(a)(c), Section 8, section 9, Section 10(a), and Section 13(a)(b)(c) in the lease agreement for further supplication [sic] on lessee responsibilities.

Ex. 220 at 1.  The attachment referenced in Keaton Baker's email was not offered into evidence.

Some seven months later, on August 27, 2013, Grant Baker sent an email to Mr. Jones and Ms.

Crown.  In it, he wrote:

> Here are the *final repairs* made to 16 of the cars you have returned.  I believe you
> have 7 additional cars at the shop which will be repaired soon.  This bill is
> Payable on or before 9/30/13.
> Please let me know if you have any questions or need any explanation of the
> repairs made to the cars.

*Id.* at 2 (emphasis added).  This time, the parties admitted the email's attachments—*i.e.*, the bills

for "final repairs"—into evidence.  *Id.*  During closing arguments, CBC conceded that these

attachments show that CBC had billed Coshocton only for repairs to Lessee Maintenance Items

and that CBC made all the repairs itself.  Doc. 243 at 38:21–39:4.

But CBC contends that this characterization of events oversimplifies things.  CBC

contends that it

> could not get [T]he Anderson[s] to work those [29] cars . . . [and] [t]here was
> another destination for those cars . . . [so] Carle Baker made a decision that
> because [T]he Andersons were not going to work on the cars, to send them on to
> the next lessee.  [So] [a]ll that CBC could do was minor work and the gates and
> hatch covers.  CBC sent those invoices without [T]he Anderson invoices because
> there were no Anderson invoices that CBC could send.

Doc. 208 at 17.  This may be so, but no evidence suggests that Coshocton knew why CBC chose

to bill only for Lessee Maintenance Items and cleaning.[51]

And, nothing in the emails just discussed suggests that Coshocton should have known

that it interpreted § 13(b)(i) differently than CBC.  Rather, these emails (and attachments)

support Coshocton's belief that the parties interpreted § 13(b)(i) the same way.  Grant Baker's

August 2013 email, in particular, adds to Coshocton's assurance of a mutual understanding.  The

---

[51] During closing argument, the court asked CBC whether any evidence in the record showed that CBC had
communicated to Coshocton its reason for billing as it did.  CBC responded that the only evidence it presented on
that point was Keaton and Grant Baker's January 2013 and August 2013 emails.  Doc. 243 at 37:1–18.

"final repairs" that Grant Baker billed Coshocton for on the first 29 cars were all Lessee

Maintenance Items.  So, until CBC sued Coshocton for $1,115,449 for return-condition damages,

Coshocton had no reason to believe that the parties understood § 13(b)(i) differently.  The court

thus finds Coshocton's purported course-of-performance evidence persuasive about the parties'

intent.  And the intent it manifests supports the court's holding:  Section 13(b)(i) does not make

Coshocton responsible for all repairs made to the cars at return.

The court concedes that one piece of evidence supports a conclusion different than the

court's.  Keaton Baker's January 2013 email instructed Mr. Jones—and thereby, Coshocton—to

"[see] Section 13(a)(b)(c) in the lease agreement for further [supplementation][52] on lessee

responsibilities."  Ex. 220 at 1.  And, all the BRCs attached to Grant Baker's August 2013 email

came from CBC—not a repair shop.  This means that CBC's mobile crew performed the work.

At trial, Keaton Baker testified that a mobile crew typically makes light repairs, such as repairs

to Lessee Maintenance Items.  *E.g.*, Trial Tr. 847:12–23, 999:23–1000:3.  So some support exists

for CBC's argument that these emails do not, definitively, establish a mutual understanding

between the parties.  But the court cannot view just one piece of evidence in isolation and, when

considered as a whole, the evidence supports the view of the evidence expressed in the preceding

paragraphs.

### 4.    CBC's Prior Damage Theory

Finally, the court considers whether extrinsic evidence supports its conclusion that the

Lease did not obligate Coshocton to reimburse CBC at Lease-end for all repairs made during the

Lease.  Because the parties only had returned cars once before, the same problem presents itself

as did in the previous section.  Course-of-performance analysis cannot apply, but Kansas's

---

[52] Keaton Baker's email actually uses the word "supplication."  Ex. 220 at 1.  At trial, though, he explained that he intended to write "supplementation."

subsequent-conduct principle still may.  The court thus considers the parties' evidence under this principle.

CBC did not request reimbursement for prior damage when Coshocton returned the first 29 cars.  Indeed, no evidence exists of any discussion about prior damage before this litigation began.  The court finds this lack of evidence persuasive on the question of the parties' intent.  And the intent it manifests, again, supports the court's holding:  the Lease did not obligate Coshocton to reimburse CBC for all repairs made during the Lease, at the end of the Lease or otherwise.

>### 5. *Conclusion*

In sum, the court has not relied on extrinsic evidence to arrive at its conclusions in this section.  But if it were appropriate to consider it, that evidence enhances the court's return-condition and prior-damage conclusions.  The parties' actions during the Lease and when Coshocton returned the first 29 cars show that both CBC and Coshocton believed Coshocton was responsible only for the costs incurred to perform the repairs required by § 6(c); and that this division of responsibility was the same during and after the Lease.

### F.   Lost Rent Claim

CBC's last claim under § 13 contends that CBC is entitled to recover "lost rent for each railcar while the railcars were in [the] shop" after Coshocton returned the cars.  Doc. 165 at 17.  CBC argues it is entitled to recover this lost rent because, "[h]ad Coshocton not breached, CBC would have received cars in the condition meeting the requirements placed on Coshocton and could have given return locations other than [the shop] so as to have placed the cars" immediately into a lease with Bella Logistics, LLC or Lansing Trade Group, LLC.  *Id.*  CBC's claim seeks $600 rent per car for each month that the cars were in the shop.  *Id.*  CBC bases this

number on the amount it contends Bella or Lansing would have paid to lease the cars. *Id.* CBC never identifies any Lease provision supporting this as a proper measure of damages. And, reviewing the Lease Agreement convinces the court that CBC's claim does not seek lost rent— *i.e.*, rent that the Lease Agreement obligated Coshocton to pay. Instead, CBC's claim really seeks lost profits—*i.e.*, money CBC lost due to Coshocton's alleged breach.

To recover lost profits, CBC first must prove that Coshocton breached the Lease Agreement. Next, CBC must prove its lost-profits damages "with reasonable certainty" and also that such damages "reasonably [could] be considered to have been within the contemplation of the parties" when they signed the Lease Agreement. *Source Direct, Inc. v. Mantell*, 870 P.2d 686, 693 (Kan. Ct. App. 1994) (citations omitted).

CBC fails to support its request for lost-profit damages and provides no argument explaining why it is entitled to recover such damages. To begin with, and as the court explained above, § 13(b)(ii) allowed Coshocton to return the cars without repairing them so long as Coshocton reimbursed CBC for the costs it incurred to repair items that were Coshocton's responsibility under § 13(b)(i). *See supra* pp. 44–45. Coshocton took advantage of this right under § 13(b)(ii) and, as already explained, did not breach that provision. So, CBC has proven no breach.

Yet another reason exists to deny CBC's claim for lost profits. Section 13(b)(ii) establishes that the parties did not contemplate recovery of the lost-profit damages that CBC seeks. As just mentioned, § 13(b)(ii) allowed Coshocton to return the cars unrepaired and permit CBC to repair them. Section 13(b)(ii) thus contemplates that CBC, while it repaired the cars, would lose the opportunity to profit it might realize from placing the cars immediately in a new

lease.  In short, the plain language used by § 13(b)(ii) establishes that CBC is not entitled to recover the lost-profit damages it seeks.

CBC disagrees with the court's conclusion, noting that § 13(b)(ii) provides that it is not an exclusive remedy.  Doc. 165 at 14 n.1.  This is so, but it does not change that § 13(b)(ii) offers the parties a second, alternative method for handling returns:  Coshocton can permit CBC to perform all the repairs and simply bill Coshocton for them.  Section 13(b)(ii)'s "not an exclusive remedy" language does not alter Coshocton's duties under § 13(b), and CBC never explains how it could.

CBC has failed to establish that it is entitled to lost profits for Coshocton's failure to repair the cars before returning them.  The court finds for Coshocton on CBC's lost-profits claim.

## V.     Insurance Provision Claims

Next, CBC contends that Coshocton breached § 15's insurance requirements, repeatedly, and that these breaches caused $2,190,324 in damages.[53]  This damage total includes:  $25,000 for the derailment of RFMX 464595; $17,800 in lost rent on RFMX 464595; $296,276 for prior damage; $989,843 for damage on return; $203,000 in lost rent while the cars were shopped on return;[54] and $15,000 in pre-judgment interest.  Doc. 233 at 33.  CBC contends it is due these amounts because Coshocton breached § 15 in the following ways:  (a) by failing to file insurance claims for damage done to the cars; (b) by failing to submit a claim for the derailment of car number RFMX 464595; (c) by failing to carry insurance continuously throughout the lease; (d)

---

[53] The damages CBC seeks under § 15 are nearly identical to those it sought under its return condition claims.  As far as the court can tell, the only difference is that CBC doesn't seek damages for certain why-made codes under § 15 that it sought damages for in its return condition claims.

[54] As the court discussed in the introduction to this Decision, CBC failed to preserve—or even raise—its lost-rent and good-faith claims under § 15 in the Pretrial Order.  So, for the same reasons explained *supra* pp. 25–27, the court does not address either claim here.

by failing to provide CBC with documentation of its insurance coverage annually; and (e) by failing to name CBC as an additional insured on its insurance policy. *Id.* at 46, 50, 52–53. Also, CBC raises its § 15-based all-damage theory again. But, as the court already has concluded, § 15 does not require Coshocton to pay for all repairs to the cars. *See supra* p.71. So, to recover the damages it seeks, CBC must prove that those damages result from the five § 15 breaches that Coshocton purportedly has committed.

Coshocton responds, arguing that CBC is entitled to no damages. This is so, Coshocton says, because it had no duty to file insurance claims and because CBC has failed to prove that it was damaged by any breach of § 15. Doc. 234 at 41, 46–48. The court considers each alleged breach, separately, below. But first, the court recites § 15, as amended by Schedule B1, to place CBC's § 15 claims in context:

> [Coshocton] represents that it is insured with J H Ward Agency Insurance Company, P. O Box 98, Unionville Center, Ohio 43077. [Coshocton's] insurance has commercial general liability insurance with J H Ward Agency Insurance Company and will cover [CBC's] railcars in the amount of twenty-five thousand dollars ($25,000) against physical damage per Car. [CBC] will provide unique identifying marks for each Car insured by [Coshocton]. [Coshocton's] insurance shall name [CBC] as additional insured's. Upon execution hereof, and annually thereafter, [Coshocton] shall provide [CBC] with [Coshocton's] insurance certificate evidencing [Coshocton's] insurance required hereunder. [Coshocton's] insurance shall be primary without right of contribution from any insurance carried by [CBC]. The $25,000 value is a stipulated loss value for the casualty of a railcar regardless of its AAR Rule 107 depreciated value. Except while cars are on a Short-line or Class 1 railroad tracks, the depreciated value will apply, and [CBC] shall collect depreciated value from the damaging railroad. [All terms of the Lease shall remain unchanged and continue in full force and effect.]

Ex. 1 at 10; Ex. 4 (Schedule B1, adding the last two sentences to § 15).

## A.      Failure to File Claims for Damage

The court begins by reiterating what § 15 does not obligate Coshocton to do. This provision never obligated Coshocton to submit any claims to its insurance provider. *See supra* p. 71. Instead, it only requires Coshocton to carry insurance on the cars. The court thus finds for

Coshocton on CBC's claim that § 15 obligated Coshocton to file insurance claims. *See Pancake House, Inc. v. Redmond ex rel. Redmond*, 716 P.2d 575, 578 (Kan. 1986) ("A breach of contract may be said to be a material failure of performance of a duty arising under or imposed by agreement.").

### B.      Failure to Submit a Claim for the Derailment of RFMX 464595

CBC next contends that Coshocton's refusal to submit a claim to its insurer for RFMX 464595's derailment was a breach of § 15 and § 5(c). Doc. 233 at 42, ¶ 35; *id.* at 52–53. CBC seeks $57,800 for this breach, which consists of $25,000 for the car's contractually stipulated value, $17,800 in lost rent, and $15,000 in pre-judgment interest. But nothing in either § 15 or § 5(c)—as they existed at the end of the Lease or when this car derailed in 2010—requires Coshocton to submit an insurance claim for a car's derailment. CBC has failed to prove that Coshocton breached § 15 or § 5(c) by failing to submit an insurance claim for RFMX 464595's stipulated value.

The court considers whether Coshocton breached § 5(c) by refusing to pay for RFMX 464595's derailment later in this Decision. But, to be clear, CBC has not proved that Coshocton breached a duty under either § 15 or § 5(c) by refusing to submit an insurance claim for RFMX 464595. So, CBC may not recover the derailment-related damages it seeks under § 15. The court thus finds for Coshocton on this claim as well.

### C.      Failure to Carry Insurance Continuously Throughout the Lease

CBC claims that Coshocton did not carry the insurance required by § 15 "at any time." Doc. 165 at 10. Based on CBC's contention that § 15 required Coshocton to carry insurance on the cars regardless of their location, CBC could claim a breach of § 15 either because (1) Coshocton did not carry general liability insurance on the cars "at any time," or because (2)

Coshocton did not carry insurance that would cover the cars regardless of their location "at any time." No matter which theory CBC invokes, Coshocton concedes that it breached § 15's insurance requirement. At trial, Ms. Crown testified that Coshocton carried general liability insurance on the cars in 2010 when the Lease began, but that "there was a period there where it fell off [later] and we put it back on." Trial Tr. 732:3–8. CBC thus has proved a breach of this obligation.

The question, then, is whether CBC has proved that Coshocton's failure to carry insurance caused CBC damage. "The basic principle of contract damages is to make a party whole by putting it in as good a position as the party would have been had the contract been performed." *Kansas ex rel. Stovall v. Reliance Ins. Co.*, 107 P.3d 1219, 1228 (Kan. 2005) (citations omitted). So, "[a] party is not entitled to recover damages [that are] 'not the proximate result of the breach of contract [or] those which are remote, contingent, and speculative in character.'" *Id.* (quoting *Apperson v. Sec. State Bank*, 528 P.2d 1211, Syl. ¶ 7 (Kan. 1974)).

CBC contends that Coshocton's failure to carry insurance on the cars caused CBC to sustain $1,343,919[55] in damage because Coshocton never "submit[ted] insurance claims" for damage to the cars. Doc. 165 at 10. As the court already has found, Coshocton had no duty to submit insurance claims. And, CBC adduced no evidence that it ever tried to file a claim for the cars that was denied because Coshocton did not have insurance. Trial Tr. 1373:10–20. So, CBC has failed to prove that Coshocton's breach proximately caused the $1,343,919 in damages that CBC claims. Indeed, CBC has failed to prove that Coshocton's failure to carry insurance caused CBC any damage. The court finds for Coshocton on this claim.

---

[55] This amount includes CBC's claims based on the derailment of RFMX 464595.

### D. Failure to Produce an Insurance Certificate Annually

Next, CBC claims that Coshocton did not "produce[] a certificate of liability insurance until 2014" and so it breached § 15 of the Lease. Doc. 233 at 50. Section 15 required Coshocton to provide CBC with a certificate of liability insurance annually. Ex. 1 at 10. The court finds that Coshocton did not provide CBC a certificate of insurance for 2010, 2011, 2012, and 2013. *See* Trial Tr. 1312:25–1313:7 (Grant Baker testifying that the first time he received anything about insurance from Coshocton was in 2014). But, CBC failed to prove any damage proximately caused by breach of this insurance-certificate requirement in any year. The court thus finds for Coshocton on this claim.

### E. Failure to Name CBC as an Additional Insured

Finally, CBC contends that Coshocton never named it as an additional insured on Coshocton's insurance policy. The evidence presented at trial supports CBC's claim—to an extent. In his first deposition testimony, admitted at trial, Mr. Jones testified that he did not know whether CBC was named an additional insured on Coshocton's general commercial liability policy. Jones Dep. at 81:1–12. But in a later deposition, also admitted at trial, Mr. Jones testified that Coshocton did not add CBC as an additional insured on its policy until January 2015 (though the change was effective beginning March 2014). 30(b)(6) Dep. at 14:5–16:9. Mr. Jones's testimony combined with Exhibit 139—which includes material about Coshocton's insurance policies between 2010 and 2015—supports an inference that Coshocton failed to include CBC as an additional insured until 2015. Ex. 139 at 142. CBC thus has proved that Coshocton breached § 15's additional-insured requirement. This leads to the damage element of CBC's contract claim.

CBC contends that Coshocton's failure to list CBC as an additional insured caused CBC to sustain $1,343,919 in damages[56]. CBC theorizes that, "[h]ad Coshocton obtained the required coverage, CBC would have obtained the benefit of the bargain by having all of [the] items categorized as damage paid for under the insurance policy." Doc. 233 at 53, ¶ 33. There are several problems with this theory. First, CBC never tried to file a claim with Coshocton's insurer that was denied because CBC was not an additional insured. CBC contends that this fact does not matter because CBC could not have filed an insurance claim anyway. Doc. 233 at 42, ¶ 35. Even if CBC were correct, its own actions belie its theory of recovery. By February 25, 2015, at the latest, CBC knew that Coshocton had added CBC to Coshocton's insurance policy as an additional insured. 30(b)(6) Dep. at 14:5–16:9. But CBC never tried to file a claim under Coshocton's policy.[57] Second, the court already has explained that § 15 does not require Coshocton to pay for all repairs to the cars. So, even if CBC had tried to file a claim and it was denied, Coshocton still would have no duty under the Lease to pay for all the repairs that CBC seeks reimbursement for as damages. CBC again has failed to prove that Coshocton's breach was the proximate cause of the damages it seeks.

It is possible that CBC meant to contend that CBC, if named as an additional insured, "could have already resolved the . . . claims of physical damage" and so Coshocton's failure to name CBC as an additional insured damaged CBC by prolonging or requiring this litigation. *Id.* at 80, ¶ 3 (Indemnity Clauses section). CBC provided no evidence to support this contention. It

---

[56] This amount includes CBC's claims based on the derailment of RFMX 464595.

[57] At trial, CBC sought to explain its actions by arguing that it never received an endorsement that was required to make its status as an additional insured effective. *See* Ex. 138 (2014 Certificate of Liability Insurance naming CBC as an additional insured). The court heard conflicting testimony on this issue. Coshocton employees testified that CBC was an additional insured; CBC employees testified that, due to this endorsement language, they were not. None of the insurance exhibits admitted at trial resolve this dispute. However, based on one of those exhibits— Exhibit 138—and Mr. Jones's deposition testimony, Coshocton's evidence has the better of the argument. The court finds CBC's endorsement argument unpersuasive.

is merely speculative. CBC thus has failed to prove that it was damaged by Coshocton's breach of § 15's additional-insured requirement, and the court finds for Coshocton on this claim.

### F.    Conclusion

In sum, though CBC has proved that Coshocton breached § 15, CBC has not proved that Coshocton's breaches caused CBC any damage. The court thus finds for Coshocton on all of CBC's breach of contract claims under § 15.

## VI.    Indemnification Claims

In its last multi-million dollar claim, CBC contends that Coshocton repeatedly breached the Lease's indemnification requirements in § 8 and § 17, and that these breaches caused CBC $2,315,930 in damage. This damage total includes: $25,000 for the derailment of RFMX 464595; $17,800 in lost rent on RFMX 464595; $296,276 for prior damage; $1,115,449 for damage on return; $203,000 in lost rent while the cars were shopped on return; and $15,000 in pre-judgment interest.[58] Doc. 233 at 76. CBC contends it is owed these amounts because "the indemnity clauses were triggered" by the following six events: (a) Coshocton's failure to carry "the required" insurance and name CBC as an additional insured; (b) the derailment of RFMX 464595; (c) damage done to "CBC's railcars . . . by railroads or industries"; (d) Coshocton filing this lawsuit; (e) CBC requesting payment for "repairs to the railcars and for other costs such as attorneys' fees"; and (f) Coshocton's failure "to accept CBC's request for indemnification." *Id.* at 80, ¶ 2.

At first glance, one might think that CBC uses the term "triggered" as a synonym for "breached." But on closer analysis, it is evident that CBC asserts that just one of these six "triggering" events actually breached § 8 or § 17. Specifically, Coshocton's failure "to accept

---

[58] As the court discussed in the introduction to this Decision, CBC failed to preserve—or even raise—its $203,000 lost-rent damage claim or its $17,800 lost-rent damage claim under § 8 or § 17 of the Pretrial Order. So, for the reasons explained *supra* pp. 25–27, the court does not address the substance of those claims here.

CBC's request for indemnification" was a breach. *Id.* In contrast, CBC never alleges that the other five events breached § 8 or § 17. Instead, CBC alleges that these triggering events breached other provisions of the Lease and that these breaches "thereby trigger[ed] the indemnification clauses." *Id.* at 81, ¶ 3. So, CBC asserts that Coshocton must indemnify it under § 8 and § 17 because Coshocton: (a) filed this lawsuit; (b) breached § 15's insurance requirements; (c) breached § 5(c) by failing to pay for RFMX 464595; and (d) breached the Lease by failing to pay CBC for all repairs to the cars.

The court begins its discussion with these four theories of indemnification and then considers CBC's claims for breach of § 8 and § 17.

**A.      Theories of Indemnification**

*1.      Indemnification Under § 8*

The court can dispose of any claims CBC brings under § 8 without considering all four of CBC's indemnification theories. Section 8 states, in relevant part:

> [Coshocton] agrees to defend, indemnify and hold harmless [CBC] from any liability, losses, damages, injuries, claims, and demands and expenses, including reasonable attorney's fees and expenses, *arising out of*, or as a result of, *the loading and/or shipping in the Cars of commodities which cause oxidative corrosion or deterioration or damage to the Cars* . . . .

Ex. 1 at 5 (emphasis added). The italicized text means one of two things: (1) Coshocton must indemnify CBC only if Coshocton loaded a commodity in the cars that caused the corrosion or corrosion-like damage present at the end of the Lease, or (2) Coshocton must indemnify CBC only if Coshocton loads corrosion-causing commodities in the cars. CBC does not explain which interpretation it advances. But, ultimately, it does not matter. CBC has failed to prove that Coshocton either loaded corrosive commodities[59] in the cars or that the commodities Coshocton loaded in the cars caused any corrosion or corrosion-like damage. *See* discussion *supra* p. 66-67

---

[59] During trial, the court recalls the evidence referencing just two commodities loaded in the cars: grain and beans.

(holding that CBC failed to prove that commodities caused the corrosion found on the leased railcars). CBC thus has failed to prove that Coshocton had a duty to indemnify CBC under § 8 and so, the court finds for Coshocton on this claim.

### 2. Indemnification Under § 17

CBC's indemnification theories present more difficult questions under § 17 than they did under § 8. So, to assist the discussion, the court reproduces § 17 here:

> [Coshocton] shall indemnify, defend and hold [CBC] harmless from and against any loss, liability, claim, cost, damage or expense (including reasonable attorney's fees) arising out of or in connection with the possession, leasing, subleasing, storage, use or return of any Car from the date of acceptance by [Coshocton] to the date of delivery to [CBC], excepting, however, any loss, liability, claim, cost, damage or expense which is attributable to the negligence or willful misconduct of [CBC], its agents or employees, or accrues with respect to any of the Cars while such Car is in a repair shop undergoing repairs for only Lessor maintenance items.

Ex. 1 at 11.

The § 17 theory asserts that Coshocton must indemnify CBC for costs it incurred because of four of Coshocton's alleged breaches. But CBC never ties the damages it seeks to any of those alleged breaches. Instead, CBC contends that § 17 applies between CBC and Coshocton (called first-party indemnity) and not just between CBC and third parties (called third-party indemnity). *See Rand Constr. Co. v. Dearborn Mid-W. Conveyor Co.*, 944 F. Supp. 2d 1042, 1059 (D. Kan. 2013) (discussing first and third-party claims for indemnification). CBC asserts that, because § 17 applies to first-party indemnity claims, § 17 entitles CBC to recover for any breach of the Lease. CBC also takes this theory one more step, arguing that § 17 expands Coshocton's liability under several sections of the Lease Agreement. So, CBC contends, even if it cannot recover for a breach under § 6, for example, it can recover for a breach based on the same conduct and theory of liability under § 17.

While CBC's logic is difficult to follow, the court does not need to accept or reject that logic to reject CBC's ultimate conclusion. Even if § 17 is worded in broad enough terms to apply between Coshocton and CBC, it is too broadly worded to have the effects that CBC attributes to it. Specific provisions control over general ones. *Exch. State Bank v. Kan. Bankers Sur. Co.*, 177 P.3d 1284, 1285 (Kan. Ct. App. 2008). Section 17 thus does not alter the parties' explicit and deliberate distribution of rights and obligations under the substantive provisions of the Lease. Just as the court explained under CBC's § 13 claims, § 17 does not expand Coshocton's liability—or create new or independent duties—for repairs or for derailed cars. And, it does not alter the Lease's insurance requirements.

CBC's four alleged "triggering" breaches are controlled by the Lease provisions specific to their subject matter. Sections 6 and 8 control Coshocton's liability for repairs to the cars, and the court already has decided CBC's claims under those sections. Section 15 controls Coshocton's liability for breaching the Lease's insurance requirements, and the court already has ruled those claims, too. Section 5(c) controls Coshocton's liability for derailed cars. The court considers CBC's claims under § 5(c) later in this Decision. *See infra* p.109-10. As for CBC's fourth "triggering" breach—*i.e.*, Coshocton filing this lawsuit—the court can find no Lease provision that bars Coshocton from filing suit against CBC. Instead, the Lease merely specifies where Coshocton must sue. The court has found that Coshocton breached this provision and awarded CBC damages. So, CBC's reference to this lawsuit must assert a claim for attorneys' fees and expenses under § 17.

But, § 12—dealing with "Default"—controls CBC's claim for attorneys' fees and expenses, not § 17. Section 12 explicitly applies to claims between CBC and Coshocton for any alleged default under the Lease. And, though § 12 is not a model of clarity, it more clearly

articulates Coshocton's liability for attorneys' fees and expenses than § 17 does. Assuming, without deciding, that § 17 applies to first-party claims, this provision requires Coshocton to reimburse CBC for "any loss, liability, claim, cost, damage or expense (including reasonable attorney's fees) arising out of or in connection with the possession, leasing, subleasing, storage, use or return of any Car from the date of acceptance by [Coshocton] to the date of delivery to [CBC]." Ex. 1 at 11. The Lease Agreement never defines any of the terms used in this part of § 17. The court thus is left to wonder when § 17 would require Coshocton to reimburse CBC for something. Does § 17 require Coshocton to pay CBC's attorneys' fees even if CBC loses its claims? Does § 17 require Coshocton to pay CBC's attorneys' fees for a lawsuit brought (or, as here, continued) after Coshocton has returned the cars?

Neither the Lease nor the evidence at trial answers these questions. And the parties provide no helpful guidance. Section 17's indemnification language is so broad and so vague that the court is not sure when the parties intended for it to apply. *See Mohr v. State Bank of Stanley*, 770 P.2d 466, 480 (Kan. 1989) ("Only reasonable certainty is required in a purported contract, but where the purported contract is so vague and indefinite that the intentions of the parties cannot be ascertained, it is unenforceable." (citation omitted)); *accord Jack Richards Aircraft Sales, Inc. v. Vaughn*, 457 P.2d 691, 694–95 (Kan. 1969). On balance, the court finds that § 12 is the more specific attorney-fees provision in the Lease and so it considers CBC's attorney-fee and litigation expenses claims under that provision only.

To be clear, the court does not decide if § 17 applies to first-party claims. Instead, the court merely finds for Coshocton on CBC's claims under § 17 that rely on the four above-discussed "triggering" breaches because they are controlled by other, more specific provisions of the Lease Agreement.

B.      **Breach of Contract Claims**

The court faces one more question under § 8 and § 17: Did Coshocton breach § 8 or § 17 when it failed "to accept CBC's request for indemnification?" Doc. 233 at 80, ¶ 2. As the preceding sections conclude, CBC has not proved that either § 8 or § 17 imposed a duty on Coshocton to indemnify CBC for the costs it seeks. So, CBC has failed to prove that Coshocton breached § 8 or § 17 by refusing to accept CBC's request for indemnification. The court thus finds for Coshocton on those claims.

## VII.   **Derailed Car Claims**

When discussing other provisions of the Lease, the court has referenced its conclusion that § 5(c) controls CBC's claims for damages from the derailment of car number RFMX 464595. This provision addresses derailments explicitly. Still, the parties' arguments at trial and in post-trial filings discuss CBC's derailment claims under § 15. But, CBC presented its derailment claims under § 5(c) in the Pretrial Order. The court addresses that theory of recovery now. *See* Doc. 165 at 9–10 (separating derailment claim from other § 15 claims).

Section 5(c) of the Lease, titled "Derailment," provides:

> If any Car is derailed on another railroad besides and was not caused by [Coshocton] or its agents, then if such Car is not re-railed after ten (10) days, rent shall then abate but shall be reinstated as of the date of re-railment. However, if such Car(s) requires repairs, Subsections 5(a) and 5(b) above shall control. In the event the derailment damages the car(s) beyond the stipulated value of $25,000 per car [CBC] may accept the stipulated value and repair the car or ask that the car(s) be scrapped by the damaging railroad or industry with Coshocton Grain Company paying [CBC] the stipulated value. If Coshocton Grain Company decides it wants to repair the car, at its expense, [CBC] agrees as long as all repairs to the damaged car(s) are made per the original construction and design of the entire car. Such drawings and specifications will be given to XYZ Company upon request.

Ex. 1 at 3. It is evident that the parties failed to complete the drafting work necessary to conform this boilerplate provision to the arrangement between CBC and Coshocton. The extrinsic

evidence provided no dispositive information about the parties' intentions for the words missing from this provision. The court thus takes § 5(c) as it finds it.

CBC seeks the following damages for Coshocton's alleged breach of § 5(c): $25,000 for the RFMX 464595's stipulated value; $15,000 in pre-judgment interest; and $17,800 in lost rent on RFMX 464595. Doc. 233 at 33. After providing some background information about the derailment of RFMX 464595, the court considers CBC's three damage claims separately.

### A.    RFMX 464595's Derailment and Subsequent Events

RFMX 464595 derailed on October 27, 2010, and split in two. This damage would cost $30,000 to repair, which exceeded the car's $25,000 stipulated value. So, on October 28, 2010, Kathy Peck—CBC's office manager at the time—contacted Coshocton's Rhoda Crown asking her to file an insurance claim for the car's stipulated value. Ex. 217. Ms. Crown responded the next day, saying that she was confused why CBC would ask Coshocton for the stipulated value of the car when the Norfolk Southern Railroad had caused the derailment. *Id.* The evidence did not reveal any more communication about this derailed car until December 6, 2010, when CBC sent Coshocton an invoice for the $25,000 stipulated value of RFMX 464595. *Id.*

After receiving the invoice, Scott Jones called CBC to find out why CBC had sent it. Jones Dep. at 63:21–65:7; Trial Tr. 1360:12–14. Although Mr. Jones could not recall the exact words used during that phone call, he testified that he had told Grant Baker that "if we [Coshocton] are subject to [$]25,000 for each car, we can't be in the lease." Jones Dep. at 66:17–19. Mr. Jones also explained that Coshocton would have to return the cars if it was "subject to that kind of risk on each car." *Id.* at 67:5–6. Mr. Jones also asked Mr. Baker "to find out if there's anything else [CBC] could do" so that Coshocton did not have to back out of the Lease Agreement. *Id.* at 68:3–4. On December 31, 2010, sometime after this phone

conversation, Mr. Jones sent another email to Mr. Baker. It asked whether CBC had "ever resolve[d] the insurance issue on [RFMX 464595]?" Ex. 219. Mr. Baker responded by email four days later, writing:

> We are not going to press the issue at this time. I would say we disagree with the language of the lease, but until an attorney would get involved over this I would just keep paying your rent on the 29 cars you have and [we] will deal with this at a later time. I'm not saying we are going to do anything. We just want to get along. We don't have a substitute car available right now but will keep a look out for one.

*Id.* At some point after this email exchange, Mr. Jones remembers having a conversation with Mr. Baker, who said that CBC was "going to work with [Coshocton] on this and change the lease . . . so it would only apply on [Coshocton's] . . . tracks." Jones Dep. at 69:23–70:1. Presumably, the antecedent of the "it" that Mr. Baker referenced was § 5(c) of the Lease Agreement.

On February 15, 2011, about a month after this email exchange, the parties signed Schedule B1. Schedule B1 added 75 cars and an additional year to the Lease. Ex. 4. It also increased the monthly rent on the cars by $100. *Id.* Finally, Schedule B1 added the following language to the end of the Lease Agreement's insurance provision, § 15: "Except while cars are on a Short-line or Class 1 railroad tracks, the depreciated value will apply, and [CBC] shall collect depreciated value from the damaging railroad. [All terms of the Lease shall remain unchanged and continue in full force and effect.]" *Id.* (second set of brackets in original). Schedule B1 made no other changes to the Lease Agreement. The evidence presented at trial did not disclose any more communications about the derailed RFMX 464595 after the parties agreed to the modified § 15. But CBC referenced the car in its final Amended Counterclaim, filed on October 30, 2015. Trial Tr. 650:20–25; Doc. 134-1.

### B.    Stipulated-Value Claim

Though it has its flaws, the parties managed to include enough terms in § 5(c) for the court to determine whether Coshocton breached that provision.  Under Kansas law, that makes the provision sufficient to enforce.  *See Wood v. Hatcher*, 428 P.2d 799, 803 (Kan. 1967) ("Ambiguity does not arise from total omission.  It arises when application of pertinent rules of interpretation to an instrument as a whole fails to make certain which one of two or more meanings is conveyed by the words employed by the parties."  (citations omitted)); *Starr v. Union Pac. R.R. Co.*, 75 P.3d 266, 269 (Kan. Ct. App. 2003) ("Errors in contracts, which do not create such inconsistency that the overall intent of the parties cannot be determined from the four corners of the instrument, do not result in an ambiguous contract but merely create an inconsistency subject to interpretation by the court considering the contract as a whole."); *accord Penncro Assocs., Inc. v. Sprint Spectrum L.P.*, No. 04-2549-JWL, 2006 WL 1320252, at *10 (D. Kan. May 15, 2006) (applying Kansas law).

As explained below, the court concludes that Coshocton has breached § 5(c).  But the path to this conclusion takes several twists and turns.

#### 1.    What Terms Control?

The court concludes that the Lease Agreement and Schedule A control CBC's derailment claim.  RFMX 464595 derailed before the parties signed Schedule B1.  Based on the evidence, no reason exists to believe that Schedule B1's increase in rent amount, number of cars leased, or lease term was meant as an "adjustment of a disagreement [of] what is due from one party to another and the payment of the agreed amount."  *Barnes v. Mid-Continent Cas. Co.*, 388 P.2d 642, 645 (Kan. 1964) (citations omitted).  So, the court concludes that the parties' agreement to Schedule B1 did not produce an accord or satisfaction for RFMX 464595's stipulated value.

2.    *Meeting of the Minds and Mistake*

Next, the court addresses Coshocton's argument that § 5(c) is void (or at least

unenforceable) because no meeting of the minds occurred about that provision.[60]  In Kansas,

"there must be a meeting of the minds on all essential elements" "to form a binding contract."

*Albers v. Nelson*, 809 P.2d 1194, 1198 (Kan. 1991) (citation omitted).  As Kansas law

recognizes, "[t]he phrase 'meeting of the minds' is somewhat misleading shorthand for the

requirement that parties to a contract objectively manifest their intent to be bound by the terms of

a proposed agreement and that they share an understanding of those terms."  *Andra v. Lean P.*

*Peebler Revocable Tr.*, 286 P.3d 576, 2012 WL 4937465, at *6 (Kan. Ct. App. 2012) (citations

omitted).  Coshocton's use of the phrase here illustrates this point.  Coshocton asserts that it and

CBC never arrived at a shared understanding of § 5(c) and, thus, had no meeting of the minds.

This argument is not so much one based on meeting of the minds, as it is one based on unilateral

mistake.

Meeting of the minds is part of the intent requirement for forming a contract.  *Sidwell Oil*

*& Gas Co. v. Loyd*, 630 P.2d 1107, 1113 (Kan. 1981); *Sw. & Assocs., Inc. v. Steven Enters.*, 88

P.3d 1246, 1249 (Kan. Ct. App. 2004).  Whether the parties' minds have met and satisfied the

intent element of contract formation is an objective question.  *Steven Enters.*, 88 P.3d at 1249.

So, the meeting-of-the-minds "inquiry . . . focus[es] not on the question of whether the subjective

minds of the parties have met, but on whether their outward expression of assent is sufficient to

form a contract."  *Id.* (citation omitted).  Here, no evidence suggests that Coshocton manifested

anything but full consent to all terms in the Lease Agreement when the parties executed it in

---

[60] Coshocton also argues that CBC, to succeed on this breach claim, must prove that it either performed or was
willing to perform "in compliance with the contract."  Doc. 234 at 42.  This is true.  But, Coshocton only asserts that
CBC did not prove that it was willing to perform in compliance with § 15.  CBC performed in accordance with §
5(c).  So Coshocton's argument is not persuasive.

March 2010.  The same is true for Schedule A, signed in June 2010.  *Cf. Andra*, 2012 WL 4937465, at *7 ("[A] party signing a written contract thereby manifests acceptance of its terms . . . ." (citation omitted)).  And, unlike cases where courts have held that the parties did not form a contract because no meeting of the minds occurred, nothing suggests that Coshocton and CBC did not agree on the subject matter or nature of the Lease Agreement.  *See, e.g.*, *Sidwell Oil & Gas Co.*, 630 P.2d at 1112–14 (holding that the parties created no contract where both parties signed the lease but the lessee mistakenly chose a form-lease that did not contain the terms he intended, but contained the terms the lessor had earlier agreed to).  The meeting-of-the minds element of contract formation is satisfied here.

But, in rare instances, the equitable doctrine of mistake entitles "a party [unilaterally] mistaken about the meaning of a substantive term of a contract . . . to legal relief."  *Andra*, 2012 WL 4937465, at *7.  "Kansas cases have long adhered to the principle that an instrument may be reformed where there is ignorance or mistake on one side and fraud or inequitable conduct on the other."  *Andres v. Claassen*, 714 P.2d 963, 969 (Kan. 1986).  This doctrine also does not apply here.  No evidence can support a finding that CBC engaged in fraud or inequitable conduct when the parties signed the Lease Agreement or Schedule A.  Indeed, CBC had no reason to know that Coshocton's understanding of § 5(c) differed from CBC's until after RFMX 464595 had derailed.  That Coshocton understood § 5(c) differently than CBC does not void the Lease Agreement or § 5(c).

### 3.    Did Coshocton Breach § 5(c)?

With these threshold questions settled, the court turns to the substantive question presented by this claim:  Has CBC proved that Coshocton breached § 5(c)?  Section 5(c) is not ambiguous even though it is poorly drafted.  The provision's third sentence answers all that the

questions presented by this claim. It provides: "In the event the derailment damages the car(s) beyond the stipulated value of $25,000 per car [CBC] may accept the stipulated value and repair the car or ask that the car(s) be scrapped by the damaging railroad or industry with Coshocton Grain Company paying [CBC] the stipulated value." Ex. 1 at 3. So, no matter where a car has derailed, the third sentence of § 5(c) allows CBC to scrap the car and recover its stipulated value from Coshocton. Section 5(c)'s plain language, then, obligated Coshocton to pay CBC $25,000 for RFMX 464595, even though the car had derailed on Norfolk Southern's track and Coshocton was not at fault. Nothing else in the Lease Agreement—as it existed in October 2010— abrogates this duty.[61]

### 4. Coshocton's Affirmative Defenses

Coshocton claims that three affirmative defenses insulate it from liability under § 5(c) for RFMX 464595. They are: (1) waiver; (2) estoppel; and (3) set off. Doc. 234 at 40–42. None of these defenses succeed.

### a. Waiver

"[W]aiver is the intentional surrender of a right." *Steckline Commc'ns, Inc. v. Journal Broad. Grp. of Kan., Inc.*, 388 P.3d 84, 91 (Kan. 2017). "[T]he gravamen of a waiver claim is the voluntary relinquishment of a right (or its continued existence)," and so "it is possible for a party to inoculate itself against future claims that it has waived a contractual right by including a

---

[61] The parties devoted considerable effort at trial and in their filings to arguing whether the Lease Agreement made Coshocton liable for derailments that occurred on tracks that Coshocton didn't own. Whether a car is derailed on Coshocton's tracks or elsewhere, the third sentence of § 5(c) made clear that, in 2010, CBC had the right to recover any derailed car's stipulated value from Coshocton. The parties' geography arguments, then, are irrelevant to CBC's § 5(c) claim. Ex. 1 at 3.

      Coshocton's also argues that AAR Rule 95—which requires the damaging railroad to pay for things like repairs to a derailed car—influences the parties' responsibilities under § 5(c). This argument misses the mark by a wide measure. *See* Trial Tr. 528:8–20 (Larry Koelzer testifying about AAR Rule 95); Ex. 7 at 669 (AAR Rule 95). Parties can alter the AAR Rules's division of responsibility by contract. Ex. 7 at 5, Rule A(1)(f).

valid anti-waiver provision in the contract." *Id.* (citation omitted). Coshocton's waiver argument is unpersuasive for several reasons.

First, Coshocton's argument isn't really a waiver argument at all. Instead, it is a discharge argument. Waiver, as a doctrine, is best suited to discussions involving the relinquishment of one's right to require performance of a contract's condition, such as rent being due the first of each month. *See* Arthur Linton Corbin et al., *Corbin on Contracts* § 40.1 (rev. ed.), LexisNexis ("Waiver refers to excuse of conditions."); *see also Hull v. Allen*, 113 P. 1050, 1050 (Kan. 1911) (discussing waiver as a doctrine that does not vary a contract, but excuses "performance of [the waived] condition of the contract" and stating that "[t]he furnishing of an abstract, or other like condition, may be waived, and when waived . . . the appellant could only put appellee in default by a performance or offer of performance on his own part"). A landlord who accepts a late rent payment may have waived a lease condition requiring rent to be paid on the first of the month. *Id.* But he has not waived his right to collect the rent. *Id.* This latter right—the landlord's right to rent—can only be eliminated by discharge. *Id.*

Discharge occurs when "the legal duty of one of the parties has been annulled or extinguished; [or] one or more of the legal relations of the parties is deemed satisfied without any continuing legal obligation." *Id.* § 67.1 (footnotes omitted). Here, § 5(c) contains no conditional promises. It just imposes rights and duties. And, Coshocton has not shown that any of CBC's rights or Coshocton's obligations were discharged. *See Belt v. Shepard*, 808 P.2d 907, 911 (Kan. Ct. App. 1991) (finding no discharge where defendant gave plaintiff "no consideration for the release and received no written release or document signifying an agreement" to discharge defendant's duty under the contract).

Second, even if the facts presented a basis for a waiver argument, the Lease Agreement includes an explicit no-waiver provision. Section 18(f) provides that "[n]o delay, waiver, indulgence or partial exercise by [CBC] of any right power, or remedy shall preclude" it from "any further exercise thereof of the exercise of any right, power or remedy in contract or law." Ex. 1 at 12. Kansas law imposes the burden on Coshocton, as the party asserting an affirmative defense, to prove facts warranting its application. *See Lyons ex rel. Lawing v. Holder*, 163 P.3d 343, 349–50 (Kan. Ct. App. 2007) (holding that waiver is an affirmative defense and so the proponent of the defense bears the burden of proof at trial). Given the Lease's explicit no-waiver provision, the court holds that Coshocton has failed to establish that CBC waived its right to seek a remedy for the derailed car, RFMX 464595.

<u>b.</u>   <u>Equitable Estoppel</u>

Coshocton also asserts an equitable estoppel defense to CBC's derailment claim. "Estoppel . . . is a judicial doctrine sounding in equity that effectively draws the sting of an existing legal right by preventing its enforcement." *Steckline Commc'ns*, 388 P.3d at 91. In other words, "estoppel is the legal inability to assert a right." *Id.* Though an equitable doctrine, estoppel may be used to "prevent[] one party from enforcing a contract against another." *In re PB&R*, 380 P.3d 234, 242 (Kan. Ct. App. 2016) (citing *Rockers v. Kan. Turnpike Auth.*, 991 P.2d 889, 894–95 (Kan. 1999)). And, a no-waiver clause does not preclude application of the doctrine. *See Steckline Commc'ns*, 388 P.3d at 91.

Because Coshocton is the party asserting equitable estoppel as a defense, it must prove that CBC has, by its "acts, representations, admissions, or silence when [CBC] . . . had a duty to speak, induced [Coshocton] . . . to believe certain facts existed . . . [and that Coshocton] reasonably relied and acted upon such belief and would now be prejudiced if [CBC] were

permitted to deny the existence of such facts." *Id.* at 91–92 (quoting *Owen Lumber Co. v. Chartrand*, 157 P.3d 1109, 1120 (Kan. 2007)). While some evidence exists to support a finding in Coshocton's favor on all of the doctrine's elements, the court finds that Coshocton has not carried its burden of proof. Coshocton's only grounds for estoppel are Grant Baker's email stating that CBC was not going to "press the issue" and that the parties would "deal with this [problem] at a later time,"[62] and CBC's five-year silence about RFMX 464595 after the parties' signed Schedule B1. These two circumstances, even when combined, do not warrant an estoppel precluding CBC from asserting its rights. Grant Baker's email was equivocal and no evidence suggests that CBC ever completely disclaimed its right to receive the $25,000 for RFMX 464595. *Cf. id.* at 92 (holding that estoppel applied where plaintiff remained completely silent about defendant's breach for seven years and reaped the benefits of a financial relationship as a result). Coshocton's second affirmative defense fails as well.

<u>c.</u>      <u>Set Off</u>

Coshocton's final affirmative defense contends that it may "set off for the depreciated value" of RFMX 464595. Doc. 233 at 13. The court is not altogether certain what this phrase means, but Coshocton has no claim to the set off it seeks.

In the traditional sense, the defense of set off would allow Coshocton to "set off against [CBC's] claim a judgment in [Coshocton's] favor and against [CBC]." *Read v. Jeffries*, 16 Kan. 534, 535 (1876); *see also id.* at 535–36 ("An action can be maintained on a judgment, and *e converso*, it can be set up in an answer and used as a defense." (citation omitted)). Coshocton supplied no facts to support applying this defense here.

If Coshocton meant to argue that the court should decrease CBC's damages for RFMX 464595—$25,000—by the amount CBC received for the car from Norfolk Southern, the court

---

[62] Ex. 219.

rejects that position. Nothing in the Lease Agreement, as it existed in October 2010, provides for such a set off. And, even if Norfolk Southern paid CBC $25,000[63] for RFMX 464595, CBC would not recover a windfall if Coshocton also paid $25,000 for the car. CBC is entitled to its expectation damages for Coshocton's breach. *See Source Direct*, 870 P.2d at 693.

Section 5(c) explicitly entitled CBC to recover $25,000 for RFMX 464595 from Coshocton. Neither § 5(c) nor any other Lease provision precluded CBC from also recovering the car's depreciated value from the damaging railroad under the AAR Rules. *See* Ex. 1 at 10, § 15 ("The $25,000 value is a stipulated loss value for the casualty of a railcar regardless of its AAR Rule 107 depreciated value."). Although it might seem unwise for Coshocton to have entered into a contract that allows CBC to recover twice for one derailed car, that is the contract Coshocton made with CBC. Coshocton's set-off defense fails.

### 5.  *Conclusion*

Under § 5(c) of the Lease—as it existed in October 2010—Coshocton owed a duty to pay CBC the stipulated value of RFMX 464595. Coshocton never paid that stipulated value, so it breached § 5(c). Coshocton has failed to establish an affirmative defense for its breach, so the court awards CBC the $25,000 value stipulated by the Lease as damages.[64]

### C.  **Pre-Judgment Interest Claim**

CBC seeks $15,000 in pre-judgment interest based on Coshocton's breach of § 5(c). In Kansas, a party may recover pre-judgment interest in a breach of contract action starting from the date the claim became liquidated. *Phelps Dodge Copper Prods. Corp. v. Alpha Constr. Co.*, 455

---

[63] The court uses this figure for illustrative purposes only; the record does not reveal how much Norfolk Southern paid CBC. Trial Tr. 1360:20–1361:5.

[64] In the Pretrial Order, Coshocton also mentions anticipatory repudiation, alleged prior material breaches by CBC, and recission as affirmative defenses. It did not raise any of these as defenses to CBC's derailment claim in its Proposed Findings. The court thus does not address any of them here.

P.2d 555, 558–59 (Kan. 1969). A claim becomes liquidated when "there is no uncertainty as to the amount which is due or the date on which it becomes due." *Arrowhead Constr. Co. of Dodge City, Kan. v. Essex Corp.*, 662 P.2d 1195, 1203 (Kan. 1983) (citation omitted), *disapproved of on other grounds by Wichita Sheet Metal Supply, Inc. v. Dahlstrom & Ferrell Constr. Co.*, 792 P.2d 1043 (Kan. 1990). But, "the fact that a good-faith controversy exists as to whether the party is liable for the money does not preclude a grant of prejudgment interest." *Blair Constr., Inc. v. McBeth*, 44 P.3d 1244, 1251 (Kan. 2002) (citations omitted). And, "the existence of a set-off, counterclaim, or cross claim which is unliquidated will not prevent the recovery of" pre-judgment interest. *Phelps Dodge Copper*, 455 P.2d at 559 (citation omitted). Ultimately, the decision whether to grant pre-judgment interest is assigned to the court's discretion. *Blair Constr.*, 44 P.3d at 1251–52.

Here, one could argue, the $25,000 due for RFMX 464595 was not certain until the court issued this Decision because Coshocton contended that, even if it was liable for RFMX 464595, it was not liable for the full $25,000 because its liability should be decreased by whatever funds CBC recovered from Norfolk Southern. The court is not persuaded by this argument. Coshocton did not base its position on the Lease Agreement as it existed when RFMX 464595 derailed. And, Coshocton never asserted that the parties had agreed on an amount less than the $25,000 stipulated to by the Lease. *Cf. Arrowhead Constr. Co.*, 662 P.2d at 1203 (affirming district court's denial of pre-judgment interest because the "[a]ppellants claim[ed] there was never a firm contract and if there was, the price was $1.25 per square foot" so the debt was disputed and therefore "was not liquidated until the trial court found there was a contract for $1.35 per square foot and entered judgment accordingly"). The court finds that the amount Coshocton owed CBC was certain.

But the date when Coshocton's debt became due was not certain. CBC sent Coshocton an invoice for RFMX 464595 in December 2010. However, in an email sent on January 3, 2011, Grant Baker told Coshocton that CBC was "not going to press the issue at this time," explaining that the parties disagreed about the Lease's terms but that he advised Coshocton to "just keep paying your rent on the 29 cars you have and [we] will deal with this at a later time." Ex. 219. In the same email, Mr. Baker also told Coshocton that he was "not saying [CBC is] going to do anything" about the $25,000 invoice. *Id.* The court finds that CBC's communications prevent the December 2010 invoice from qualifying as a debt due by a certain date. A reasonable lessee easily could have understood Mr. Baker's statements to mean that no debt currently was due and owing. And, CBC did not request payment for RFMX 464595 again until it filed its final Amended Counterclaim on October 30, 2015. These facts, though insufficient to support Coshocton's estoppel defense, persuade the court that CBC should not recover pre-judgment interest beginning December 2010. Instead, these facts persuade the court to exclude from its pre-judgment interest award the era of uncertainty created by Mr. Baker's January 2011 email and CBC's ensuing silence. Exercising its discretion, the court thus awards CBC pre-judgment interest only for the period from October 30, 2015, to the entry of judgment in this case under the rate chosen by 28 U.S.C. § 1961.[65] The court now turns to CBC's final derailment claim.

### D. Lost-Rent Claim

CBC also contends that Coshocton owes lost rent on RFMX 464595. CBC seeks $17,800 in lost rent based on the period from November 2010 to September 2016. Doc. 165 at 10. This claim lacks merit.

---

[65] *Compressed Gas Corp., Inc. v. U.S. Steel Corp.*, 857 F.2d 346, 353 (6th Cir. 1988) (applying § 1961 to diversity case).

Section 5(c) of the Lease provides that rent will abate on any car that is not derailed by Coshocton or its agents if the car is "not re-railed after ten (10) days." Ex. 1 at 3. This provision also directs that rent will be "reinstated as of the date of re-railment." *Id.* RFMX 464595 never was re-railed and Norfolk Southern, not Coshocton, caused the derailment. So, under § 5(c)'s plain language, Coshocton ceased to owe rent on the derailed car 10 days after it derailed.[66] The court finds for Coshocton on this claim.

### E. Conclusion

In sum, the court finds for CBC on its stipulated-value claim based on RFMX 464595. It grants CBC $25,000 in damages on that claim as well as pre-judgment interest from October 30, 2015, until judgment is entered. But the court finds for Coshocton on CBC's lost-rent claim.

## VIII. Late Fee Provision Claims

In the Pretrial Order, CBC preserved a claim for late fees for its return condition and prior damage claims. CBC bases its claim for late fees on sections 4(d) and 6(c) of the Lease. Doc. 165 at 26. CBC contends that these provisions entitle it to recover late fees because Coshocton failed to pay CBC for maintenance, cleaning, and repairs under § 6(c), which makes Coshocton's failure to pay for those costs subject to the 5% late-fee provision in § 4(d). Coshocton responds that the Lease only permits late fees on past-due rent.

Section 6(c) provides, in relevant part, that

[Coshocton] shall, within thirty (30) days after notification that [CBC] has paid a bill for maintenance, repair or cleaning for which [Coshocton] is responsible, reimburse [CBC] for such payment which shall be deemed to be additional rent due hereunder.

---

[66] A second reason exists to deny at least part of CBC's lost-rent claim. Had it not derailed, RFMX 464595 would have gone off the Lease in August 2013 like the other 29 cars under the Lease and Schedule A. CBC would not have received rent on RFMX 464595 after that date.

Ex. 1 at 4–5.  So, by its plain language, § 6(c) treats all costs that CBC paid to clean the cars, repair Lessee Maintenance Items, and make the cars suitable for grain service as rent due under the Lease.  Section 4(d), found in the "Rent" section and titled "Late Payment Penalty," provides:

> [Coshocton] agrees to pay a late fee of 5% per month on any amount due hereunder not paid on or before the due date.  The late fee is applicable to payment only and in no way is a recoupment or setoff for other fees due under this Lease, nor does it limit [CBC's] rights under this Lease.

*Id.* at 3.  So, because the Lease classifies § 6(c) repair and cleaning costs as rent, any overdue bills for those costs are subject to late fees under § 4(d).[67]

But, CBC is not entitled to all the late fees it seeks.  CBC proved only that Coshocton has failed to reimburse CBC for cleaning the cars and patching roof leaks.  *See supra* p. 77.  The court has concluded that all of CBC's other claims for payment under § 6(c) fail.  *See id.*  CBC thus is entitled to late fees only on the costs it incurred for cleaning the cars and patching roof leaks.  Coshocton would have the court deny CBC even these late fees because CBC never billed Coshocton for the cleaning-cost and roof-repair damages that the court has granted.  But the court finds this argument unsupported by the Lease Agreement's terms.  The fact that the court awards CBC damages in an amount less than the invoiced amount does not change the fact that Coshocton received bills from CBC for cleaning costs and return-related roof repairs but did not pay them.

The court thus awards CBC $7,121 in late fees under § 4(d) based on Coshocton's failure to reimburse CBC for the cleaning and return-related roof repair costs that CBC incurred.  Nothing is simple in this case and so it is with the late fees calculation.  CBC did not submit

---

[67] Judge Lungstrum's summary-judgment ruling addressed CBC's indemnity claims under sections 8 and 17.  *See* Doc. 110 at 27.  But it did not reach the issue the court now decides.

invoices for all 74 railcars at the same time so the late-fee owed varies, car-by-car. Appendix A summarizes the calculation producing the court's late-fees award.[68]

CBC asks the court to award post-judgment interest at the 5% late-fee rate under § 4(d) instead of the statutory rate applied to post-judgment interest set by 28 U.S.C. § 1961. "[P]arties may contract to, and agree upon, a post-judgment interest [rate] other than that specified in § 1961." *In re Riebesell*, 586 F.3d 782, 794 (10th Cir. 2009) (citation omitted). "But to do so, they must specifically contract around the general rule that a cause of action reduced to judgment merges into the judgment and the contractual interest rate therefore disappears for post-judgment purposes." *Id.* (citation and footnote omitted). "If parties want to override the general rule on merger and specify a post-judgment interest rate, they must express such intent through clear, unambiguous and unequivocal language." *Id.* (citation omitted). No such overriding language exists in § 4(d) or elsewhere in the Lease. And, the Lease's choice-of-law provision "is insufficient to avoid § 1961." *Id.* (citation omitted). The court thus denies CBC's request.

## IX.     Attorneys' Fees and Litigation Expenses

As referenced at the outset, CBC claims all (or nearly all) of its attorneys' fees and litigation expenses incurred for every claim discussed in this Decision. In total, CBC claims $643,403 for fees and litigation expenses. The court found it easiest to address all of CBC's fees and expenses claims together, and undertakes that task now.

CBC claims that three Lease provisions support its attorneys' fees claims: sections 8, 17, and 12(b). Sections 8 and § 17's fees provisions are embedded in those sections' indemnification language. In contrast, § 12(b) allows CBC to recover attorneys' fees whenever an Event of Default occurs under § 12(a) and CBC seeks redress for that Event under § 12(b).

---

[68] The Lease does not entitle CBC to recover compounded late fees.

Because § 8 and § 17 are so similar, the court addresses the parties' arguments under those two provisions together. It then considers their arguments under § 12(b).

### A.    Attorneys' fees and Expenses Under § 8 and § 17

In its Proposed Findings and Trial Brief, CBC fails to articulate how § 8 and § 17 provide a basis to award the attorneys' fees and expenses it seeks. But, the Pretrial Order and CBC's Statement of Contentions make CBC's position clear: CBC theorizes that an award under these two provisions properly measures the damages CBC incurred because Coshocton breached both provisions.[69] In other words, CBC does not argue that sections 8 and 17 entitle it to attorneys' fees because it has prevailed on some of its breach of contract claims. Instead, CBC seeks attorneys' fees under those provisions because Coshocton improperly refused CBC's request for indemnification and thereby breached § 8 and § 17.

Because CBC seeks fees under § 8 and § 17 as damages caused directly by Coshocton's breach of those provisions, CBC must first prove that Coshocton breached § 8 or § 17. The court already has considered CBC's breach claims under both provisions and found for Coshocton. *See supra* p. 108. The court thus finds against CBC on its claims for attorneys' fees under § 8 and § 17.

### B.    Attorneys' fees and Expenses Under § 12(b)

Section 12(b) allows CBC to recover "all its costs and expenses including reasonable attorneys, fees and expenses in enforcing its rights and remedies." Ex. 1 at 7. But a prerequisite to this kind of recovery is an "Event of Default" meeting § 12(a)'s definition of that term. *Id.* CBC's claims rely on two such Events of Default: (a) § 12(a)(i), "[t]he nonpayment by

---

[69] *See* Doc. 186 at 6 ("In CBC's own words: 'Because [Coshocton] has not indemnified [CBC] for any of these attorneys' fees or costs, [CBC] is claiming that it has been directly damaged by [Coshocton] in breaching the indemnification provisions and that [CBC's] direct damages for this aspect of the indemnification breach is the amount of all attorneys' fees and costs incurred.'" (quoting CBC's Motion to Bifurcate, Doc. 167 at 4)).

[Coshocton] of any sum required herein to be paid by [Coshocton] within fifteen (15) days after the date such payment is due"; and (b) § 12(a)(ii), "[t]he breach by [Coshocton] of any other term or condition of this Lease which is not cured within thirty (30) days." *Id.* (emphasis omitted).

Coshocton contends that no Event of Default occurred under § 12(a)(ii) because CBC never provided Coshocton notice of any breach. But nothing in § 12(a)(ii) or the Lease as a whole required CBC to provide Coshocton with notice before calling an Event of Default under § 12(a)(ii). Perhaps it is unusual that § 12(a)(ii) includes a right to cure but provides no right to notice of the default to be cured. But Kansas law permits parties to form unusual agreements and, indeed, many aspects of the Lease Agreement prove that point. To say it plainly, Coshocton has not persuaded the court that a notice requirement exists and the court is not free to invent one. The court can apply § 12(a)(ii) based on its plain language and it turns to that task next.

Under the plain language of § 12(a)(i) and (ii), several Events of Default occurred here. Coshocton's failure to reimburse CBC for cleaning the cars and patching roof leaks constituted Events of Default under both § 12(a)(i) and (ii). Coshocton's failure to pay late fees on those cleaning and repair costs also constituted Events of Default under both § 12(a)(i) and (ii). Coshocton's breach of the subleasing and insurance provisions of the Lease constituted Events of Default under § 12(a)(ii) only. And Coshocton's breach of the Lease's derailment provision constituted an Event of Default under both § 12(a)(i) and (ii).

But, to recover attorneys' fees and expenses under § 12(b), CBC must do more than prove an Event of Default. Based on its plain language, § 12(b)'s attorneys'-fees provision depends on CBC "enforcing its rights and remedies," which are defined in § 12(b)(i) through

(v).[70]  Ex. 1 at 7.  CBC relies on § 12(b)(ii) here.  Doc. 233 at 19, 36, 58, 88.  It provides CBC

with the right to "[p]roceed by any lawful means to enforce performance by [Coshocton] of this

Lease and/or to recover damages for any breach thereof."  Ex. 1 at 8.  So, because CBC has not

brought a claim seeking specific performance, it must "recover damages for [a] breach" of the

Lease Agreement before it can recover attorneys' fees and expenses under § 12(b).  *See id.*

CBC has proven that Coshocton breached the Lease in seven places:  (a) § 5(c) by failing

to pay for RFMX 464595; (b) § 13(b)(i) by failing to reimburse CBC for cleaning the cars; (c)

§ 13(b)(i) by failing to reimburse CBC for patching roof leaks on return; (d) § 4(d) by failing to

pay late fees on CBC's cleaning costs; (e) § 4(d) by failing to pay late fees on CBC's roof-leak

repair costs; (f) § 15 by failing to carry the required insurance; and (g) § 18(b) by failing to

notify CBC of some subleases.  But, CBC has not recovered damages for all of these breaches.

The court has awarded CBC damages on just the first five breaches.  CBC thus may recover

attorneys' fees and expenses under § 12(b) for those five breaches only.

This conclusion makes CBC a prevailing party under Federal Rule of Civil Procedure

54(d).  So, that rule controls how CBC may recover its fees and expenses.  The court exercises

its discretion to establish an appropriate procedure to resolve the attorneys' fees dispute and

orders the parties to comply with D. Kan. Rule 54.2.  *See Fusion, Inc. v. Neb. Aluminum

Castings, Inc.*, No. 95-2366-JWL, 1997 WL 51227, at *26 (D. Kan. Jan. 23, 1997) (ordering the

parties to comply with D. Kan. Rule 54.2 even though "Local Rule 54.2 applies by its terms to

statutory attorneys' fees" (citation omitted)).  The clock on CBC's duties under D. Kan. Rule

54.2 starts with the entry of this Decision.  If the parties cannot agree on an award of attorneys'

fees, CBC must file the documents required by D. Kan. Rule 54.2(c) no later than 30 days after

---

[70] At closing argument, CBC asserted that even defending against a lawsuit was "enforcing its rights and remedies"
as that phrase is used in § 12(b) of the Lease Agreement.  Section 12(b) does not include language broad enough to
support this argument.

the date of this Decision. If the parties have not agreed within 30 days but believe they could reach an agreement if provided more time, CBC may move to extend this deadline.

As the parties begin their discussions under D. Kan. Rule 54.2, the court emphasizes the scope of CBC's award. CBC can recover attorneys' fees and expenses only for the work its attorneys performed on CBC's § 5(c) derailment claim; § 13(b)(i) cleaning-costs claim; § 4(d) cleaning-costs claim; § 13(b)(i) roof-repair claim; and § 4(d) roof-repair claim. To amplify this directive, CBC's approach to forum attorney fees will not serve as a good model for the parties' forthcoming fee discussions.

## X.       CBC's Motion to Re-Open the Evidentiary Record

On February 8, 2017, CBC filed a Motion to Re-Open the Evidentiary Record. Doc. 237. In this Motion, CBC asks the court to reopen the evidence so that it may submit attorneys' fees records for time spent on the case after October 31, 2016. *Id.* at 1. To the extent that CBC's motion seeks to introduce records that are not part of the elements of any claims it pursed at trial, Rule 54(d)(2) and D. Kan. Rule 54.2 control and so no reason exists to re-open the evidence. And, to the extent that CBC's motion seeks to introduce records as part of the elements of its claims to attorneys' fees under the Lease's indemnity provisions, no reason would justify re-opening the evidence for that reason. The court has ruled against CBC on those claims. The court denies CBC's Motion to Re-Open the Evidentiary Record.

## XI.      Conclusion

In sum, the court awards CBC $44,465.50 and grants CBC pre-judgment interest on RFMX 464595's stipulated value, beginning October 30, 2015, and ending when judgment is entered. The court also orders the parties to attempt to resolve CBC's attorneys' fees claims

without intervention by the court using the procedures established by D. Kan. Rule 54.2.  And, the court denies CBC's Motion to Re-Open the Evidentiary Record.

**IT THEREFORE IS ORDERED THAT**, for reasons stated above, the court awards counterclaim-plaintiff Caldwell-Baker Company $44,465.50 in damages.

**IT IS FURTHER ORDERED THAT** counterclaim-plaintiff Caldwell-Baker Company's Motion to Re-Open the Evidentiary Record (Doc. 237) is denied.

**FINALLY, THE COURT DIRECTS** the Clerk of the Court to enter without delay a Judgment in CBC's favor for $44,465.50.  Such a Judgment comports with the Supreme Court's directive in *Ray Haluch Gravel Co. v. Central Pension Fund of the International Union of Operating Engineers and Participating Employers*, 134 S. Ct. 773, 777 (2014).  The court also treats CBC's pending request for attorney's fees as "a timely motion for attorney's fees . . . made under [Federal Rule of Civil Procedure] 54(d)(2)."  *Id.* at 781.  And, consistent with the Supreme Court's directive in *Ray Haluch*, the court orders under Rule 58(e) that "the motion have the same effect as a timely motion under Rule 59 for purposes of Federal Rule of Appellate Procedure 4(a)(4)."  *Id.*  While the parties ultimately must make their own decisions, *Ray Haluch* notes that such a motion "delays the running of the time to file an appeal until the entry of the order disposing of the fee motion."  *Id.* (citing Fed. R. App. P. 4(a)(4)(A)(iii)).

**IT IS SO ORDERED.**

**Dated this 22nd day of August, 2017, at Topeka, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**

**Appendix A**

| Car | Invoice Date | Cleaning[71] | Roof Labor[72] | Roof materials | Total | Late Fee Per Month[73] | Total Late Fee |
|-----|-----|-----|-----|-----|-----|-----|-----|
| 10480 | 1/11/16 | 100 | | | 100 | 5 | 90 |
| 464100 | 1/13/16 | 100 | 25.75 | 24 | 149.75 | 7.49 | 134.82 |
| 464115 | 4/5/16 | 100 | 13 | 12 | 125 | 6.25 | 93.75 |
| 464137 | 1/13/16 | 100 | | | 100 | 5 | 90 |
| 464166 | 4/5/16 | 100 | | | 100 | 5 | 75 |
| 464198 | 4/1/16 | 100 | 17.25 | 16 | 133.25 | 6.66 | 99.9 |
| 464202 | 1/13/16 | 100 | | | 100 | 5 | 90 |
| 464214 | 4/1/16 | 100 | 112 | 104 | 316 | 15.80 | 237 |
| 464217 | 1/11/16 | 100 | 6.5 | 6 | 112.5 | 5.63 | 101.34 |
| 464218 | 6/9/16 | 100 | | | 100 | 5 | 65 |
| 464220 | 1/13/16 | 100 | | | 100 | 5 | 90 |
| 464227 | 1/13/16 | 100 | 10.75 | 10 | 120.75 | 6.04 | 108.72 |
| 464242 | 5/11/16 | 100 | | | 100 | 5 | 70 |
| 464244 | 1/11/16 | 100 | | | 100 | 5 | 90 |
| 464245 | 1/11/16 | 100 | 25.75 | 24 | 149.75 | 7.48 | 141.81 |
| 464272[74] | 1/11/16 | 0 | | | 0 | 0 | 0 |
| 464276 | 1/13/16 | 100 | | | 100 | 5 | 90 |
| 464288 | 5/11/16 | 100 | | | 100 | 5 | 70 |
| 464295 | 1/11/16 | 100 | | | 100 | 5 | 90 |
| 464307 | 4/1/16 | 100 | | | 100 | 5 | 75 |
| 464316 | 1/11/16 | 100 | | | 100 | 5 | 90 |

[71] The amounts in this column represent $25 per hour times four hours per car.

[72] The court arrived at the amounts in this column by dividing the dollar-amount charged in CBC's BRCs by $65—the labor rate that CBC used, according to Keaton Baker's testimony. The quotient of this equation represents the hours of labor charged for that railcar. The court then multiplied that quotient by $25, which is CBC's actual labor cost per hour of labor. This equation produced the amounts shown in the "Roof Labor" column.

[73] The court arrived at these late-fee amounts by multiplying the total amount owed per car—calculated in the "Total" column—times 5% per month, then multiplying the product of this equation by the number of months that Coshocton's payment is late.

[74] Though CBC submitted a BRC for this car, that BRC did not include an entry for pressure washing the car.

| Car | Invoice Date | Cleaning | Roof Labor | Roof materials | Total | Late Fee Per Month | Total Late Fee |
|---|---|---|---|---|---|---|---|
| 464366 | 1/13/16 | 100 | 38.75 | 36 | 174.75 | 8.74 | 157.32 |
| 464373 | 1/11/16 | 100 | | | 100 | 5 | 90 |
| 464397 | 4/1/16 | 100 | | | 100 | 5 | 75 |
| 464413 | 1/11/16 | 100 | 66.75 | 62 | 228.75 | 11.44 | 205.92 |
| 464416 | 1/11/16 | 100 | | | 100 | 5 | 90 |
| 464422[75] | 4/1/16 | | | | 0 | 0 | 0 |
| 464428 | 1/11/16 | 100 | | | 100 | 5 | 90 |
| 464436 | 4/1/16 | 100 | 13 | 12 | 125 | 6.25 | 93.75 |
| 464440 | 1/11/16 | 100 | 19.5 | 18 | 137.5 | 6.88 | 123.84 |
| 464451 | 4/5/16 | | | | 0 | 0 | 0 |
| 464453 | 1/11/16 | 100 | | | 100 | 5 | 90 |
| 464457 | 1/11/16 | 100 | 6.25 | 0 | 106.25 | 5.31 | 95.58 |
| 464461 | 1/11/16 | 100 | | | 100 | 5 | 90 |
| 464468 | 1/13/16 | 100 | 17.25 | 16 | 133.25 | 6.66 | 119.88 |
| 464482 | 1/11/16 | 100 | 150.75 | 105 | 355.75 | 17.78 | 320.21 |
| 464492 | 5/11/16 | 100 | 445.25 | 309.75 | 855 | 42.75 | 598.50 |
| 464512 | 4/1/16 | 100 | | | 100 | 5 | 75 |
| 464520 | 1/13/16 | 100 | | | 100 | 5 | 90 |
| 464530 | 1/11/16 | 100 | | | 100 | 5 | 90 |
| 464536 | 1/11/16 | 100 | | | 100 | 5 | 90 |
| 464538[76] | 5/20/16 | 100 | | | 100 | 5 | 70 |
| 464549 | 5/20/16 | 100 | | | 100 | 5 | 70 |
| 464557 | 4/1/16 | 100 | | | 100 | 5 | 75 |
| 464573 | 4/1/16 | 100 | | | 100 | 5 | 75 |
| 464575 | 6/1/16 | | | | 0 | 0 | 0 |

[75] Exhibit 203 contained no CBC BRC for RFMX 464422, RFMX 464451, or RFMX 464575.

[76] Exhibit 211 contained two invoices—both purporting to be the original, correct invoice—for RFMX 464538, RFMX 464549, RFMX 464798, RFMX 464805, and RFMX 464841. The first invoice—titled "CG005"—discloses that it was created on February 3, 2016. The second invoice—also titled "CG005"—discloses that it was created on May 20, 2016. Because CBC bears the burden of proof on its late-fees claim, the court calculates the late fee for these railcars based on the later date: May 20, 2016.

| Car | Invoice Date | Cleaning | Roof Labor | Roof materials | Total | Late Fee Per Month | Total Late Fee |
|---|---|---|---|---|---|---|---|
| 464576 | 1/11/16 | 100 | | | 100 | 5 | 90 |
| 464582 | 1/11/16 | 100 | | | 100 | 5 | 90 |
| 464606 | 1/11/16 | 100 | | | 100 | 5 | 90 |
| 464612 | 1/11/16 | 100 | 8.5 | 8 | 116.5 | 5.83 | 104.94 |
| 464616 | 6/1/16 | 100 | | | 100 | 5 | 65 |
| 464632 | 1/11/16 | 100 | | | 100 | 5 | 90 |
| 464646 | 1/13/16 | 100 | | | 100 | 5 | 90 |
| 464687 | 4/1/16 | 100 | | | 100 | 5 | 75 |
| 464695 | 4/5/16 | 100 | | | 100 | 5 | 75 |
| 464747 | 5/11/16 | 100 | | | 100 | 5 | 70 |
| 464755 | 4/1/16 | 100 | | | 100 | 5 | 75 |
| 464765 | 4/1/16 | 100 | | | 100 | 5 | 75 |
| 464776 | 1/11/16 | 100 | | | 100 | 5 | 90 |
| 464783 | 4/5/16 | 100 | | | 100 | 5 | 75 |
| 464798 | 5/20/16 | 100 | | | 100 | 5 | 70 |
| 464805 | 5/20/16 | 100 | | | 100 | 5 | 70 |
| 464811 | 4/1/16 | 100 | | | 100 | 5 | 75 |
| 464819 | 5/11/16 | 100 | | | 100 | 5 | 70 |
| 464826 | 1/11/16 | 100 | | | 100 | 5 | 90 |
| 464828 | 1/11/16 | 100 | | | 100 | 5 | 90 |
| 464837 | 4/1/16 | 100 | | | 100 | 5 | 75 |
| 464841 | 5/20/16 | 100 | | | 100 | 5 | 70 |
| 464857 | 4/1/16 | 100 | | | 100 | 5 | 75 |
| 464861 | 1/13/16 | 100 | | | 100 | 5 | 90 |
| 464884 | 1/11/16 | 100 | 10.75 | 10 | 120.75 | 6.04 | 108.72 |
| 464898 | 6/1/16 | 100 | | | 100 | 5 | 65 |
| 464903 | 4/1/16 | 100 | | | 100 | 5 | 75 |
| 464914 | 4/1/16 | 100 | | | 100 | 5 | 75 |
| TOTALS | | 7000 | 987.75 | 772.75 | 8760.5 | | 7121.00 |